Kevin COOPER, Petitioner–Appellant,

v.

Jill L. BROWN, Warden, California State Prison at San Quentin, Respondent–Appellee.

No. 05–99004.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 9, 2007.

Filed Dec. 4, 2007.

Norman C. Hile and Ali Kazemi, Orrick, Herrington & Sutcliffe LLP, San Francisco, CA, for the petitioner.

Holly D. Wilkens, Deputy Attorney General, State of CA, San Diego, for the respondent.

Before: PAMELA ANN RYMER, M. MARGARET McKEOWN, and RONALD M. GOULD, Circuit Judges.

Opinion by Judge RYMER; Concurrence by Judge McKEOWN.

RYMER, Circuit Judge:

Kevin Cooper appeals the district court's denial of his third federal petition for a writ of habeas corpus. Sitting en banc, we held that Cooper made out a prima facie case that entitled him to file a second or successive application; author-

ized him to file it; and remanded for the district court to order that two tests be performed so that "the question of Mr. Cooper's innocence can be answered once and for all." *Cooper v. Woodford,* 358 F.3d 1117, 1124 (9th Cir.2004). The two tests were a mitochondrial test of blond hairs found in one of the victim's hands, and a test for the presence of the preservative agent EDTA on a bloody T-shirt that was not part of the prosecution's case at trial but that Cooper specifically asked, on appeal, to have tested. On remand, the district court conducted the mitochondrial DNA testing on the hairs and EDTA testing on the T-shirt. The results do not show Cooper's innocence. The court also held extensive evidentiary hearings at which forty-two witnesses testified with respect to all issues encompassed in Cooper's third application. In a 159–page ruling that comprehensively addresses each of the claims, then-Chief United States District Judge Marilyn L. Huff denied the petition on the merits and, alternatively, on the ground that Cooper's claims in the successive petition are procedurally barred. Order Denying Successive Petition for Writ of Habeas Corpus (May 27, 2005) (Order) (attached as Appendix A).

Cooper sought, and we provisionally granted, a Certificate of Appealability (COA) on whether the district court abused its discretion by denying discovery, necessary forensic testing, evidentiary hearings, and a request to expand the record; whether he is entitled to relief on his claims of actual innocence, that the state contaminated or tampered with key evidence, that the state failed to disclose material exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and that Josh Ryen's testimony was unreliable; and whether he demonstrated multiple constitutional errors without which the jury would have returned a not guilty or non-capital verdict. We leave the COA in

place, but we see no abuse of discretion in any respect and we agree with, and adopt, the district court's analysis on each of the claims.

Accordingly, we affirm.

I

Cooper was convicted of the first-degree murders of Franklyn Douglas Ryen, Peggy Ryen, his wife, Jessica Ryen, their 10–year old daughter, and Christopher Hughes, an 11–year old neighborhood friend of Joshua Ryen, the Ryen's 8–year old son who was brutally assaulted but lived. Following his conviction, Cooper was sentenced to death.

Cooper escaped from the California Institute for Men (CIM), a state prison, on Thursday, June 2, 1983, and hid out in a vacant house (the Lease house) next door to the Ryens' residence on Thursday night, all day Friday, and Friday night before the murders on Saturday night, June 4. Using a hatchet or axe and a knife that came from the Lease house, Cooper hacked to death Doug, who had 37 separate wounds, Peggy, who had 32 separate wounds, Jessica, who had 46 wounds that included carving on her chest, and Christopher, who had 26 wounds. Cooper inflicted chopping wounds to the head, and stabbing wounds to the throat, of Joshua. Christopher's father found the bodies late Sunday morning.

The facts are set out in meticulous detail in the district court's order. Order at 892–917; 954–61. Suffice it to summarize here that Cooper admitted staying in the Lease house; a blood-stained khaki green button identical to buttons on field jackets issued at the state prison from which Cooper escaped was found on the rug at the Lease house; tests revealed the presence of blood in the Leases' shower and bathroom sink; hair found in the bathroom sink was consistent with that of Jessica and Doug

Ryen; a hatchet covered with dried blood and human hair that was found near the Ryens' home was missing from the Lease house, and the sheath for the hatchet was found in the bedroom where Cooper had stayed; Cooper's semen was found on a blanket in the closet of the Lease house; one drop of blood (A–41) that belongs to an African–American male, which Cooper is, was found on the wall of the Ryen hallway opposite where Jessica was found and post-trial DNA testing confirms that Cooper is the source of A–41; plant burrs found inside Jessica's nightgown were similar to burrs from vegetation between the Lease house and the Ryen house, and to burrs found on a blanket inside the closet where Cooper slept at the Lease house, and in the Ryen station wagon, which was missing when the bodies were discovered but turned up, abandoned, in Long Beach; two partial shoe prints and one nearly complete one found in or near the Ryens' house and in the Lease house were consistent both with Cooper's shoe size and Pro–Keds Dude tennis shoes issued at CIM that Cooper did not deny having; a hand-rolled cigarette butt and "Role–Rite" tobacco provided to inmates at CIM was in the Ryens' vehicle, and similar tobacco was in the bedroom of the Lease house; and a hair fragment found in the Ryen station wagon was consistent with Cooper's pubic hair. Cooper checked into a hotel in Tijuana about 4 o'clock on Sunday afternoon.

The district court's order likewise recounts the procedural history from Cooper's February 19, 1985 conviction. Order at 15696–703. In sum: the judgment of conviction and sentence was affirmed by the California Supreme Court, which observed that the "sheer volume and consistency of the evidence is overwhelming," *People v. Cooper*, 53 Cal.3d 771, 837, 281 Cal.Rptr. 90, 129, 809 P.2d 865 (1991), and the United States Supreme Court denied a petition for certiorari, *Cooper v. California*, 502 U.S. 1016, 112 S.Ct. 664, 116 L.Ed.2d 755 (1991). Cooper's first federal petition, subsequently amended and supplemented, was filed August 11, 1994, and denied August 25, 1997; we affirmed, *Cooper v. Calderon*, 255 F.3d 1104 (9th Cir. 2001) (*Cooper I*); and his petition for a writ of certiorari was denied, 537 U.S. 861, 123 S.Ct. 238, 154 L.Ed.2d 100 (2002). Cooper filed a second federal petition on April 20, 1998, which we construed as an application for authorization to file a second or successive petition and denied. *Cooper v. Calderon*, 274 F.3d 1270 (9th Cir.2001) (*Cooper II*). He sought to file another successor petition that involved DNA testing and tampering, which we denied, *Cooper v. Calderon*, No. 99–71430 (9th Cir. Feb. 14, 2003, April 7, 2003) (orders). Meanwhile, Cooper filed seven petitions in the California Supreme Court together with a writ of mandate and various motions, a habeas petition in the San Diego County Superior Court, and six other petitions for a writ of certiorari in the United States Supreme Court as well as two petitions for habeas corpus, each of which was denied. Cooper's February 2, 2004 petition to the California Supreme Court raised similar claims to those asserted in this application; that court denied all claims on the merits on February 5, 2004, and also denied as untimely those having to do with evidence tampering, failure to disclose exculpatory evidence, submission of false testimony to the jury, and offering Joshua Ryen's unreliable testimony. On February 6, 2004, Cooper filed another application to file a successive application, which was initially denied, *Cooper v. Woodford*, 357 F.3d 1019 (9th Cir.2004), *withdrawn*, 357 F.3d 1054 (9th Cir.2004), but was later granted after this court sua sponte decided to rehear the application en banc, *Cooper v. Woodford*, 357 F.3d 1054 (9th Cir.2004). En banc, we authorized Cooper's third habeas petition to be filed,

and stayed execution pending resolution of this application. *Cooper,* 358 F.3d at 1124 (*Cooper III* ).

The district court denied the petition and denied Cooper's request for a COA. Judgment was entered on May 31, 2005. When Cooper then filed a request for a COA in this court, we allowed the appeal to go forward conditioned upon further consideration once briefing was completed. The state asks that we withdraw the COA, but we decline to do so. 28 U.S.C. § 2253(c); *Miller–El v. Cockrell,* 537 U.S. 322, 335–37, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). This means that Cooper has leave to assert that even though the district court allowed the testing that we ordered, it abused its discretion in how the tests were conducted and in the scope of the evidentiary hearings that it held; and to appeal denial of claims one through four (actual innocence, contamination or tampering with evidence, *Brady* violations, and unreliability of Joshua Ryen testimony), and six through nine (unlawful destruction of bloody coveralls, ineffective assistance of counsel for failing to present evidence of another person's confession, ineffective assistance of counsel in failing to connect the bloody coveralls to Lee Furrow, ineffective assistance of counsel in failing to introduce evidence that victims were clutching hair in their hands, and denial of constitutional rights by cumula-

tive law enforcement errors and misconduct) of his third petition.

## II

Standards of review under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) are well-known and are fully set out in the district court's order. *See* Order at 917–22. However, the framework for analyzing an actual innocence "gateway" claim under *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), remains unsettled. There is a question whether such a claim is governed by the *Schlup* standard itself, or by the AEDPA conditions for filing a second or successive application, 28 U.S.C. §§ 2244(b)(2)(B)(i) and (ii).[1] *Cf. House v. Bell,* 547 U.S. 518, 126 S.Ct. 2064, 2078, 165 L.Ed.2d 1(analyzing a *first* habeas petition seeking consideration of defaulted claims based on a showing of actual innocence under *Schlup* rather than AEDPA). However, this need not detain us for Cooper fails to meet either standard.

Beyond this, a district court's decision to exclude expert testimony is reviewed for an abuse of discretion. *Stilwell v. Smith & Nephew, Inc.,* 482 F.3d 1187, 1191 (9th Cir.2007). "The trial court has wide discretion in determining whether particular scientific tests are reliable enough to permit expert testimony based upon their results." *United States v. Gil-*

1. To make a successful claim under *Schlup,* "a petitioner must show that in light of all the evidence, including new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.' " *Carriger v. Stewart,* 132 F.3d 463, 478 (9th Cir.1997) (en banc).

For authorization to file a second or successive application for habeas corpus under AEDPA, a petition must show that
(B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

(ii) the facts underlying the claim, if proven and viewed in light of the evidence a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.
28 U.S.C. §§ 2244(b)(2)(B)(i) and (ii). *See Cooper III,* 358 F.3d at 1119 (discussing the differences but finding it unnecessary to decide which standard applies).

*lespie*, 852 F.2d 475, 480 (9th Cir.1988) (citations omitted). The determination whether an expert witness has sufficient qualifications to testify is reviewed for an abuse of discretion. *United States v. Abonce–Barrera*, 257 F.3d 959, 964(9th Cir.2001).

■ We also review a district court's decision to permit or deny discovery in habeas proceedings for an abuse of discretion. *Bittaker v. Woodford*, 331 F.3d 715, 728 (9th Cir.2003) (en banc). Such discovery is available only "for good cause."[2] *Hayes v. Woodford*, 301 F.3d 1054, 1065 n. 6 (9th Cir.2002). "We review for an abuse of discretion the district court's denial of an evidentiary hearing and the scope of an evidentiary hearing held." *Williams v. Woodford*, 384 F.3d 567, 586 (9th Cir.2004).

## III

We first consider issues that relate to whether the district court abused its discretion as Cooper contends it did in denying discovery, failing to order forensic testing, limiting what he could show at evidentiary hearings, and refusing to expand the record on certain claims. Many of these issues are interwoven with the merits of claims one through four and six through nine, but Cooper raises discrete procedural challenges that we treat separately as best we can because, if the district court did not abuse its discretion in these procedural rulings, we agree with its other determinations. Necessarily there is overlap; to the extent there is, and reference to the district court's discussion on the merits is helpful to understanding its procedural rulings, we incorporate (without repeating) its analysis.

## A

Cooper complains that the district court denied the bulk of his discovery requests, but focuses on only three of them:[3] his request for photographs and documentation of the examination and testing of the bloodstained T-shirt, blood drop A–41, and the cigarette butts V–12 and V–17; San Bernardino Sheriffs Department (SBSD) files reviewed by Deputy Derek Pacifico after Cooper filed his third habeas petition as part of an investigation into whether CIM Warden Midge Carroll had or had not contacted SBSD before trial with *Brady* information regarding shoeprint evidence; and his request for test data of Dr. Gary Siuzdak, one of the EDTA testing experts selected by the court, when Siuzdak withdrew his results after discovering EDTA contamination in his laboratory. Cooper offers only a sketchy explanation why denying these requests, without prejudice, abused the court's discretion. We discern no basis for concluding that it did.

The state produced materials relating to the post-conviction DNA testing in 2001 and these materials were also exhibits in the evidentiary hearing conducted by the district court. We cannot see how denying discovery as to these materials mattered at all.

Warden Carroll's January 30, 2004 declaration stated that she had learned before

---

**2.** Rule 6(a) of the Rules Governing Section 2254 Cases provides:

> (a) A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery.

**3.** Cooper's briefing mentions other requests, *e.g.*, for discovery related to instructions to investigating authorities at the time of the murders to stop pursuing evidence pointing to someone other than Cooper, and of the notes of San Bernardino Sheriffs Department (SBSD) investigators who, after the third petition was filed, investigated employees and patrons of the Canyon Corral Bar on the night of the murders. However, he develops no argument with respect to them and we deem appeal as to these denials, and others, abandoned.

trial—and had communicated to one of the lead detectives on the Cooper case—that the shoes CIM carried were not specially designed prison-issue shoes and were common shoes available to the general public through Sears and other such retail stores.[4] Because the en banc court was persuaded that a *Brady* violation appeared to be indicated, *see Cooper III,* 358 F.3d at 1120–21, the district court set an evidentiary hearing to address Cooper's claim that the prosecution failed to disclose Carroll's information. It heard testimony from Carroll; Lt. Donald Smith, a former investigator at CIM under Carroll; Don P. Luck, a former executive and sales manager for Stride Rite Corporation, the company that manufactured the Pro–Keds Dude tennis shoe; and Sandra Coke, the defense investigator who obtained declarations from Carroll, James Taylor, a CIM inmate who testified at trial that he gave Pro–Keds Dude tennis shoes to Cooper, and Detective Derek Pacifico of SBSD.[5] Carroll's files about Cooper's escape and the murder investigation were also in evidence. They are extremely detailed and include records of telephone conversations; however, they contain no indication that she spoke with the SBSD about tennis shoes worn by CIM inmates. In part for this reason, the court did not abuse its discretion in concluding that Cooper's request for all SBSD files reviewed by Pacifico was unjustified by the possibility that Pacifico's review may have overlooked SBSD documents reflecting a communication that Carroll's own detailed files do not show. In addition, the prosecution's theory was not that Pro–Keds Dude shoes were limited to prison inmates (the Stride Rite records introduced at trial showed distribution to other government institutions), but that there was a link between the imprints found at and near the Ryen house and in the Lease house to Cooper, who never denied having a pair of Pro–Keds Dude shoes. Contracts from Stride Rite that were in evidence at trial show that CIM purchased 1,390 Pro–Keds Dude shoes. Carroll herself had no personal knowledge whatsoever about the availability of the tennis shoes at CIM or elsewhere. Thus, even if she had called SBSD as her declaration avers, all that she could have communicated was her *belief* that Pro–Keds Dude shoes weren't available at CIM but were available at places like Sears—which is both mistaken and immaterial. Consequently, her communication could not have had any appreciable bearing on a *Brady* claim. *Cf. Pham v. Terhune,* 400 F.3d 740, 743 (9th Cir.2005) (noting that discovery under Rule 6(a) should not be denied if it is essential to develop fully a petitioner's claim).

Finally, the court acted within its discretion in denying access to Dr. Siuzdak's

---

4. Although the district court cited a phone slip with the name of "Midge Carroll" dated 9/19/83 and two pages of notes from trial counsel David Negus's files, its determination does not depend upon proof that Negus knew about Carroll's investigation of the tennis shoes. There was, therefore, no need for Cooper to have been allowed to expand the record to correct this error, if any. For this reason, the court neither abused its discretion nor ignored the truth, as Cooper contends, in denying his Motion to Expand the Record Pursuant to Rule 7.

5. Carroll was, of course, known to Cooper from day one. She had contact with defense investigators before and after trial. Carroll's availability to Cooper would not necessarily derogate the state's affirmative *Brady* obligation to disclose material exculpatory information that it knew about, but her accessibility does highlight the lack of any meaningful connection between the breadth of Cooper's request and the possibility of adducing favorable, material information that would tend to exculpate him. It is unlikely that the SBSD would have thought itself capable of suppressing information that Carroll herself could easily have provided to Cooper.

data. His EDTA test results did not reflect the expected results from the PBS buffer reagent blank control and so were unreliable. Contamination was not remarkable, as laboratories use EDTA in testing. As Suizdak's results were unreliable, they could not be used to prove Cooper's tampering claim.

B

Cooper contends that the district court's testing protocol for the bloody T-shirt was flawed in five respects: (1) while the court facially complied with the en banc order allowing only Cooper to select a stain from the T-shirt for limited anti-clotting agent testing, it refused to allow presumptive blood testing to determine whether the stain tested was even a blood stain; (2) it did not allow his experts, Dr. Peter De-Forest and Dr. Kevin Ballard, to view the T-shirt as a first step in designing the protocol; (3) it accepted at face value Dr. Gary Siuzdak's retraction of his EDTA testing results; (4) it denied testing for anti-clotting agent migration; and (5) it denied testing for other anti-clotting agents such as citric acid that were used to preserve Cooper's blood. He also maintains that while the district court facially complied with this court's order to perform mitochondrial DNA testing to determine whether hairs at the crime scene belonged to a third party perpetrator, the testing ignored the recommendation of Dr. Edward Blake to evaluate unexamined groups of hair. As a result, Cooper submits, a large group of hairs was never examined for anagen roots (roots that indicate the hair was pulled instead of having been cut or broken), and thus hairs in that group were never considered for testing. He also argues that the Cooper DNA against which the hairs were examined was contaminated and therefore could not prove that he was a possible source of the hairs. We disagree that the district court abused its discretion in conducting either test.

The district court held a tutorial on mitochondrial DNA and EDTA testing at which experts for Cooper and the state testified. At the tutorial, Cooper's expert, Dr. Terry Melton, explained that mitochondrial testing cannot be used effectively to identify the source of hairs, but rather is primarily an exclusionary method as it determines only whether a hair shares maternal DNA with a particular individual. The court developed a protocol and ordered that ten hairs suitable for testing from Jessica's hands be tested for mitochondrial DNA and that two hairs (one found on Doug Ryen's hand and one on Chris Hughes's arm) identified in 2001 as having anagen roots also be tested. Dr. DeForest, Cooper's criminalist, selected the hairs. Two proved to be animal hairs, and tests on the remaining hairs could not exclude Jessica, Peggy, Josh or their maternal relatives as donors. Therefore, the results of mitochondrial DNA tests did not indicate that these hairs were pulled out of the head of a third party perpetrator.

With respect to testing the T-shirt for the purpose of determining whether the blood, previously associated with Cooper's DNA, had been planted, the district court developed the EDTA protocol over a three-month period and after extensive input from counsel and the experts. Upon the parties' recommendation, the court also adopted a "control" method of testing in which the amount of EDTA detected in a stain would be compared to the amounts of EDTA found in various control swatches and from other non-stained portions of the T-shirt. Pursuant to the protocol, the stain was to be extracted by Dr. DeForest and shipped to Dr. Ballard and Dr. Suizdak for double-blind EDTA testing. After the test results were submitted, the parties proposed a protocol for DNA testing to determine whether the main stain fabric cut-out from the EDTA testing contained Cooper's blood. From the results of that

testing, Cooper could not be excluded as a contributor of the DNA extracted from the cut-out, while Peggy Ryen, Jessica Ryen, Josh Ryen, Doug Ryen and Chris Hughes were each eliminated as a possible contributor. The court ultimately concluded that EDTA testing lacks sufficient indicia of reliability to be admissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). However, the court alternatively found that Dr. Ballard's results disprove Cooper's theory of tampering because Cooper's theory requires a high level of EDTA presence in the blood, but the EDTA level in the stain with blood was actually lower than that of most of the control areas. *See* Order at 933–50 (describing process and making EDTA findings).

■ Turning to Cooper's contentions about testing of the T-shirt, we note at the outset that it is immaterial whether the EDTA tests were flawed or not because the district court had discretion to conclude that EDTA testing does not meet *Daubert* standards. "In *Daubert,* the Court set out four factors to be reviewed when applying Rule 702:(1) whether the theory or technique can be or has been tested, (2) whether the theory or technique has been subjected to peer review, (3) whether the error rate is known and standards exist controlling the operation of the technique, and (4) whether the theory or technique has gained general acceptance." [6] *United States v. Benavidez–Benavidez,* 217 F.3d 720, 724 (9th Cir.2000). There is no evidence in the record that application of mass spectrometry to forensic analysis of blood evidence to determine EDTA levels can be or has been tested. The technique has been offered to courts only twice before; in one case, there was no challenge to the EDTA evidence and in the other, Dr. Ballard, as well as the EDTA testing that he was to perform, were rejected by the court. EDTA testing has not been subjected to peer review and there has been no discussion of forensic EDTA testing in scientific literature since a 1997 article that headlines the need for a better analytical method. In short, for reasons explained in detail by the district court, Order at 942–48, EDTA testing has not gained general acceptance in the scientific community.

Regardless, Cooper fails to explain why additional inspection of the T-shirt was necessary, for an appropriate stain and controls were selected after 6G, the stain that was initially selected, proved unavailable because it had already been consumed. Dr. DeForest did not participate in this selection because he had removed himself, but Cellmark—a laboratory that Cooper agreed was highly qualified—replaced him to conduct the extraction. No basis appears in the record to question selection of the stain that was used, and Cooper points to none on appeal. Dr. Maddox of Cellmark and the state's expert, Steven Myers, selected an area between two stains designated "6J" and "6K," each of which had earlier been found to be blood containing primarily Cooper's DNA.

---

6. Federal Rule of Evidence 702 governs admissibility of scientific evidence in federal district court. *Clausen v. M/V NEW CARISSA,* 339 F.3d 1049, 1055 (9th Cir.2003). It provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Nor does any reason appear why Dr. Suizdak's representations should not have been accepted at face value; the testing he was to undertake was double-blind, he is a well respected scientist, and he had no interest in the outcome.

Cooper never asked for presumptive blood testing before the protocol was implemented, which is sufficient reason to reject his argument on appeal; in any event, as DNA analysis on the tested area later confirmed that Cooper could not be excluded as a contributor of the DNA extracted from the cut-out, there is no point to his complaining now about the lack of presumptive testing. Likewise, Cooper articulated no concern before the test results were in about the possibility that EDTA could have migrated from the selected stain. Regardless, if his post-hoc migration theory were correct, it would be theoretically impossible to achieve meaningful results from further testing as there is no way to determine whether the background EDTA levels throughout the shirt are higher than normal for there is no "normal" base level of EDTA.

Finally, Cooper's suggestion that testing for *other* anti-clotting agents such as citric acid should have been allowed is misplaced as the only occasion where his blood was preserved in a tube containing citric acid was when it was drawn by the San Quentin Prison, not by the SBSD, and the only blood sample of Cooper's to which the SBSD had access was drawn into a tube containing EDTA as a preservative. Further testing on the T-shirt was, therefore, not required.

Neither was the mitochondrial DNA testing deficient as Cooper argues. By way of background, Cooper's forensic expert (Dr. Blake) and Department of Justice criminalist Steven Myers spent six days in 2001 jointly conducting visual and microscopic examination of approximately 1000 hairs recovered from the victims' bod-

ies in order to identify hairs that had properties of hair pulled from the skin. Only hairs with anagen roots can be used to identify an assailant because only they, as contrasted with a cut or broken hair, can indicate that the victim may have pulled the perpetrator's hair in a struggle. Three hairs meeting the experts' criteria were identified, but nuclear DNA testing of these hairs yielded no human DNA. Responsive to the en banc ruling, the district court allowed Cooper's criminalist to select up to 10 hairs from those removed from Jessica's hands for mitochondrial DNA testing. No anagen hairs were identified and the 10 hairs selected were tested along with the two remaining hairs subjected to nuclear DNA testing in 2001. The results show that Jessica, Peggy, and Josh Ryen could not be excluded as the source of the hairs in Jessica's hands.

Cooper contends that the court turned its back on its "own expert's" view that hair testing must be designed to ensure that it is complete and thorough, but the premise is faulty on two accounts. First, the expert referred to—Dr. Blake—was not the court's expert, as Cooper characterizes him; he was *Cooper*'s expert in state court and has been throughout the federal proceedings, and did not become otherwise solely on account of his appointment by the court for the purpose of assuring adequate compensation. More importantly, Dr. Blake did not recommend that *every* hair be examined, as Cooper suggests. To the contrary, Blake testified that "[t]he only reason to go through this process one more time is simply to be much more rigorous and detailed in the survey, should that be deemed to be a useful thing to do." He never opined that it *would be* useful or reasonable.

Cooper's argument that his blood sample was contaminated is beside the point. The hairs were never examined to see if

they came from *Cooper,* and there has never been any evidence or suggestion to that effect. Rather, Cooper's theory was that the hairs came from *a third party,* that is, from the real killer, and if this could be shown, then the presence of a third party at the scene would prove his innocence. That is why the en banc court ordered mitochondrial testing. *See* 358 F.3d at 1124 (noting that mitochondrial testing of the blond or light brown hair in Jessica Ryen's hand, if favorable to Cooper, could positively identify Lee Furrow or perhaps others as the killer or killers). Thus, even if Cooper's sample were contaminated, it is irrelevant.

C

Cooper maintains that the district court refused to allow him to present evidence related to the three suspicious men in the Canyon Corral Bar. This is belied by the record. *See* Order at 961–69. He points to exclusion of Al Warren, a bartender who was not present on the night of the murders, for whom his only proffer was that Warren was "presumably" privy to discussion of the incident. Having heard from the bartender who was on duty (Edward Lelko), the manager, the waitress who served the three men drinks, two patrons who saw the three men, another waitress who was working that night, a bouncer, and others who frequented the Canyon Corral, the court had discretion to decline to hear another bar employee who was not percipient. Cooper also points to limited inquiry into witness tampering with Lance Stark. Stark testified that before the evidentiary hearing, he was approached by an individual wearing a white, short sleeve shirt and driving a white, unmarked Ford Crown Victoria with a computer extending out from the dashboard on an arm, whom he believed to be a member of law enforcement and who made it clear that it would be in Stark's best interest not to talk about the Cooper case. However, the court had

discretion to find that Cooper's request for further inquiry would be a wild goose chase as Cooper had no license plate or other information that might lead to the driver, and to conclude that it would be unlikely to produce anything of probative value. Stark testified, so the incident did not inhibit him and even if it were law-enforcement related as he speculates, it would have no tendency to prove what happened at the Canyon Corral Bar.

Cooper also submits that the court improperly refused to allow him to examine Daniel Gregonis, the SBSD criminalist responsible for examining and testing several items of evidence including the bloodstained T-shirt, blood drop A–41, and the cigarette butts V–12 and V–17. However, Cooper was given an evidentiary hearing in state court in 2003 to present evidence of his tampering claims, and Gregonis testified and was examined by Cooper's counsel. He had an opportunity to develop a record, and the district court was not obliged to provide another one.

■ The same is true to the extent Cooper contends that further testing is needed in general to show that these items, blood spots identified as the "UU Series," and a blood sample drawn from him at the time of his arrest (VV–2) were tampered with. Each claim is procedurally barred and, in addition, both the tampering with the UU Series claim and the planting of cigarette butts claim have been previously adjudicated. *See, e.g., Cooper v. Calderon,* No. 92–CV–427H at 41, 50–51. As we have explained, it doesn't matter to any of Cooper's claims whether his blood sample (VV–2) was contaminated or not; it wasn't used for anything material.

Cooper also insists that the fact that the size of one of the cigarettes (V–12) changed by 3 millimeters after having been unrolled for testing demonstrates tampering, but his position was rejected by

the San Diego County Superior Court after an evidentiary hearing and Cooper has not overcome the deference due that determination under 28 U.S.C. § 2254(d). The first measurement (4 mm) was of a "butt," whereas the second measurement (7 mm) is one of two dimensions given for "burned paper in box 7x7 mm." It is clear that the second measurement is of *unrolled paper*, whereas the first measurement is of the *rolled butt*. That the dimensions would be different is self-evident, and the difference in no way calls into question the state court's finding or requires further inquiry at this stage.

Cooper continues to assert that the bloody T-shirt is connected to at least one of the perpetrators and that the district court limited the evidence he was allowed to develop and present to show tampering. This goes nowhere for reasons we have just explained. Nor did the district court abuse its discretion in not allowing Cooper to recall Dr. Ballard to clarify the reliability of his testing methods, to state that he could test for other anti-clotting agents, and to testify to the reliability of his laboratory; or to cross-examine experts with respect to anti-clotting agent testing; or to cross-examine Dr. Suizdak and Dr. Lewis Maddox, who prepared the stain solutions for testing. To the extent relevant and helpful, ample opportunity for expert input and consultation was afforded.

■ Cooper also faults the district court for refusing to permit him to pursue examination of informant Albert Anthony Ruiz, who testified at an evidentiary hearing on August 6, 2004, about what he might have heard from sources other than law enforcement in San Bernardino County. The asserted relevance was to Cooper's *Brady* claim that the prosecution failed to disclose evidence from Ruiz that law enforcement was ordered to plant evidence inculpating Cooper. We see no abuse of discretion, as Ruiz did not work for and had no dealings

with SBSD and had no direct information about the investigation. All that he could possibly have learned was secondhand public information recounted by Jim Parsons, a deputy with the Riverside County Sheriff's Department who submitted a declaration himself and who, in any event, had no involvement in the Cooper case or knowledge of it beyond what he read in the papers or saw on television. In light of this, the court committed no error in excluding information that was hearsay and speculation as well as immaterial to SBSD's *Brady* obligations.

Cooper's contention that the district court improperly refused to allow him to uncover and present evidence regarding daily logs and a blue shirt listed on the log for June 6, 1983, fails as no evidence contradicts the state's submission that the log was available to Cooper before trial. Cooper's counsel represented to the trial judge that he had the daily logs. The issue could, and should, have been pursued long before now. *See* Order at 994–97.

Cooper argues that he was precluded from fully exploring his tennis shoe claims by the court's refusal to allow him to review the records Pacifico reviewed and to send written questions to Michael Newberry, who worked for Stride Rite Corporation and testified at trial that Stride Rite had a contract with CIM for Pro–Keds Dude tennis shoes that were not available in retail stores. We have already explained why the court did not abuse its discretion in declining to order discovery into all the SBSD files reviewed by Pacifico, and Cooper makes no proffer why questions to Newberry would shed any light on the contracts which were, themselves, in evidence, or on distribution of the Pro–Keds Dude shoe as to which there is no substantial dispute—except for Carroll's unfounded belief.

Cooper also complains that he was not allowed to cross-examine Josh Ryen in

connection with Claim Four, which asserts that Josh's testimony at trial was altered and unreliable. As the district court found, the facts and circumstances surrounding Josh Ryen's statements and how they were presented to the jury have been known for twenty years. The jury heard two taped statements pursuant to the parties' stipulation: a videotape of an interview on December 9, 1984 when Cooper's counsel and the prosecutor questioned Josh under oath, and an audiotape of a December 1, 1983 interview with Dr. Lorna Forbes, Josh's treating psychiatrist. He did not identify an assailant in either one, but said on the one hand that three Hispanic workers visited the ranch the day of the murders, and on the other that he saw a single man with a "puff" of hair standing over his mother. On April 22, 2005, the district court allowed Josh Ryen, along with Christopher Hughes's parents, to make a statement about their views of the matter as victims.[7] Cooper argues that he should have been allowed an evidentiary hearing because the April 22, 2005 statement (during which Josh Ryen recalled a man with "bushy" hair) was a "third version" that further proves the ma-

nipulation, and unreliability, of the trial version. We disagree that the court abused its discretion.[8] Even accepting Cooper's position that Josh Ryen's April 22, 2005 statement satisfies the requirements for an evidentiary hearing in § 2254(e)(2) because the latest version could not have been discovered earlier, § 2254(e)(2)(B)[9] nevertheless applies to bar relief as the jury knew that Josh Ryen had given somewhat inconsistent accounts yet convicted Cooper anyway. We cannot conclude that no reasonable juror would have convicted Cooper knowing that Josh Ryen now recalls a man with bushy hair.

Finally, Cooper maintains that the district court purported to make credibility determinations of witnesses based solely on documents. Even if this weren't allowed (which it is, in appropriate circumstances), he points to no instances where this happened.

Accordingly, there is no basis to remand for examination and more testing of the evidence, or additional evidentiary hearings, as Cooper urges.

## IV

■ The district court denied Cooper's claim of actual innocence after detailing

---

7. This was after the close of evidence. The district court allowed Hughes and Josh Ryen an opportunity to make a statement consistent with Congress's intent in The Justice For All Act, Pub.L. No. 108–405, § 102, 118 Stat. 2260, 2261–62 (2004), that victims be heard.

8. Aside from noting that the jury never heard Josh's recollection of a man with bushy hair, the district court did not base its Claim Four determination on anything that Josh said in his victim statement. Rather, it found that the defense was benefited at trial by the taped presentations because Josh Ryen did not identify his assailant, the jury heard his earlier statement that three Hispanic workers had been at the ranch, and the stipulation avoided the sympathy factor of having Josh present on the stand. It concluded that deference was due to the state court's determinations and, as

Cooper has known about Josh's somewhat inconsistent versions since the murder, he failed to exercise due diligence in developing the factual predicate for a new evidentiary hearing. *See* Order at 14878–79; 28 U.S.C. § 2254(e)(2).

9. In relevant part, 28 U.S.C. § 2254(e)(2)(B) provides that an evidentiary hearing shall not be held on a claim unless it relies on a factual predicate that could not have been previously discovered through the exercise of due diligence, and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

the DNA evidence that shows he is the donor of the DNA extracted from the drop of blood found in the hallway outside the Ryen master bedroom (A–41), saliva from the hand-rolled and manufactured cigarette butts (as used at CIM) found inside the abandoned Ryen station wagon, and blood smears on the T-shirt found near the Canyon Corral Bar (even though it was not used to establish Cooper's guilt at trial); explaining why Cooper's challenge to the DNA evidence is unavailing; reviewing prior court findings that document overwhelming evidence of guilt; and considering the testimony from forty-two witnesses and numerous exhibits introduced at evidentiary hearings held after remand. Order at 950–84.

Cooper argues the district court was incorrect in light of substantial evidence of third party perpetrators in the Canyon Corral Bar and Albert Anthony Ruiz's testimony. That he didn't do it, Cooper suggests, is bolstered by his showing of alternative suspects through the Kenneth Koon confession and information concerning Lee Furrow and his bloody coveralls. We disagree, for reasons stated by the district court. *See* Order at 980–82; 983–84.

We agree with the district court's conclusion that all of Cooper's challenges "have come back the same: there is overwhelming evidence that Petitioner is the person guilty of these murders." Order at 15854. Considering all the evidence, new and old, Cooper has not shown that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *Schlup*, 513 U.S. at

327, 115 S.Ct. 851; *see House*, 126 S.Ct. at 2076–78(explaining the *Schlup* standard). Thus, Cooper meets neither *Schlup's* gateway nor AEDPA's.[10] It follows that Cooper has not met *Herrera's* standard for actual innocence. *Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993).

V

In discussing Cooper's procedural challenges, we have already indicated why he is not entitled to relief on his claim that the state contaminated or tampered with the evidence with respect to examination and testing of the T-shirt and the blood spot (A–41). The T-shirt, of course, was not used as evidence against Cooper so it is difficult to see how it could have had any inculpatory effect. Post-conviction, however, it has become the center of attention. *See, e.g., Cooper III*, 358 F.3d at 1124(observing that this case centers on Cooper's claim that he is innocent, and quoting his argument that with EDTA testing " 'the question of Mr. Cooper's innocence can be answered once and for all' "); *id.* (Silverman, CJ, concurring in part and dissenting in part) (noting that "[e]verything comes down to the bloody t-shirt"). The San Diego County Superior Court took evidence on the tampering claim and found none, and the California Supreme Court denied Cooper's petition for writ of mandate on the issue. EDTA testing turned up nothing to indicate tampering.

There was neither visible blood remaining on the paint chips comprising A–41 nor control areas around the blood sample for

10. In addition to finding that most of Cooper's allegations relate to evidence that was already presented at trial and previously rejected, and that the remainder rest on unreliable or incorrect information and source, the court concluded that Cooper did not meet his burden under 28 U.S.C. § 2244(b), which requires a factual claim not discoverable

through due diligence that establishes by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty, or under § 2254(d), which requires that the state court's decision be contrary to or an unreasonable application of clearly established federal law.

purposes of determining if there is a significant difference between the amounts of EDTA in the stain compared with areas surrounding it. Accordingly, for reasons it explained that are well-founded in the record, the district court concluded that A–41 is not able to be reliably tested for the presence of EDTA. Order at 948–50. This leaves in place the finding of the state court that no tampering occurred. Cooper offers no convincing evidence why that finding is not correct and entitled to deference.

To the extent his appeal extends beyond these items, we also agree with the district court's analysis that Cooper's claims of evidence tampering and withholding lack merit. *See* Order at 997–1000.

## VI

Cooper argues that the district court's analysis of his *Brady* claims was contrary to clearly established federal law as set forth in *Kyles v. Whitley*, 514 U.S. 419, 435–36 & n. 10, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), in that it analyzed each *Brady* claim individually without analyzing their cumulative effect. We agree with the district court's analysis with regard to the state's alleged withholding and manipulation of evidence related to shoeprints found in the Ryen home and hideout house, the bloody coveralls, the blue shirt, and the Canyon Corral Bar. As there is no individual *Brady* violation, there are no violations to cumulate.

Apart from what we have already discussed, the district court held an evidentiary hearing to evaluate Cooper's claim that he discovered in 1998 a disposition report initialed "KS" that contradicted Deputy Frederick Eckley's trial testimony that on his own, he had destroyed the coveralls that Diana Roper gave him. After considering the testimony of Eckley and Deputy Ken Schreckengost (the "KS" of "KS") and evaluating their credibility, the court found

that Eckley did act on his own in destroying the coveralls without discussing it with Schreckengost. So, as the district court held, the disposition report does not cast doubt on Eckley's testimony or undermine the prior findings and conclusions of the California Supreme Court or the district court's own determination that the coveralls were not material exculpatory evidence in Cooper's case. Order at 987–89. We are not firmly convinced this finding is wrong.

The district court rejected Cooper's contention that the prosecution failed to disclose that a police officer was present at the Canyon Corral Bar on the night of the murders based on extensive testimony about what actually happened that night and what it viewed as the more credible version of those events. Cooper's argument on appeal is insubstantial and leaves us without a firm conviction that the district court erred. As there was no police presence at the bar on the night of the murders, there was no evidence for the prosecution to suppress.

Cooper additionally alludes to the fact that Detective Timothy Wilson had information that three suspicious men were seen in the bar, which he passed on to the sergeant in charge of the Ryen/Hughes investigation but which the prosecution failed to disclose to Cooper. However, Cooper offers no suggestion why this information undermines confidence in the verdict. It was no secret that three strangers were at the bar. The district court found that the more credible version of events came from employees and patrons interviewed shortly after the murders who testified at trial. In any event, none of the witnesses casts doubt on the physical evidence of Cooper's guilt. As the court's exhaustive recital of all the Canyon Corral evidence— both that adduced at trial and at the evidentiary hearing—shows, *see* Order at 961–69, rumors that Wilson picked up from

word on the streets could not have been exculpatory, impeaching or material.

## VII

The district court noted that the jury heard two taped statements of Joshua Ryen, pursuant to stipulation, that benefited the defense because he did not identify his assailant, had earlier indicated that three Hispanic workers had been at the ranch, and was not on the stand to garner sympathy. The court deferred to denial of Cooper's constitutional claim on the merits by the California Supreme Court pursuant to 28 U.S.C. § 2254(d), and found that Cooper had not demonstrated that, but for constitutional error, no reasonable juror would have found him guilty if Josh Ryen had been subjected to testifying at trial. Order at 999–1001. We agree.

## VIII

Cooper's initial briefing posits that he is entitled to relief on his claim that SBSD unlawfully destroyed the bloody coveralls, and on his claims that trial counsel ren-

dered ineffective assistance in failing to present evidence of another person's confession to the murders, failing to connect the bloody coveralls to Lee Furrow, and failing to introduce evidence that victims were clutching hair in their hands. He pursues none of these claims in reply. Each has been adjudicated previously in one forum or another. And we are in accord with the district court's treatment of all these claims. *See* Order at 980–85.

## IX

Our conclusion that Cooper prevails on none of his claims moots his last submission, that his conviction and sentence were infected by multiple constitutional errors without which the jury would have returned a not guilty or non-capital verdict. As the district court, and all state courts, have repeatedly found, evidence of Cooper's guilt was overwhelming. The tests that he asked for to show his innocence "once and for all" show nothing of the sort.

AFFIRMED.

## APPENDIX A

Order Denying Successive Petition for Writ of Habeas Corpus (May 27, 2005)

United States District Court
Southern District of California

KEVIN COOPER, CAPITAL CASE Petitioner,

vs.

JILL L. BROWN, Acting Warden, San Quentin State Prison, Respondent.

CASE NO. 04–CV–656 H

Related cases 98–CV–818–H, 92–CV–427–H

### Order Denying Successive Petition for Writ of Habeas Corpus

Petitioner Kevin Cooper, a California state prisoner, brings this successive peti-

tion for writ of habeas corpus petition pursuant to 28 U.S.C. § 2254. He challenges his capital conviction for the first-degree murders of Franklyn Douglas Ryen ("Doug"), Peggy Ryen, his wife, Jessica Ryen, their 10–year–old daughter, and Christopher Hughes, an 11–year–old neighborhood friend, and the attempted murder of Joshua Ryen, the 8–year–old son of Doug and Peggy Ryen.

Petitioner's successive petition challenges post-conviction DNA test results that confirm that Petitioner is responsible for the Ryen/Hughes murders. (DOJ Physical Evidence Report dated July 2, 2002; Supplemental DOJ Physical Evidence Exam Report dated Sept. 24, 2002.)[1] These DNA tests were done pur-

---

1. (92–CV–427, Third Supplemental Notice of Lodgment ("NOL") filed Jan. 23, 2004, Ex.

suant to a Joint DNA Forensic Testing Agreement ("Joint DNA Agreement") entered on May 10, 2001.[2] Those results provide strong evidence of Petitioner's DNA from blood inside the Ryen residence (one in 310 billion), from saliva on two cigarette butts recovered from the stolen Ryen station wagon (one in 19 billion and one in 110 million), and from a T-shirt found on the side of a road that contained Petitioner's blood (one in 110 million) and victim Doug Ryen's blood (one in 1.3 trillion). (Supplemental DOJ Physical Evidence Exam Report dated Sept. 24, 2002.) In addition to the DNA evidence inculpating Petitioner, DNA profiles of blood taken from a hatchet that was taken from the house where Petitioner hid after his escape from prison matched that of several of the victims including Doug and Jessica Ryen and Chris Hughes. (Supplemental DOJ Physical Evidence Exam Report dated Sept. 24, 2002.)

On February 9, 2004, the Ninth Circuit granted Petitioner's request to file a successive petition for writ of habeas corpus in federal court and remanded the successive petition to this Court. *Cooper v. Woodford*, 358 F.3d 1117 (9th Cir.2004). The Ninth Circuit stated that Petitioner's guilt may be resolved through two scientific tests: (1) mitochondrial DNA testing of hairs found on the victims and (2) testing of the T-shirt for ethylene-diamine tetra-acedic acid ("EDTA") blood preservative. *Id.* at 1123–24. Having conducted mitochondrial DNA testing and EDTA testing, reviewed the parties' papers, heard testimony from forty-two witnesses, reviewed numerous exhibits, considered the prior record, and listened to the parties' oral arguments, this Court DENIES the successive petition for writ of habeas corpus.

## PROCEDURAL HISTORY

On February 19, 1985, Petitioner was convicted of four counts of first-degree murder (Cal.Penal Code § 187(a)) of Doug Ryen, his wife Peggy Ryen, their 10–year-old daughter Jessica Ryen and a neighborhood friend, 11–year–old Christopher Hughes. Petitioner was also convicted of attempted murder in the first degree (Cal.Penal Code §§ 664,187(a), 12022.7) of the Ryens' eight-year-old son Joshua, the severely wounded sole survivor. Petitioner also pled guilty to escape from a state prison. (Cal.Penal Code § 4530(b).) The jury found true an allegation of the special circumstance of multiple murders, (Cal.Penal Code § 190.2(a)(3)), as well as the allegation that Petitioner intentionally inflicted great bodily injury on the sole survivor, Joshua Ryen (Cal.Penal Code § 12022.7). The jury determined the penalty as death. On May 15, 1985, the trial court sentenced him to death.

On May 6, 1991, the California Supreme Court affirmed the judgment of conviction and sentence of death. *People v. Kevin Cooper*, 53 Cal.3d 771, 281 Cal.Rptr. 90, 809 P.2d 865 (1991). On June 26, 1991, the California Supreme Court denied Petitioner's petition for rehearing and issued its remittitur. On December 16, 1991, the United States Supreme Court denied Petitioner's first petition for writ of certiorari.

No. 4, DOJ Physical Evidence Exam Report dated July 2, 2002 ("DOJ Physical Evidence Report dated July 2, 2002"); 92–CV–427, Third Supplemental NOL filed Jan. 23, 2004, Ex. No. 5, Supplemental DOJ Physical Evidence Exam Report dated Sept. 24, 2002 ("Supplemental DOJ Physical Evidence Exam Report dated Sept. 24, 2002").)

**2.** (92–CV–427, Third Supplemental NOL filed Jan. 23, 2004, Ex. No. 23, Joint Forensic DNA Testing Agreement dated May 10, 2001.)

*Cooper v. California,* 502 U.S. 1016, 112 S.Ct. 664, 116 L.Ed.2d 755 (1991).

On March 24, 1992, Petitioner requested appointment of counsel and a stay of execution from this Court. On March 26, 1992, the first in a series of stays of execution was issued by this Court. *Cooper v. Calderon,* Case No. 92–CV–427 (*"Cooper I"*).

On August 11, 1994, Petitioner filed his first petition for writ of habeas corpus in this Court. *Cooper I,* 92–CV–427. On April 12, 1996, Petitioner filed an amended petition for writ of habeas corpus in this Court. *Cooper I,* 92–CV–427, Doc. No. 123. On June 20, 1997, Petitioner filed a supplemental petition for writ of habeas corpus with this Court. On August 25, 1997, following an evidentiary hearing, this Court denied Petitioner's first federal petition for writ of habeas corpus. *Cooper I,* 92–CV–427, Doc. No. 165. On September 16, 1997, Petitioner filed a motion and objections to the entry of judgment in this Court. *Cooper I,* 92–CV–427, Doc. No. 202. The Court denied Petitioner's motion on November 7, 1997. *Cooper I,* 92–CV–427, Doc. No. 208.

On April 4, 1996, Petitioner filed his first of seven state petitions for writ of habeas corpus in the California Supreme Court. *In re Cooper,* Case No. S052741. The California Supreme Court denied the first petition for writ of habeas corpus on February 19, 1997. (Answer, Ex. 1.)

On March 12, 1997, Petitioner filed a motion to recall the remittitur in the direct appeal in the California Supreme Court. *People v. Cooper,* Case No. S004687. The California Supreme Court denied Petitioner's motion to recall the remittitur on March 26, 1997. (Answer, Ex. 2.)

On September 12, 1997, Petitioner filed his second state petition for writ of habeas corpus in the California Supreme Court. (Answer, Ex. 3.) On September 30, 1997, Petitioner filed his second motion to recall the remittitur in the California Supreme Court, which was denied October 15, 1997. (Answer, Ex. 4.)

On April 26, 1998, during the pendency of his appeal to the Ninth Circuit Court of Appeals from this Court's denial of his first federal habeas petition, Petitioner filed a second petition for writ of certiorari in the United States Supreme Court in case number 97–8837 regarding this Court's denial of his first federal petition for writ of habeas corpus. On June 26, 1998, the United States Supreme Court denied the petition. *Cooper v. Calderon,* 524 U.S. 963, 118 S.Ct. 2392, 141 L.Ed.2d 757 (1998).

On April 30, 1998, Petitioner filed a second federal petition for writ of habeas corpus in this Court. *See Cooper v. Calderon,* Case No. 98–CV–818 (*"Cooper II"*). On June 15, 1998, this Court dismissed Petitioner's second petition for writ of habeas corpus for lack of jurisdiction and as impermissibly successive under 28 U.S.C. 2244(b)(1). *Cooper II,* 98–CV–818, Doc. No. 3. On June 25, 1998, Petitioner filed a motion in this Court to alter or amend the judgment dismissing his second federal petition for writ of habeas corpus. This Court denied the motion on June 30, 1998. *Cooper II,* 98–CV–818, Doc. No. 6.

On December 23, 1998, Petitioner filed his third state petition for writ of habeas corpus in the California Supreme Court. *In re Cooper,* Case No. S075527. On March 15, 1999, Petitioner filed a supplemental petition for writ of habeas corpus in the California Supreme Court in his third state habeas proceeding. *In re Cooper,* Case No. S075527. On March 26, 1999, while his third state habeas petition

was still pending, Petitioner filed a fourth state habeas corpus petition in the California Supreme Court. *In re Cooper,* Case No. S077408. On April 14, 1999, the California Supreme Court denied Petitioner's third and fourth state petitions for writ of habeas corpus. (Answer, Exs.5, 6.) On May 7, 1999, Petitioner filed a motion for clarification of rulings regarding his third state petition for writ of habeas corpus. The motion was denied on May 12, 1999. (Answer, Ex. 7.)

On July 9, 1999, Petitioner filed a third petition for writ of certiorari in the United States Supreme Court in case number 99–5303, challenging the denial of his third state habeas petition by the California Supreme Court. The United States Supreme Court denied the petition on October 4, 1999. *Cooper v. California,* 528 U.S. 897, 120 S.Ct. 229, 145 L.Ed.2d 192 (1999).

The Ninth Circuit affirmed the Court's denial of Petitioner's first federal habeas petition on July 9, 2001. *Cooper v. Calderon,* 255 F.3d 1104 (9th Cir.2001), *cert. denied,* 537 U.S. 861, 123 S.Ct. 238, 154 L.Ed.2d 100 (2002). On August 29, 2001, Petitioner filed a petition for rehearing and rehearing en banc. On January 8, 2002, the Ninth Circuit denied the petition.

On December 21, 2001, the Ninth Circuit denied Petitioner's request for authorization to file a second petition for writ of habeas corpus. *Cooper v. Calderon,* 274 F.3d 1270(9th Cir.2001). On February 4, 2002, Petitioner filed a petition for rehearing and rehearing en banc from the denial of authorization to file a second petition. The Ninth Circuit denied Petitioner's request on October 18, 2002. *Cooper v. Calderon,* 308 F.3d 1020 (9th Cir.2002), *cert. denied,* 538 U.S. 984, 123 S.Ct. 1793, 155 L.Ed.2d 677 (2003). On November 21, 2002, the Ninth Circuit denied Petitioner's motion to reconsider or vacate the order

denying his motion to stay the mandate pending the filing of a petition for writ of certiorari and request for en banc review regarding the denial of authorization to file a second federal habeas petition. *Cooper v. Calderon,* Case No. 98–99023.

On April 18, 2002, Petitioner filed his fourth petition for writ of certiorari in the United States Supreme Court in case number 01–10742. This fourth petition challenged the Ninth Circuit's affirmance of this Court's denial of Petitioner's first federal petition for writ of habeas corpus. *See Cooper,* 255 F.3d 1104. On October 7, 2002, the United States Supreme Court denied the petition. *Cooper v. Calderon,* 537 U.S. 861, 123 S.Ct. 238, 154 L.Ed.2d 100 (2002).

On February 11, 2003, Petitioner filed another petition for writ of habeas corpus in the United States Supreme Court in case number 02–9051. *See Cooper,* 274 F.3d at 1272. The United States Supreme Court denied the additional petition for writ of habeas corpus on April 21, 2003. *In re Cooper,* 538 U.S. 976, 123 S.Ct. 1793, 155 L.Ed.2d 696 (2003).

On February 14, 2003, the Ninth Circuit denied Petitioner's authorization to file a third federal petition for writ of federal petition for writ of habeas corpus in the District Court. *Cooper v. Calderon,* Case No. 99–71430. On April 7, 2003, the Ninth Circuit denied Petitioner's petition for rehearing and rehearing en banc from the denial of authorization to file a third federal petition for writ of habeas corpus. On February 20, 2003, Petitioner filed a fifth petition for writ of certiorari in the United States Supreme Court in case number 02–9050, regarding the Ninth Circuit's denial of authorization to file a second federal habeas petition in this Court. On April 21, 2003, the United States Supreme Court

denied the petition. *Cooper v. Calderon,* 538 U.S. 984, 123 S.Ct. 1793, 155 L.Ed.2d 677 (2003).

On May 15, 2003, Petitioner filed his second petition for writ of habeas corpus in the United States Supreme Court in case number 02–10760. The United States Supreme Court denied the petition on October 6, 2003. *In re Cooper,* 540 U.S. 808, 124 S.Ct. 92, 157 L.Ed.2d 254 (2003).

On June 13, 2003, the San Diego County Superior Court denied Petitioner's petition for writ of habeas corpus. (Answer, Ex. 8.) On October 22, 2002, Petitioner filed a motion seeking post-conviction mitochondrial DNA testing of hairs. On June 16, 2003, Petitioner filed a motion for post-conviction testing of a T-shirt to show evidence tampering by law enforcement personnel. (Answer, Ex. 9.) The Honorable William H. Kennedy of the San Diego County Superior Court held an evidentiary hearing on Petitioner's claim of evidence tampering and request for mitochondrial DNA testing on June 23–25, 2003. Following this post-conviction evidentiary hearing, the San Diego County Superior Court denied Petitioner's motions relating to evidence tampering and post-conviction DNA testing. (Answer, Ex. 9.)

On June 24, 2003, Petitioner filed his fifth state petition for writ of habeas corpus in the California Supreme Court. On October 22, 2003, the California Supreme Court denied the petition. (Answer, Ex. 10.) On July 22, 2003, Petitioner filed a petition for writ of mandate in the California Supreme Court, relating to the denial of his post-conviction DNA motion. *Cooper v. Superior Court,* Case No. S117675. The California Supreme Court denied the motion on October 22, 2003. (Answer, Ex. 11.)

On September 2, 2003, Petitioner filed a third motion to recall the remittitur in the California Supreme Court. *People v. Cooper,* Case No. S004687. On October 22, 2003, the California Supreme Court denied the motion. (Answer, Ex. 12.)

On December 17, 2003, the California Superior Court issued an execution date of February 10, 2004.(*See* Cal.Crim. Case No. 72787 filed Dec. 17, 2003.)

On January 20, 2004, Petitioner filed his sixth petition for writ of certiorari in the United States Supreme Court, in case number 03–8513, challenging the California Supreme Court's denial of his fifth state petition for writ of habeas corpus and an application for a stay. *Cooper v. California* The United States Supreme Court denied the petition and the application for a stay on February 9, 2004. *Cooper v. California,* 540 U.S. 1172, 124 S.Ct. 1197, 157 L.Ed.2d 1225 (2004).

On January 22, 2004, this Court held a telephonic status conference to set an expedited briefing schedule to allow for meaningful appellate review prior to the impending execution. Petitioner's counsel represented that the filings would not be done in the Southern District of California. Nevertheless, the Court urged the parties to proceed in an expeditious manner to permit an orderly and reasoned review of the issues.

On February 2, 2004, Petitioner filed a complaint in the United States District Court for the Northern District of California, pursuant to 42 U.S.C. § 1983, seeking a temporary restraining order, preliminary injunction, and expedited discovery on a claim that California's use of lethal injection violates the Eighth Amendment. *Cooper v. Rimmer,* Case No. 04–436. On February 6, 2004, the Honorable Jeremy Fogel, United States District Court Judge, issued an order denying the motions for

temporary restraining order, preliminary injunction, and expedited discovery. On February 8, 2004, the Ninth Circuit panel affirmed the district court's order. *Cooper v. Rimmer*, 358 F.3d 655 (9th Cir.2004).

On February 2, 2004, Petitioner filed his sixth petition for writ of habeas corpus and an emergency application for a stay of execution in the California Supreme Court. *In re Cooper*, Case No. S122389. The California Supreme Court denied the petition on the merits on February 5, 2004. (Answer, Ex. 13.)

On February 5, 2004, Petitioner filed a sixth volume of exhibits with the California Supreme Court in support of his sixth state habeas petition after the denial of his sixth petition. On February 6, 2004, the California Supreme Court deemed the submission a seventh state habeas corpus petition. *In re Cooper*, Case No. S122507. The California Supreme Court denied the seventh state habeas petition on the merits on February 9, 2004. (Answer, Ex. 14.)

On February 6, 2004, Petitioner filed an application for authorization to file a successive petition for writ of habeas corpus in the Ninth Circuit Court of Appeals. *Cooper v. Woodford*, Case No. 04–70578. On February 8, 2004, a three-judge panel denied Petitioner's application for authorization to file a successive petition. On February 7, 2004, Petitioner filed his seventh petition for writ of certiorari with the United States Supreme Court. *Cooper v. California*, 03–8773. The United States Supreme Court denied Petitioner's petition and application for stay on February 9, 2004. *Cooper v. California*, 540 U.S. 1172, 124 S.Ct. 1198, 157 L.Ed.2d 1225 (2004). On February 9, 2004, the Ninth Circuit sua sponte agreed to hear Petitioner's application en banc. *Cooper v. Woodford*, 357 F.3d 1019 (9th Cir.2004). On February 9, 2004, the en banc Ninth Circuit granted

Petitioner authorization to file his third habeas corpus petition with this Court. *Cooper v. Woodford*, 358 F.3d 1117 (9th Cir.2004).

On March 19, 2004, Respondent filed a petition for writ of certiorari with the United States Supreme Court, challenging the jurisdiction of the en banc court to grant authorization to file a successive petition in this Court. This petition for certiorari was denied on May 17, 2004. *Goughnour v. Cooper*, Case No. 03–1328.

On March 2, 2004, the mandate of the Ninth Circuit issued to this Court regarding the authorization to file a successive habeas petition. On April 2, 2004, Petitioner filed his third petition for writ of habeas corpus with this Court. Between April 2, 2004 and April 1, 2005, the Court ordered mitochondrial DNA testing, EDTA testing, heard testimony from forty-two witnesses, and reviewed numerous exhibits and extensive briefing. On April 22, 2005, the Court heard final argument on the successive petition and denied the petition on the merits, and alternatively, denied the petition on procedural grounds as reflected in this order.

## FACTS

Petitioner was sentenced to death for the "massacre of a mother, father, daughter, and houseguest in the sanctity of their home, and the attempted murder of the young son, the only person to survive." *Cooper*, 53 Cal.3d at 793, 281 Cal.Rptr. 90, 809 P.2d 865. "The jury convicted Cooper of hacking to death Franklyn Douglas Ryen (Doug) and Peggy Ryen, their 10–year–old daughter Jessica, and an 11–year–old houseguest, Christopher Hughes (Chris), inside the Ryen home near the California Institute for Men (CIM), a state prison in Chino. Eight-year-old Joshua

Ryen (Josh), although severely injured, survived. Two days before this execution of the innocent, defendant had escaped from CIM." *Cooper,* 53 Cal.3d at 794, 281 Cal.Rptr. 90, 809 P.2d 865. The California Supreme Court noted the "sheer volume and consistency of the evidence is overwhelming." *Cooper,* 53 Cal.3d at 837, 281 Cal.Rptr. 90, 809 P.2d 865.

After escaping from CIM prison on June 2, 1983, Petitioner hid in a vacant house owned by Larry Lease and brothers Roger and Kermit Lang ("hideout house") for two-and-one-half days before entering the Ryen house. *Cooper,* 53 Cal.3d. at 795–801, 281 Cal.Rptr. 90, 809 P.2d 865; *Cooper,* 255 F.3d at 1107–08; *Cooper I,* 92–CV–427, Aug. 25, 1997 Order at 2–3; (*see also* 87 RT 2959–62, 2967–70, 2991.) The hideout house was next door to the Ryen house, just 126 yards away. (4/22/05 Reporters' Transcript of Evidentiary Hearing ("HRT") 60; *Cooper,* 53 Cal.3d at 795, 281 Cal.Rptr. 90, 809 P.2d 865.); *Cooper,* 255 F.3d at 1107; *Cooper I,* 92–CV–427, Aug. 25, 1997 Order at 2, 22, 23.

At the time of these attacks, Petitioner was an escapee of both CIM, where he escaped by foot on June 2, 1983, and from custody in Pennsylvania. *Cooper,* 53 Cal.3d at 876, 281 Cal.Rptr. 34, 809 P.2d 809. In Pennsylvania, Petitioner kidnapped, raped, assaulted, and stole a car from a teenage girl who interrupted him while he was committing yet another residential burglary. *Cooper,* 53 Cal.3d at

840, 281 Cal.Rptr. 90, 809 P.2d 865; *Cooper I*, 92–CV–427, Aug. 25, 1997 Order at 48. He threatened to kill the victim during the attack. He had escaped from custody in Pennsylvania numerous times so that his escape from CIM was his twelfth escape. *Cooper I*, 92–CV–427, Aug. 25, 1997 Order at 22. Prior to his arrival in California, Petitioner had also been arrested, charged, and convicted several times of theft-related offenses. *Cooper*, 53 Cal.3d at 802, 840, 841, 281 Cal.Rptr. 90, 809 P.2d 865; *Cooper I*, 92–CV–427, Aug. 25, 1997 Order at 25.

In California, Petitioner was arrested, charged, and sentenced to state prison for two counts of residential burglary in Los Angeles County. *Cooper I*, 53 Cal.3d at 802, 281 Cal.Rptr. 90, 809 P.2d 865. Petitioner lied about his identity, background, and criminal history by using the false name of David Trautman. (92–CV–427, Third Supplemental NOL filed Jan. 23,

2004, Ex. 44, Case No. A–386448). Following his burglary conviction, Petitioner was designated to CIM on April 29, 1983, still using the false name of David Trautman. On June 1, he was transferred to a minimum-security portion of the prison from which he subsequently escaped. (85 Trial Reporters' Transcript ("RT")[3] 2596–97.)

On June 2, 1983 Petitioner arrived at the hideout house. Petitioner's own testimony and the physical evidence, including fingerprints, confirmed that Petitioner was at the hideout house next to the Ryen house at the time of the murders. (87 RT 2959–62, 2967–70, 2991.) The hideout house was down the hill and nearest to the Ryen house.

One of the murder weapons, a hatchet covered with dried blood and human hair, came from the hideout house where Petitioner hid. (87 RT 3004, 3072; 90 RT 3796–97.) Witnesses identified the hatchet as the one missing from the hideout house after the killing. (87 RT 3004, 3072.)

---

**3.** The Reporters' Transcripts from the original trial are designated by a "RT" and are lodged with the Court. Respondent used the photos in this order in its final habeas argument on April 22, 2005.

A local citizen discovered the hatchet on June 5, 1983 on the side of English Road, the only paved road leading from the Ryen home out of the immediate area. (89 RT 3519; 90 RT 3791.) The hatchet was covered by bloodstains; its head was covered by dried blood and human hairs. (90 RT 3797.) Some of the hairs were consistent with those of Doug and Josh Ryen. (96 RT 5015–16.) Dr. Irving Root, who performed the autopsies, concluded that the hatchet could have inflicted the chopping wounds

suffered by the victims. (90 RT 3870.) Post-conviction DNA testing confirmed that the blood came from the murder victims. (Supplemental DOJ Physical Evidence Exam Report dated Sept. 24, 2002.)

The hatchet had been kept in a sheath by the fireplace in the hideout house. (86 RT 2685, 2715, 2878–79, 3004.) On June 7, two employees of the owner of the hideout house, Richard Sibbitt and Perry Burcham, discovered the sheath to the hatchet lying on the floor near the bedroom where Petitioner slept. The bedroom had been previously occupied by Kathleen Bilbia, who lived in the hideout house in May. (86 RT 2859–60.) Bilbia recalled seeing it by the fireplace when she was cleaning the house. (86 RT 2685.) The sheath was not on the floor when Bilbia vacated the room. (86 RT 2677, 3004–05.)

Buck knifes, an eleven-inch hunting knife, and ice picks were missing from the hideout house. (86 RT 2860; 87 RT 3002–04.) The hunting knife could have inflicted the remaining injuries. (91 RT 3957.) A strap fitting one of the missing buck knives was found on the floor by the Bilbia

bedroom closet where Petitioner slept. (87 RT 3073.)

The victims died from numerous chopping and stabbing injuries from a hatchet. (90 RT 3835.) Doug Ryen suffered at least thirty-seven separate wounds. (90 RT 3835–71.) Two separate chop injuries fractured his skull. (90 RT 3838–39.) Five chop wounds to Mr. Ryen's skull were in a "tight pattern," indicating his skull was stationary when the blows were delivered. (90 RT 3841.) The blows appear to have been administered in rapid succession, within a second or two, as Mr. Ryen was kneeling by the side of the bed. (90 RT 3841.) One blow administered to Mr. Ryen's skull was consistent with being struck by the blunt side of a hatchet, causing a depressed skull fracture, where the bone was pushed into his head. (90 RT 3849.)

Mr. Ryen sustained numerous stabbing injuries. (90 RT 3852–68.) Mr. Ryen's right middle finger was amputated by a chopping blow. (90 RT 3846.) His severed finger was on the floor inside the Ryen bedroom closet. (90 RT 3381–82.) He sustained another chopping injury to his right ring finger. (90 RT 3846.) Another chop wound cut clear through the bone of his right forearm. (90 RT 3837.) One stab wound penetrated his sternum entering his heart. (90 RT 3853–55.) One stab wound punctured his lung and cut one of his ribs. (90 RT 3861.) There was a slicing injury to the right side of Mr. Ryen's cheek. Before he died, Mr. Ryen was stabbed on the left side of his neck, severing his carotid artery and cutting his trachea. (90 RT 3858.) Mr. Ryen also sustained deep incisions into his right thigh, his left leg and his buttocks area. (90 RT 3866, 3868.)

Peggy Ryen suffered thirty-two separate identified wounds. (90 RT 3872–96.)

Mrs. Ryen was five feet, eight inches tall and weighed 140 pounds. (90 RT 3924.) A series of three chopping wounds to the right side of Mrs. Ryen's head were consistent with having been administered while she was standing. (90 RT 3874.) Two chopping wounds nearly formed an upside down "V" on her forehead. (90 RT 3872.)

One triangular defect in her skull, inflicted before death, was consistent with having been made by the tip of the hatchet. (90 RT 3874–75.) Mrs. Ryen sustained a chopping wound at the midline of the back of her head. (90 RT 3876.) Mrs. Ryen had a defensive wound to her right thumb. (90 RT 3878.) Mrs. Ryen also suffered wounds to her chest, stomach, breast, and neck areas. (90 RT 3882–94.)

Jessica Ryen suffered forty-six separate identified wounds, consisting of a combination of chopping and stabbing or incision wounds. (90 RT 3896–23.) Jessica was four feet, eleven inches tall, and weighed eighty pounds. (90 RT 3924.) Two wounds were from a single blow that formed a "V" in her forehead. (90 RT 3896–97.) A chopping blow to the right side of her nose and cheek fractured her jaw. A chopping injury to the top of Jessica's head resulted in a fracture. (90 RT 3898.)

A wound to Jessica's lower left back was consistent with the knife being drawn across her back and then inserted into her back. The bruising associated with the wound showed that it was one of the earlier wounds suffered by Jessica. (90 RT 3908–09.) Jessica suffered a stab wound to her neck. The wound resulted in massive bleeding. Unconsciousness from the wound would have occurred in as little as thirty to sixty seconds, and would have been fatal in a couple of minutes. (90 RT

3903–04.) Three stab wounds to Jessica's chest were in close proximity to each other, suggesting the wounds were delivered in rapid succession. The wounds were consistent with having been delivered while Jessica was in the position in which she died. (90 RT 3905–06.)

Jessica suffered a grouping of twenty separate carving injuries on her chest. Some were associated with slight bleeding, but most apparently occurred after Jessica had stopped bleeding. The injuries were consistent with an ice pick, a nail, or an awl having been used. These injuries were primarily inflicted while Jessica was in the position in which she died. (90 RT 3910–12.)

Plant burrs were found inside Jessica Ryen's nightgown that were similar to the burrs on the blanket inside the closet where Petitioner slept, (106 RT 7678–81), burrs from the vegetation between the hideout house and the Ryen house, and in the car.

Chris Hughes suffered twenty-five separate identifiable wounds. (90 RT 3924–45.) Chris was four feet, eleven inches tall, and weighed eighty-six pounds. (90 RT 3924.) A chopping wound to his right wrist went through the bone of his forearm, almost severing his hand from his wrist. (90 RT 3925.) A chopping wound almost amputat-

ed his right second finger, leaving the finger attached to the hand by only a small portion of skin. (90 RT 3926.) Chris also suffered a chopping injury to his right hand. The injuries were consistent with Chris placing his hand by the right side of his head in an effort to protect his head. (90 RT 3926–27).

Chris suffered six parallel chopping wounds with fractures down the side of his head, extending from the front to the back of his head. There was little bleeding associated with the series of chopping wounds, indicating that Chris was dying or already dead when they were administered. (90 RT 3927–28.) Chris suffered a chopping or incision wound that fractured the facial bones and cut his nose. (90 RT 3929.) Chris suffered a chopping injury to the top of his head, and stab wounds to his chest, back, head and arms. (91 RT 3932–36, 3939–40.) Chris suffered two post-mortem wounds in his right armpit area, from a "pushing" action of the knife. (91 RT 3943–44.)

Josh's injuries included a hatchet wound to the top of his head, a stab wound to his throat, and a hatchet wound near his left ear. (Trial Exs. 478–81, 699, 706A–H, 709, 726, 727; 88 RT 3354–56.) Dr. Root, who performed the autopsies, believed the injuries could have been inflicted quickly, within one minute for each of the victims. (91 RT 3957–58.) He opined each victim would have died within minutes after being attacked. (91 RT 3959–61.) All of the victims had a moderate amount of food in the stomach, indicating that death probably occurred about one to three hours after they had eaten last. (91 RT 3961–62.)

Prior to the murders, the Ryens and Chris Hughes attended an annual barbecue, on June 4, 1983, at the home of George Blade in Los Serranos, a few miles from the Ryen home in Chino. (88 RT 3177, 3179, 3181.) Chris had received permission from his parents to spend the night with the Ryens. (88 RT 3188.) They left the Blade residence to drive to the Ryen home sometime around 9:00 p.m. (88 RT 3182.) The Ryens' neighbor, Larry Lease, saw the Ryen truck returning sometime between 9:00 and 9:30 p.m. (86 RT 2757–58, 2780.) Except for Josh, they were never seen alive again. *Cooper*, 53 Cal.3d at 794, 281 Cal.Rptr. 90, 809 P.2d 865.

The next morning, June 5, 1983, Chris' mother, Mary Ann Hughes, became concerned when he did not come home. (88 RT 3189–90.) She called the Ryen residence a number of times, but only heard busy signals. (88 RT 3190.) Shortly after 9:00 a.m., Mrs. Hughes went to the Ryen home. (88 RT 3190.) She noted the barn was closed and it did not look like the horses had been fed. She only saw the Ryens' truck at the house. (88 RT 3190–91.)

At about 11:30 a.m., Mr. Hughes went to the Ryen home to investigate. (88 RT 3191.) He noticed the Ryen truck, but did not see their station wagon. (88 RT 3195, 3202–03.) Mr. Hughes went to the kitchen door, looked inside, tried the door, but it was locked. The Ryens were in the habit of leaving their doors unlocked when they were at home. (88 RT 3194.) He continued around the outside of the house until he reached the sliding-glass door leading into the Ryen master bedroom. (88 RT 3197.) He looked inside the sliding glass door and saw the body of his son, Chris, the unclothed bodies of Doug and Peggy Ryen, and Josh Ryen laying on the floor between his mother and Chris. (88 RT 3198–99.) Of the four people he could see, only Josh appeared to be alive. (88 RT 3199.)

Mr. Hughes frantically tried to open the sliding door. (88 RT 3200, 3203.) Josh looked up as Mr. Hughes shook the sliding glass door. Mr. Hughes asked Josh if he could open the door. (88 RT 3199.) Mr. Hughes rushed to the kitchen door, kicked it in, and entered. (88 RT 3204.) As he approached the master bedroom, he found Jessica on the floor in the hallway, also apparently dead. (88 RT 3205.) In the bedroom, Mr. Hughes touched the body of his son. It was cold and stiff. (88 RT 3205.) Mr. Hughes asked Josh who had done it. (88 RT 3205.) Josh appeared stunned; he tried to talk but could only move his lips. (88 RT 3205–06.)

Mr. Hughes tried to use a telephone in the house, but it did not work. He drove to a neighbor's house, seeking help. (88 RT 3206–07.) The police arrived shortly. (88 RT 3211–12.) Doug, Peggy, Chris, and Jessica were dead. The first three were in the master bedroom and Jessica was on the floor in the hallway that leads into the master bedroom. (88 RT 3214–18.) Josh was on his side in a fetal position. His eyes were open, but he was unable to speak or move. (88 RT 3221, 3258.) He had difficulty breathing. Josh's neck wound was not bleeding at the time and paramedics tried unsuccessfully to find a pulse in Josh, symptoms consistent with severe shock. (88 RT 3313–17.) Josh was flown by helicopter to Loma Linda University Hospital. (88 RT 3321.)

Josh had a limited memory of the attack. During the night of the murder, Josh woke up by a scream. (95 RT 4955–56.) He walked down the hall, stopping at the laundry room. Josh saw Jessica lying right by the bedroom door in the hallway. (95 RT 4956–58.) When he saw Jessica, he saw a "shadow or something" by the bathroom. It was dark. Josh could not see what the shadow was or what it was doing. (95 RT 4969–70.) There were no sounds from his parents and Josh could not see them. (95 RT 4958–59.)

The next thing he remembered was "[j]ust waking up" surrounded by the bodies of his parents. (95 RT 4959–62.) Josh's first memory after waking up was Mr. Hughes asking him if he could open the sliding glass door to the master bedroom. (95 RT 4962.)

Kathleen Bilbia, an employee of Larry Lease, had been living in the hideout house in May, and she had used the bedroom Petitioner later slept in (the "Bilbia bedroom"). (86 RT 2665.) She moved out of the house during May. By May 27, most of her belongings had been removed. (86 RT 2665.) On May 30 and June 1, Ms. Bilbia vacuumed and cleaned portions of the house, including the bathroom she had used. She cleaned the countertop, sinks, showers, and shower doors in the Bilbia bathroom. (86 RT 2666–68.) Petitioner slept in the closet of the bedroom nearest the garage where Ms. Bilbia used to sleep. (86 RT 2693–94; 97 RT 5284–85.) The window by the hideout house fireplace provided a view of the Ryen house. (86 RT 2693–94; 97 RT 5284–85.)

The hideout house had two telephones: one in the Bilbia bedroom and another in the kitchen. (86 RT 2669–70.) Petitioner admitted that he called Yolanda Jackson and Diane Williams from the hideout house and asked for their help, but they declined. (97 RT 5404–07; 86 RT 2792.) Telephone records and Ms. Jackson's testi-

mony showed that two calls were made from the hideout house to the Los Angeles area telephone number of Yolanda Jackson. The first call lasted 110 minutes beginning on June 3 at 12:17 a.m., and the second call lasted four minutes beginning at 2:26 a.m. the same morning. (87 RT 2898–2900, 86 RT 2790; 2794; 86 RT 2790.) Two calls were also made from the hideout house to Diane Williams in Pittsburgh, Pennsylvania. The first call lasted three minutes beginning on June 3 at 11:46 a.m., and the second lasted thirty-four minutes beginning on June 4 at 7:53 p.m. (87 RT 2896–2901; Trial Ex. 82.) Petitioner admitted that he called Diane Williams at about 8 p.m. on Saturday, June 4, 1983, the night of the murders. (97 RT 5435.) Diane Williams told Petitioner she did not have any money for him. (97 RT 5435–36.) Petitioner decided to leave the hideout house after the phone call. "This final call was only an hour or so before the Ryens and Chris Hughes left the Blade house for their unsuspected rendezvous with death." *Cooper*, 53 Cal.3d at 796, 281 Cal.Rptr. 90, 809 P.2d 865. Petitioner testified that he put on his prison clothes including prison-issued tennis shoes, camp jacket, and some clothes he found at the hideout house. (97 RT 5436.) He put other clothes he had into a bag he was carrying right before he left the hideout house, including a blue prison shirt. (99 RT 5852.)

A search after the murders of the hideout house located a portion of a Viceroy cigarette butt (J–20) in the headboard in the Bilbia bedroom. (87 RT 3076–77.) Mr. Lang's Viceroy cigarettes were missing from the kitchen drawer. (86 RT 2854, 2860.) Ms. Bilbia did not smoke and, to her knowledge, no one smoked in her bedroom during the eighteen months she lived there. (86 RT 2668.) San Bernardino County Sheriff's Crime Lab criminalist Daniel Gregonis performed an analysis of the saliva on the cigarette butt which was consistent with a non-secreter such as Petitioner. (93 RT 4474–75.) Only twenty percent of the population are non-secretors. (94 RT 4707). A belt belonging to Mrs. Lang was found in the closet of the Bilbia bedroom. (87 RT 3076.) The size 30 belt contained two hand-made holes in it in addition to the five manufactured holes with which it came. (87 RT 2973, 2994; Trial Ex. 77.) Petitioner's waist was approximately thirty-two inches in June of 1983. He was issued size–32 pants at CIM. (98 RT 5562–63.)

Petitioner's fingerprint was positively identified on a jar of Coffee Mate in the kitchen of the hideout house. (87 RT 2960.) A footprint was found on the Bilbia bathroom shower sill, separating the inside of the shower from the rest of the bathroom. (87 RT 2943–44.) The shower footprint was determined to have been left by Petitioner. (87 RT 2961–62.)

Police recovered a blanket with a semen stain that was part of the bedding in the closet of the Bilbia bedroom. Petitioner's genetic profile was consistent with his having deposited the semen stain on the blanket. (93 RT 4459–65.) A bloodstained khaki green button was found on the rug in the Bilbia bedroom. (87 RT 3072–73; Trial Exs. 45, 49, 97.) It was identical in appearance to buttons on field jackets inmates wore at CIM, including one Petitioner was seen wearing shortly after his escape. (85 RT 2398, 2417.) A coiled, bloodstained rope was found in the Bilbia bedroom closet. (86 RT 2682, 2842.) The rope was similar to rope kept elsewhere in the hideout house and surrounding property. (86 RT 2733, 2778.)

A criminalist from the San Bernardino County sheriff's crime laboratory sprayed various areas of the hideout house with luminol, a substance used to detect the presence of blood not visible to the naked eye. (87 RT 3079.) A positive reaction

consisting of an even "glow" ranging from about two feet to five feet above the floor was obtained on the shower walls in the Bilbia bathroom. (87 RT 3080.) There were also four positive reactions to the luminol on the rug in the hallway leading to the Bilbia bedroom that appeared to be foot impressions. (87 RT 3081.) Other positive reactions were obtained in the bedroom closet and bathroom sink. (87 RT 3082–83.) The reactions did not prove the presence of blood, but were "an indication that it could be blood." (87 RT 3082.)

Investigators recovered hair samples from the sink and debris from the shower drain. (87 RT 3084.) Some hair in the bathroom sink trap was matted and appeared to have been there a long time. (96 RT 5017.) Other hair was not matted and microscopic examination of that hair revealed characteristics similar to Jessica's head hair. (96 RT 5017–18.) A hair removed from the bathroom shower had characteristics similar to Doug Ryen's head hair. (96 RT 5017.)

Investigators found three significant shoe-print impressions: a partial sole impression on a spa cover outside the Ryen master bedroom (88 RT 3363), a partial bloody shoe print on a sheet on the Ryen bedroom waterbed (89 RT 3506), and a nearly complete shoe-print impression in the game room of the hideout house. (87 RT 2925.) All three appeared to come from tennis shoes. (88 RT 3364–65; 89 RT 3504–07.)

Two partial shoe prints and one nearly complete shoe print found in the Ryens' house were consistent both with Petitioner's size and the Pro–Keds shoes issued at CIM. Petitioner testified that his shoe size was between a 9 and a 10.(98 RT 5532–33.) James Taylor, an inmate at CIM, met Petitioner when both were in medium security at CIM. (85 RT 2508–09.) Taylor

testified that he issued Petitioner a pair of Pro–Keds Dude tennis shoes. (85 RT 2510–11.)

The Stride Rite Corporation sold Pro–Keds Dude tennis shoes to state and federal governments for use in institutions such as CIM. (86 RT 2620–24.) All "Dude" tennis shoes contain the same diamond sole pattern. The general merchandise manager for Stride Rite testified that this pattern is not found on any other shoe that the company manufactures nor, to his knowledge, on any other shoe. (86 RT 2620–24.) At trial, contracts showing the purchase of the Dude tennis shoes by CIM were admitted into evidence. (See Trial Ex. 84–88.) .

Most of the blood at the scene of the crime was consistent with having come from one or more of the victims. (92 RT 4401–25.) Significantly, a drop of blood (item A–41) found on the hallway wall opposite the door to the Ryens' master bedroom belonged to an African–American male, which is consistent with Petitioner. (89 RT 3511–12; 88 RT 3373.) Crime scene deputies recovered A–41 at 12:25 a.m. on June 6, 1983, shortly after the police arrived at the crime scene. (89 RT 3511–12.)

Criminalist Gregonis examined this drop of blood and concluded from electrophoretic testing that the blood could not have come from any of the victims. (93 RT 4426.) Based upon results obtained for several enzymes, Mr. Gregonis also concluded that the drop was consistent with Petitioner's blood. (93 RT 4433, 4426–29.) Because of various characteristics, the blood was from an African–American person such as Petitioner. (93 RT 4424.)

Mr. Gregonis and Dr. Edward Blake, an expert employed by the defense, further

tested A–41. Because of the limited amount of the remaining sample, Dr. Blake performed tests that the defense believed had the best chance of excluding Petitioner as a possible donor. (105 RT 7411–12.) The transferring test was chosen because it had an excellent chance of excluding Petitioner if he was not the donor of A–41. However, the transferrin test was consistent with Petitioner's genetic profile. The transferrin test indicated that the person who left A–41 was a person of African–American heritage. (105 RT 7405.) The transferrin test excluded any of the Ryens or Chris Hughes from being the source of A–41. (105 RT 7404–05.) The peptidas A type (2–1) of A–41 also matched the peptidase A type of Petitioner. The peptidas A type (2–1) of A–41 also meant that the person who deposited A–41 was a "person of black ancestry." (105 RT 7409.) The haptoglobin type of A–41 also indicated a person of African–American heritage. (105 RT 7409–10.) The additional tests included Petitioner as a possible donor. (105 RT 7411–12.) Petitioner's expert, Dr. Blake, was not able to exclude Petitioner as the source of A–41, but was able to exclude A–41 as having come from a Caucasian or Hispanic. (105 RT 7431–32.) Post-conviction DNA testing confirmed that Petitioner is the source of A–41 (one in 310 billion). (Supplemental DOJ Physical Evidence Exam Report dated Sept. 24, 2002.)

Electrophoretic testing also established the blood on the rope found in the Bilbia bedroom closet could have come from one of the victims but not Petitioner. The bloodstains on the rope were consistent with being a mixture of blood from either Jessica and Doug Ryen, or from Peggy and Doug Ryen. (93 RT 4404–05.) There was a positive luminol reaction in the area of the Ryen driveway where the rope was found. There was also a small luminol trail produced leading up to the rope, which was consistent with the bloodstained rope having been dragged along the driveway. (89 RT 3560–61.)

A luminol test on the sink in the Ryen master bathroom was positive, indicating the presence of blood. The nature of the luminol result was consistent with blood having been diluted with water in the sink and diluted blood having flowed down toward the sink drain, as if someone had washed blood off their hands in the sink. (89 RT 3558–60.) Tests revealed the presence of blood in the shower and bathroom sink of the hideout house, and hair found in the bathroom sink was consistent with that of Jessica and Doug Ryen. (96 RT 5017–18.)

The Ryens' vehicle was missing from the house when the bodies were discovered but was later found in Long Beach. The police found loose tobacco on the front passenger seat and floorboard. Possible blood stains were observed on the front passenger seat and driver's side-door jam. The car did not appear to have been hot-wired. (92 RT 4205–10, 4217–21.)

Two cigarette butts were recovered from the station wagon. (92 RT 4287, 4290.) A hand-rolled cigarette (V–12) was found in the crevice formed by the vertical and horizontal portions of the front passenger seat. (92 RT 4287.) Some loose "Role–Rite" tobacco, that is provided free to CIM inmates and not available at retail, was on the floorboard just to the right of the front passenger seat. (92 RT 4287–90, 5067.) Similar loose-leaf tobacco, identified as being Role–Rite, was found in the bedroom of the hideout house where Petitioner had stayed. (96 RT 5065.) San Bernardino County Sheriff's Crime Lab Criminalist Craig Ogino examined visually

and microscopically the two samples of the loose tobacco and the tobacco from the hand-rolled cigarette. Each sample was consistent with each other and with Role–Rite tobacco. (96 RT 5069.) In addition, Aubrey Evelyn, a manager with the company that manufactures Role–Rite tobacco, also testified that the tobacco found in the Ryen car was consistent with Role–Rite. (95 RT 4898.) A witness testified that Petitioner smoked hand-rolled cigarettes using Role–Rite tobacco. (85 RT 2505–06.) Petitioner had no money in his prison account during May and June of 1983 with which to purchase commercially made cigarettes. (85 RT 2600.) A manufactured cigarette butt (V–17) was also found in the front passenger seat area. (92 RT 4289.)

A hair fragment discovered in the car was consistent with Petitioner's pubic hair and a spot of blood found in the car could have come from one of the victims but not from Petitioner. (95 RT 4828–33.) Luminol testing resulted in very light positive reactions in portions of the car, some of which were consistent with the light presence of blood. (92 RT 4293–97.) One of the stains on the driver's door jamb (W–3) was found to be human blood, ABO type AB, consistent with being the blood of Peggy and Jessica, but inconsistent with Petitioner's ABO type, which is type A. (93 RT 4478–79.)

Saliva tests on the two cigarette butts in the Ryen station wagon were consistent with both cigarettes having been smoked by a non-secretor such as Petitioner. (93 RT 4472–77.) Only twenty percent of the population are non-secretors. (94 RT 4707.) The ABO blood type of the person who smoked V–17, the manufactured cigarette butt, was determined to be type A, which is also consistent with Petitioner's blood type. (94 RT 4725–26.) Post-conviction DNA tests confirmed that the ciga-

rette butts were Petitioner's (one in 19 billion and one in 110 million). (Supplemental DOJ Physical Evidence Exam Report dated Sept. 24, 2002.)

Several hairs were recovered from the vehicle and two criminalists microscopically compared the hairs with Petitioner's hair. One believed that one of the hairs (V–19) probably came from an African–American, and that "there was enough similarity between . . . the hairs from Mr. Cooper and the unknown hair that I felt the unknown hair was consistent with coming from Mr. Cooper." (95 RT 4833.) The second criminalist also found it was consistent with Petitioner's hair. Both believed it was most likely pubic hair. (95 RT 4828–33.)

Plant burrs were recovered from the Ryen station wagon. The burrs were similar to plant burrs found on the inside of Jessica Ryen's nightgown and numerous plant burrs found on the blanket inside the Bilbia closet which was part of the bedding found in the closet. (106 RT 7678–81.) The burrs were also similar in appearance to the burrs from parts of vegetation samples taken from the area between the Ryen home and the hideout house. All of the burrs were macroscopically and microscopically similar. (106 RT 7677–81, 7687.) An expert for the defense, Dr. John Thornton, concluded the burrs were all the same type, known as Medicago. He agreed that the burrs from the blanket in the Bilbia closet were "virtually identical" to the two burrs found on the inside of Jessica's nightgown. (105 RT 7521–22, 7541–43.) Dr. Thornton agreed that Jessica's killer had moved her nightgown up on her body after she was already dead in order to inflict a series of post-mortem wounds on her chest with an ice-pick or similar instrument. (105 RT 7526–28.)

The position in which Jessica was found was consistent with her killer getting down on his knees to inflict cuts in her chest after she was dead. (105 RT 7529.)

Petitioner admitted drinking beer at the hideout house. (98 RT 5613–14.) A six-pack of Olympia Gold beer with one can missing was found in the refrigerator of the Ryen house. One bloodstained can was hanging over the edge of a shelf. (88 RT 3375.) A nearly empty can of Olympia Gold beer similar in appearance to those in the Ryen refrigerator was found in a plowed horse-training arena about midway between the Ryen home and hideout house. (90 RT 3800–03.)

After the murders, Petitioner escaped to Tijuana, Mexico. (98 RT 5450–60.) Petitioner checked into a hotel in Tijuana at around 4:00 p.m. on Sunday, June 5, 1983 using the false name of Angel Jackson. (98 RT 5462.) Tijuana is only two hours

by car from the San Bernardino area, leaving ample time for Petitioner to commit the murders the night of June 4, 1983, drive to Long Beach and escape to Mexico on June 5, 1983. On June 6, at about 10:00 p.m., Ms. Williams received a collect call from Petitioner in Tijuana, Mexico. (88 RT 3175–76; Trial Ex. 113.)

From Tijuana, Petitioner made his way to Ensenada, Mexico. (98 RT 5468.) On June 9, 1983, he met Owen and Angelica Handy in Ensenada. *Cooper,* 53 Cal.3d at 800, 281 Cal.Rptr. 90, 809 P.2d 865; 95 RT 4838–40, 4874–75. Petitioner again lied about his identity to the Handys when he met them, claiming to be Angel Jackson when he asked them for work. (95 RT 4839–40.) Petitioner worked on the Handys' boat, which was in dry dock. The Handys then set sail for San Francisco and Petitioner went with them. (95 RT 4841.) The Handys saw Petitioner in possession of numerous items identified as having been taken from the hideout house. Petitioner had Mrs. Lang's blue sweat pants and gloves. (95 RT 4849–54, 4876–78.) When they stopped at various places along the way, Petitioner stayed on the boat and did not go ashore. They were in Santa Barbara for three or four days. (95 RT 4843–44.)

On July 30, 1983, Santa Barbara County Sheriff's Department responded to a call for assistance of an attempted rape on a boat docked next to the Handys' boat in Pelican Cove. The 26–year–old female victim reported that Petitioner attempted to rape her at knife point. (04–CV–656, NOL filed April 15, 2005, Resp't CIM Vault, Notebook 3 at 431.) Petitioner tried to flee when the authorities came to the dock to arrest him. The Sheriff's observed Pe-

titioner throw an object into the water before he dove off of the Handy's boat, swam to a dinghy, and started to row for shore. (95 RT 4846.) The sheriffs recovered a knife from the water where Petitioner attempted his unsuccessful escape.[4]

At trial, Petitioner admitted that he was at the hideout house, just 126 yards from the crime scene, but denied he committed the murders. The jury evaluated his credibility and concluded that there was proof beyond a reasonable doubt that Petitioner committed the murders. Petitioner testified he was at CIM under a false name, David Trautman, as a result of pleading guilty to two counts of residential burglary in Los Angeles County. (97 RT 5327–29; 98 RT 5499, 5875.) Petitioner admitted escaping from CIM, eluding CIM personnel, and hiding in a lumber yard until he was able to make his way on foot under the cover of darkness to the hideout house. (97 RT 5362–85.) He admitted hiding out close to the Ryen home, and sleeping in the Bilbia bedroom. (97 RT 5382–5417.) Petitioner testified that he slept on the Langs' bed in the hideout house on Thursday night, June 2, 1983, but when he woke up Friday morning, June 3, 1983, he realized he could have been seen in their bedroom, and decided to stay in the Bilbia bedroom closet. (97 RT 5408, 5414–15.)

Petitioner admitted he was wearing his prison camp jacket at the time of his escape, and prison-issued tennis shoes but denied ever receiving any tennis shoes from inmate Taylor. (97 RT 5349, 5350–51, 5356–58, 5385–89.) Petitioner testified the pair of shoes he was wearing were a size 9.(98 RT 5555–56.) Petitioner's prison-issued shoes were never recovered.

---

4. At trial, the prosecution presented evidence of Petitioner's arrest, but not the report of the rape at knife point or the knife that was recovered from the water.

Petitioner testified that he threw the prison-issued shoes along with other prison clothing into the ocean when the Handys' boat sailed into United States' waters. (98 RT 5892–95.)

Petitioner indicated that he drank beer that was in the garage refrigerator at the hideout house. The first thing Petitioner did at the hideout house was "[w]ent and had me a beer." (98 RT 5613–14.) Petitioner admitted having some "roll-your-own" (i.e., Role–Rite) tobacco with him when he escaped, as well as fifteen Kool cigarettes. (97 RT 5362–63.)

On Saturday night, after Ms. Williams told him she didn't have any money, Petitioner claimed he left the hideout house and "went back down the hill" on foot at night in the same manner as when he walked up the hill to hide out following his escape from CIM. (97 RT 5435–38.) He stated he stopped drivers and asked them for directions to Mexico. (98 RT 5449–50.) The jury rejected Petitioner's implausible testimony that he left on foot and asked drivers in the area at night for directions to Mexico.

Petitioner denied going to the Ryen house and denied killing anyone in the house. (97 RT 5327; 98 RT 5492.) Petitioner admitted watching television to check for possible news reports about his escape. (97 RT 5416–17, 5425–26.) Petitioner admitted taking two pairs of gloves from the Langs' bedroom, but denied wearing them in the hideout house, or making any effort to avoid leaving fingerprints. (98 RT 5513.) The only fingerprint left by Petitioner in either the Ryen home or the hideout house was on a Coffee Mate jar in the kitchen in the hideout house. (87 RT 2956–60.) He explained that he took the gloves only to wear as he left the hideout house to protect his hands because he hurt his hands when he fell

while coming up the hill to the hideout house following his escape from CIM. (98 RT 5513.)

Petitioner denied bringing the blood-stained nylon rope into the closet in the Bilbia bedroom. (97 RT 5419; 99 RT 5834–36.) He denied smoking a Viceroy cigarette and putting it in a napkin in the Bilbia headboard. (97 RT 5418–19.) Petitioner denied bringing Mrs. Lang's belt into the Bilbia bedroom closet. (97 RT 5415; 99 RT 5834–36.)

Petitioner denied that he left the semen stain on the blanket in the Bilbia closet. (98 RT 5523.) He denied using the Bilbia bathroom for the three days he was in the hideout house, other than once to test the water in the shower. He testified he always used the Langs' bathroom instead, even though he was sleeping in the Bilbia bedroom and all of his personal items were in the Bilbia bedroom. (98 RT 5682; 99 RT 5808.) Petitioner did not see any blood in the Bilbia bathroom while he was at the hideout house. (99 RT 5808–09.)

The prosecution effectively cross-examined Petitioner by pointing out inconsistencies in Petitioner's account and questioning Petitioner's credibility. After due deliberation, the jury concluded that Petitioner committed the murders.

In the penalty phase of the trial, the defense presented several friends and relatives of Petitioner who testified about his good qualities and their continuing love for him. The prosecution presented evidence that on October 8, 1982, a man stipulated to be Petitioner burglarized a home in Pennsylvania, assaulted a high-school student who interrupted the burglary, kidnapped and raped her, and then stole her car. (107 RT 7956–66.) Petitioner took the teenager to a secluded portion of a

park, threatened her, and ordered her to remove her jeans and underpants. He grabbed her by her hair and forced her face down to the ground. She could feel a screwdriver against the back of her neck as she lay face down, nude from the waist down, upset and crying. Petitioner took down his pants and raped her vaginally from behind. (107 RT 7965–66.)

Petitioner told her to keep her face down, got up, pulled up his pants, jumped into her car and drove off. Before leaving Petitioner said, "I should kill you." (107 RT 7966.) She ran to a nearby house and called the police. Petitioner was identified from a thumb print on the outside of the dining-room window of the house he was burglarizing when he kidnapped his victim. (107 RT 7977–78.) He also left a palm print on the automatic gearshift leaver of his victim's car. (107 RT 7979–81.) The jury was also allowed to consider as an aggravating factor Petitioner's prior conviction of two counts of burglary in Los Angeles. *Cooper*, 53 Cal.3d at 802, 281 Cal.Rptr. 90, 809 P.2d 865.

The jury carefully considered the evidence in aggravation and mitigation and returned a verdict of death. The death penalty was confirmed by the trial judge, and affirmed by the state and federal courts. (107 RT 8144–40); *Cooper*, 53 Cal.3d 771, 281 Cal.Rptr. 90, 809 P.2d 865 (1991); *Cooper I*, 92–CV–427, Aug. 25, 1997 Order; *Cooper v. Calderon*, 255 F.3d 1104 (9th Cir.2001); *Cooper v. Calderon*, 537 U.S. 861, 123 S.Ct. 238, 154 L.Ed.2d 100 (2002).

Petitioner's trial was conducted in 1984–1985, prior to the advent of DNA testing. In post-conviction proceedings, Petitioner sought DNA testing to prove his innocence. Subsequent to the passage of California Penal Code section 1405, the People agreed to have certain DNA testing performed in 2001. (*See* Joint DNA Agreement.) Petitioner, with the assistance of his post-conviction counsel and two nationally recognized DNA experts, entered into a Joint DNA Agreement to test the evidence. The Joint DNA Agreement specified the items of evidence to be tested: remaining blood from the drop of blood, A–41, found in the hallway on the wall directly across from the doorway to the Ryen master bedroom; one handrolled and one manufactured cigarette butt found inside the Ryen station wagon after it was recovered in Long Beach; the hatchet; the T-shirt found near the Canyon Corral Bar; a button found in the Bilbia bedroom; and hair recovered from the hands of the victims. (Answer, Ex. 86 at 11.) The Agreement provided that STR Profiler Plus DNA testing be performed by the Department of Justice Berkeley DNA Laboratory ("DOJ Berkeley") on the specified items of evidence in two stages: "blind" STR Profiler Plus DNA testing was to be performed on the specified pieces of crime scene evidence, followed by STR Profiler Plus DNA testing on the known exemplars from Petitioner and the victims. (Answer, Ex. 86 at 11.) The "blind" test results from the crime scene evidence would then be compared with the results obtained from the known reference samples from Petitioner and the victims. Petitioner's own post-conviction DNA expert, Dr. Blake, identified the drop of blood (A–41) and the two cigarette butts recovered from the stolen Ryen station wagon as "the most relevant biological evidence" in the case. (Answer, Ex. 89 at 4.) Additionally, Petitioner had the assistance of Christopher Plourd, a nationally recognized DNA expert, in support of his post-conviction DNA testing.

Petitioner's successive petition challenges the results of this post-conviction DNA testing. These DNA results provide strong evidence that Petitioner is the killer and sole person responsible for the Ryen/Hughes murders. (DOJ Physical Evidence Exam Report dated July 2, 2002; Supplemental DOJ Physical Evidence Exam Report dated Sept. 24, 2002.) Specifically the results established that Petitioner was the donor of the DNA found on the following items:

(1) a bloodstain in the Ryen home near the master bedroom where the victims were attacked matched Cooper's DNA profile and was found to occur at random in the population with a frequency of approximately 1 in 310 billion for African Americans, 1 in 270 billion for Caucasians, and 1 in 340 billion for Western Hispanics;

(2) two cigarette butts found in the stolen Ryen station wagon when it was recovered in Long Beach had Cooper's DNA, with one cigarette having enough DNA sample that it would occur at random in the population with a frequency of about 1 in 19 billion African Americans, 1 in 11 billion for Caucasians, and 1 in 15 billion for Western Hispanics; and the other cigarette having enough DNA sample that it would occur at random in the population with a frequency of about 1 in 110 million African Americans, 1 in 16 million for Caucasians, and 1 in 12 million for Western Hispanics; and

(3) a bloodstain on a[T-] shirt found on the side of a road within two miles of the Ryen home had DNA matching Cooper's and partial DNA profiles matching that of two of the victims, Doug and Peggy Ryen. The DNA matching Cooper's found on the t-

shirt occurs at random in the population with a frequency of about 1 in 110 million for African Americans, 1 in 16 million for Caucasians, and 1 in 12 million for Western Hispanics. (Supplemental DOJ Physical Evidence Exam Report dated Sept. 24, 2002 at 1–4.) In addition to the DNA evidence inculpating Petitioner, DNA profiles of blood taken from a hatchet that was taken from the house where Petitioner hid after his escape from prison matched that of several of the victims including Doug Ryen, Jessica Ryen and Chris Hughes. (Supplemental DOJ Physical Evidence Exam Report dated Sept. 24, 2002 at 4.)

Petitioner requested a hearing in the Superior Court of California regarding the DNA results. Judge Kennedy of the San Diego Superior Court held an evidentiary hearing on June 23–25, 2003. Petitioner called witnesses, including DNA expert Christopher Plourd. (92–CV–427, NOL filed Feb. 3, 2004, Reporters' Tr., Vols. 1–3 dated June 23–24 and 25, 2003 before Hon. William H. Kennedy in Case No. CR 72787; 92–CV427, NOL filed Jan. 23, 2004, Ex. 6, Judge Kennedy Order filed July 2, 2003 at 4.) Three of the original crime scene criminalists, persons from the San Bernardino Sheriff's Property Division, a Supervisor from the Diego Superior Court Exhibit Room and DOJ criminalist Steven Meyers also testified. (92–CV–427, NOL filed Feb. 3, 2004, Reporters' Tr., Vols. 1–3 dated June 23, 24 and 25, 2003 before Hon. William H. Kennedy in Case No. CR–72787; NOL filed Jan. 23, 2004, Ex. 6, Judge Kennedy Order dated July 2, 2003 at 4.) Judge Kennedy listened to all of the sworn testimony, including criminalist Gregonis and determined that, "Petitioner has not made any showing that law enforcement personnel tampered with or contami-

nated any evidence in his case." (92–CV–427, NOL filed Jan. 23, 2004, Ex. No. 6, Judge Kennedy Order dated July 2, 2003 at 10.) After reviewing written motions, listening to the testimony presented by both sides and hearing arguments, Judge Kennedy denied Petitioner's request for further DNA testing and found no merit to his allegations of evidence tampering. (92–CV–427, Third Supplemental NOL filed Jan. 23, 2004, Ex. 6, Judge Kennedy Order dated July 2, 2003 at 10, 11.)

Nearly six months after Judge Kennedy issued his ruling, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court. On February 5, 2004, the California Supreme Court denied Petitioner's claims on the merits and as procedurally barred, finding that "[a]s with the previous five petitions for writ of habeas corpus that petitioner has filed in this court challenging the judgment, this petition casts no doubt on petitioner's guilt or the validity of the judgment." *In re Cooper,* Case No. S122389.

Petitioner then filed a request with the Ninth Circuit to file a successive habeas corpus petition in federal court. The Ninth Circuit granted this request on February 9, 2004, and remanded the successive petition to this Court.

## STANDARDS OF REVIEW

### I. The Antiterrorism and Effective Death Penalty Act of 1996

"[The Antiterrorism and Effective Death Penalty Act of 1996] AEDPA [ ] govern[s] any habeas appeal commenced after its effective date, April 24, 1996, without regard to when the petition was filed." *Cooper v. Calderon,* 255 F.3d 1104, 1107 (9th Cir.2001); *Cooper v. Calderon,* 274 F.3d 1270, 1272 (9th Cir.2001). In Petitioner's previous request to file a successive peti-

tion in 1998, the Ninth Circuit determined that AEDPA governed stating:

We must first determine whether AEDPA applies to Cooper's new petition. In *United States v. Villa–Gonzalez,* 208 F.3d 1160, 1163–64 (9th Cir.2000), we held that AEDPA's provisions governing second or successive petitions apply to a new petition filed after the date of AEDPA's enactment, even if the original petition was filed before. Under *Villa–Gonzalez,* we must apply AEDPA to Cooper's new petition.

*Cooper,* 274 F.3d at 1272.

Petitioner's third federal habeas corpus petition in this Court was filed on April 1, 2004, long after the effective date of AEDPA, April 24, 1996. As such, the provisions of AEDPA govern this latest habeas petition. *See Penry v. Johnson,* 532 U.S. 782, 792, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) ("Because [petitioner] filed his federal habeas petition after the enactment of [AEDPA], the provisions of that law govern the scope of our review."); *Lindh v. Murphy,* 521 U.S. 320, 326, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) (AEDPA applies to all habeas petitions filed after April 24, 1996).

### A. AEDPA's Standard for Habeas Relief

The Ninth Circuit's authorization which enabled Petitioner to file a successive habeas petition pursuant to 28 U.S.C. § 2244(b) with this Court does not relieve Petitioner of his burden of demonstrating compliance with those requirements before this Court. Petitioner's burden in seeking authorization from the Ninth Circuit was merely to make a prima facie showing of compliance with § 2244(b) for gatekeeper purposes. 28 U.S.C. § 2244(b)(3)(C). Now that he is before this Court, he must

actually show that each claim in his pending petition satisfies the statutory requirements. *Tyler v. Cain,* 533 U.S. 656, 661, n. 3, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001). While the gatekeeper authorization allowed Petitioner to file any and all claims in a successive petition upon a prima facie showing that any one claim satisfies the requirements of 28 U.S.C. § 2244(b), *Nevius v. McDaniel,* 104 F.3d 1120 (9th Cir. 1996), Petitioner must now satisfy the requirements of 28 U.S.C. § 2244(b) as to each claim before that claim can be considered by this Court.

### 1. Claims Presented in a Prior Application are to be Dismissed

First, any claim "presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed." 28 U.S.C. § 2244(b)(1). The only exception that has been recognized by the Ninth Circuit to the requirement of dismissal for previously presented clams is in "extremely narrow circumstances" where the claim presented in the previous petition was held to be premature. *Babbitt v. Woodford,* 177 F.3d 744, 745(9th Cir.1999) (citing *Martinez–Villareal v. Stewart,* 118 F.3d 628, 630 (9th Cir.1997), *aff'd,* 523 U.S. 637, 118 S.Ct. 1618, 140 L.Ed.2d 849 (1998)).

■ A claim is not newly presented merely because the petitioner offers new factual bases in support of a legal claim that has already been raised. The Ninth Circuit held that it would not "consider new factual grounds in support of the same legal claim" that was previously presented, reasoning as follows:

A "ground is successive if the basic thrust or gravamen of the legal claim is the same, regardless of whether the basic claim is supported by new and different legal arguments.... Identical grounds may often be proved by different factual allegations...."

*Id.* (quoting *United States v. Allen,* 157 F.3d 661, 664(9th Cir.1998)).

### 2. New Claims in a Successive Application Must Meet a Rigid Standard under AEDPA

■ Second, even if the claim has not been previously presented in a federal habeas petition, it must nevertheless be dismissed unless it falls within one of two narrow exceptions:

(A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(B)(I) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

(ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2)(A)(B).

Petitioner does not rely on a new rule of Constitutional law, so his only possible claim is under the newly discovered factual predicate prong. *See* 28 U.S.C. 2244(b)(2)(B).

**B. State Court Determinations Enjoy a Heavy Deference under AEDPA**

**1. Factual Determinations, Both Express and Implied, Enjoy a Heavy Deference**

Challenges to the state court finding of facts are governed by 28 U.S.C. § 2254(e)(I). As to factual determinations, "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

The express and implied factual determinations by the state trial court and California Supreme Court are entitled to deference. "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003); 28 U.S.C. § 2254(e)(1). "Clear and convincing evidence" within the meaning of § 2254(e) "requires greater proof than preponderance of the evidence" and must produce "an abiding conviction" that the factual contentions being advanced are "highly probable." *Sophanthavong v. Palmateer,* 378 F.3d 859, 866 (9th Cir.2004) (quotation omitted).

The presumption of correctness applies not only to express findings of fact, but also applies equally to unarticulated findings that are necessary to the state court's conclusions of mixed questions of fact and law. *See Marshall v. Lonberger,* 459 U.S. 422, 433, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983) (application of presumption to a credibility determination which was implicit in rejection of defendant's claim). Where there are two permissible views of the evidence, a fact finder's choice between them cannot be clearly erroneous. *Amadeo v. Zant,* 486 U.S. 214, 226, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988)

**2. The State Court Legal Determinations Also Enjoy Heavy Deference**

Because each of Petitioner's claims have been raised in the California Supreme Court and denied on the merits, this Court must apply the highly deferential standard set forth in AEDPA. *See Lindh v. Murphy,* 521 U.S. 320, 333, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

Title 28, United States Code, section 2254(a), sets forth the following scope of review for federal habeas corpus claims:

The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a). The standard provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

To obtain federal habeas relief, Petitioner must satisfy either § 2254(d)(1) or § 2254(d)(2). *See Williams v. Taylor,* 529 U.S. 362, 403, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The threshold question is whether the rule of law was clearly established at the time petitioner's state court conviction became final. *Id.* at 406, 120 S.Ct. 1495. Clearly established federal law, as determined by the Supreme Court of the United States "refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state court decision." *Id.* at 412, 120 S.Ct. 1495; *see also Lockyer v. Andrade,* 538 U.S. 63, 71, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). Ninth Circuit case law may be "persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help us determine what law is 'clearly established.'" *Duhaime v. Ducharme,* 200 F.3d 597, 600 (9th Cir.2000). Only after the clearly established federal law is identified can the court determine whether the state court's application of that law "resulted in a decision that was contrary to, or involved an unreasonable application of" that clearly established federal law. *See Lockyer,* 538 U.S. at 71–72, 123 S.Ct. 1166.

This Court must identify the relevant United States Supreme Court authority and then apply that law to the record in the light most favorable to the state court decision. Such an approach embodies the longstanding principle that unarticulated findings that are necessary to the state court's conclusions of mixed questions of fact and law are presumed correct. *See Marshall,* 459 U.S. at 433, 103 S.Ct. 843(application of presumption to credibility determination which was implicit in rejection of defendant's claim). Moreover, anything less deferential would undermine the law that federal courts "avoid attributing constitutional error to the state court." *Himes v. Thompson,* 336 F.3d 848, 854 (9th Cir.2003); *see also Woodford v. Visciotti,* 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2003).

The "contrary to" and "unreasonable application" clauses contained in 28 U.S.C. § 2254(d) have distinct meanings. *Williams,* 529 U.S. at 404, 120 S.Ct. 1495. A decision is "contrary to" United States Supreme Court authority if it fails to apply the correct controlling authority, or if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but reaches a different result. *Id.* at 405–06, 120 S.Ct. 1495. A decision is an "unreasonable application" of clearly established federal law when the state court identifies the correct governing legal principle, but unreasonably applies that principle to the facts of that case. *Id.* at 407, 120 S.Ct. 1495. Under *Williams,* an application of federal law is unreasonable only if it is "objectively unreasonable." *Id.* at 409, 120 S.Ct. 1495.

Although the Ninth Circuit previously analyzed habeas cases for "clear error," the Supreme Court disapproved this approach. *Lockyer,* 538 U.S. at 75, 123 S.Ct. 1166(rejecting *Van Tran v. Lindsey,* 212 F.3d 1143 (9th Cir.2000)). Rather, when a petitioner does not challenge the state court's determination of the evidence, he may receive relief "only if" he establishes that the state court decisions were "contrary to, or involved an unreasonable ap-

plication of, clearly established federal law, as determined by the Supreme Court of the United States." *See Price v. Vincent,* 538 U.S. 634, 640–41 n. 2, 123 S.Ct. 1848, 155 L.Ed.2d 877 (2003).

■ When there is a federal question but no controlling Supreme Court authority on point, a state court's merits determination is not "contrary to" any decision within the meaning of the AEDPA. *Mitchell v. Esparza,* 540 U.S. 12, 17, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003). In the absence of controlling authority, federal courts should defer to a state court's reasonable interpretation of the Constitution. *Id.* at 17–18, 124 S.Ct. 7; *Penry v. Johnson,* 532 U.S. 782, 795, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) (holding that a Texas court's decision was not unreasonable where there was no squarely controlling authority).

■ "An unreasonable application of federal law is different from an incorrect application of federal law." *Williams,* 529 U.S. at 410, 120 S.Ct. 1495; *Clark v. Murphy,* 331 F.3d 1062, 1067(9th Cir. 2003). A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state court decision is wrong. *See Bell v. Cone,* 535 U.S. 685, 698–99, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Williams,* 529 U.S. at 411, 120 S.Ct. 1495. The state court decision must be affirmed unless it is "objectively unreasonable." *Bell,* 535 U.S. at 699, 122 S.Ct. 1843; *Woodford,* 537 U.S. at 24, 123 S.Ct. 357. Where a state court finds a constitutional error to be harmless beyond a reasonable doubt, a federal court may not grant relief unless the state court's harmless error decision is objectively unreasonable. *Mitchell,* 540 U.S. at 12, 124 S.Ct. 7.

■ A state court's decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding." *Miller,* 537 U.S. at 340, 123 S.Ct. 1029 (2003); 28 U.S.C. § 2254(d)(2); *Wiggins v. Smith,* 539 U.S. 510, 528, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

Even if the state court fails to cite or acknowledge United States Supreme Court authority, a federal court may not grant habeas relief unless the state court's reasoning or result contradict clearly established United States Supreme Court precedent. *Early,* 537 U.S. at 8, 123 S.Ct. 362. The Ninth Circuit has held that where there is no reasoned state court decision on one or more issues raised in the federal petition, the federal court must conduct an independent review of the record to determine whether the state court decision was contrary to, or an unreasonable application of, controlling United States Supreme Court precedent. *Delgado v. Lewis,* 223 F.3d 976, 982(9th Cir.2000). A federal court must "presume, of course, that state courts 'know and follow the law'[.]" *Himes v. Thompson,* 336 F.3d 848, 853 (9th Cir.2003) (citing *Woodford,* 537 U.S. at 24, 123 S.Ct. 357.) De novo review of a state court's adjudication is not appropriate. *Id.* at 854 n. 3.

The deference accorded to state court decisions by AEDPA is intended to prevent federal habeas "retrials" and ensures that state court convictions are "given effect to the extent possible under law." *Bell,* 535 U.S. at 693, 122 S.Ct. 1843; *see Clark,* 331 F.3d at 1067. The AEDPA deference standard demands that federal courts give state court decisions "the benefit of the doubt." *Woodford,* 537 U.S. at 24, 123 S.Ct. 357.

## II. Alternative Habeas Standards under *Schlup* and *Herrera*

Finally, if AEDPA does not apply to this successive petition, then the gateway claims presented by Petitioner are governed by *Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) and the claims of actual innocence are governed by *Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993).

■ The United States Supreme Court has held that a claim of actual innocence can be raised "to avoid a procedural bar to the consideration of the merits of [the petitioner's] constitutional claims." *Schlup*, 513 U.S. at 326–27, 115 S.Ct. 851.

> To make a successful claim under *Schlup*, a petitioner must show that in light of all the evidence, including new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.

*Cooper*, 358 F.3d at 1119 (citation omitted.) To be reliable, a claim of actual innocence must be based on "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324, 115 S.Ct. 851.

The Ninth Circuit did not decide whether the *Schlup* standard of actual innocence applies. The *Schlup* standard requires a showing that it "in light of all the evidence, including new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt," or whether the more stringent standard under 28 U.S.C. § 2244(b)(2)(B) applies, which requires a "factual claim [ ] not discoverable through the exercise of due diligence" that establishes by "clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." *Cooper*, 358 F.3d at 1119–20(citation omitted, emphasis in original).

■ In Petitioner's previous request to file a successive petition, the Ninth Circuit held that AEDPA governs a successive petition filed after the effective date of AEDPA. Therefore, the Court concludes that AEDPA applies to this successive petition.

But even if *Schlup* applies, the Court concludes that Petitioner has not established in light of all the evidence, including new evidence, that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. Under *Schlup*, if Petitioner meets his burden of establishing actual innocence, then the Court is to evaluate the alleged violation under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) or under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As stated by the Supreme Court in *Schlup*, it is only after a sufficient showing of actual innocence that the court is permitted to consider the other constitutional claims on the merits:

> Schlup's claim of innocence does not by itself provide a basis for relief. Instead, his claim for relief depends critically on the validity of his *Strickland* and *Brady* claims. Schlup's claim of innocence is thus not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.... [I]f a petitioner such as Schlup presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless

constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims.

*Schlup,* 513 U.S. at 315–16, 115 S.Ct. 851. The actual innocence exception should "remain rare" and "only be applied in the extraordinary case." *Schlup,* 513 U.S. at 321, 115 S.Ct. 851.

If AEDPA does not apply to Petitioner's claims of actual innocence, then Petitioner must meet the test of *Herrera,* which requires

> a truly persuasive demonstration of "actual innocence" ... [and] because of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high.

*Herrera,* 506 U.S. at 417, 113 S.Ct. 853. This "contemplates a stronger showing than insufficiency of the evidence to convict" or "doubt about his guilt." *Carriger v. Stewart,* 132 F.3d 463, 476 (9th Cir. 1997). Under these standards, a petitioner must affirmatively prove that he is probably innocent. *Id.*

Moreover, *Herrera* requires that there is "no state avenue open to process such a claim." *Id.* In this case, the California Supreme Court denied Petitioner's actual innocence claims on the merits, (*see* Sixth State Habeas Pet. at 12–37; Answer, Ex. 13), and the Governor of California denied Petitioner's application for clemency.

But even if upon an evaluation of the merits of Petitioner's claims of actual innocence, the Court concludes that Petitioner has not meet his burden under AEDPA, which requires among other things, a "fac-

tual claim [ ] not discoverable through the exercise of due diligence" that establishes by "clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b). For the same reasons, the Court also concludes that Petitioner has not met the requirements of *Herrera,* which requires an "extraordinarily high" showing of "a truly persuasive demonstration of 'actual innocence.'" *Herrera,* 506 U.S. at 417, 113 S.Ct. 853.

Title 28 U.S.C. section 2244(b)(3)(B) directs that "[a] motion in the court of appeals for an order authorizing the district court to consider a second of successive application shall be determined by a three-judge panel of the court of appeals." According to the statute, only a three-judge panel is allowed to review an application for a successive petition. However, in this case, the en banc panel sua sponte granted Petitioner's application to file a successive petition under the authority of *Thompson v. Calderon,* 151 F.3d 918, 922 (9th Cir. 1998).

### III. State Procedural Bars Preclude Review

▇ Petitioner has not established cause and prejudice as to any claim the state court found procedurally barred. When considering claims on habeas corpus, this Court must first address the state's argument that a claim is procedurally defaulted. *Lambrix v. Singletary,* 520 U.S. 518, 524, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997). Procedural defaults are resolved before *Teague* issues. *Id.* This is so even if the state court has also denied the claim on the merits. *Bennett v. Mueller,* 322 F.3d 573, 580 (9th Cir.2003).

A federal court is precluded from reviewing the merits of a claim when the state court has denied relief on the basis of an independent and adequate state procedural default. *Coleman v. Thompson*, 501 U.S. 722, 731–732, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Vansickel v. White*, 166 F.3d 953, 957 (9th Cir.1999). The state procedural bar must be "independent" of the federal question and "adequate to support the judgment." *Coleman*, 501 U.S. at 729, 111 S.Ct. 2546. A state procedural rule constitutes an "adequate" bar to federal court review if it was "firmly established and regularly followed" at the time it was applied by the state court. *Ford v. Georgia*, 498 U.S. 411, 423–424, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991); *Poland v. Stewart*, 169 F.3d 573, 577 (9th Cir.1999). A state procedural rule constitutes an "independent" bar if it is not interwoven with federal law or dependent upon a federal constitutional ruling. *Ake v. Oklahoma*, 470 U.S. 68, 75, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); *Michigan v. Long*, 463 U.S. 1032, 1040–41, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); *La Crosse v. Kernan*, 244 F.3d 702, 704 (9th Cir.2001).

Under the Ninth Circuit's decision in *Bennett*, 322 F.3d 573, once the state raises the existence of an independent and adequate state procedural ground as a defense, the petitioner must then raise "specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule." *Bennett*, 322 F.3d at 584, 586(quoting *Hooks v. Ward*, 184 F.3d 1206, 1217 (10th Cir.1999)). Otherwise, Petitioner must establish cause and actual prejudice to avoid imposition of the bar. *Rich v. Calderon*, 187 F.3d 1064, 1066 (9th Cir.1999).

## IV. *Brady v. Maryland*

■ In this successive petition, Petitioner alleges a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Under *Brady*, the prosecution's suppression of evidence favorable to an accused "violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194. The three components or essential elements of a *Brady* prosecutorial misconduct claim are (1) favorable evidence (2) that is withheld by the prosecution (3) that results in prejudice:

> The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.... Corresponding to the second *Brady* component (evidence suppressed by the State), a petitioner shows "cause" when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence; coincident with the third *Brady* component (prejudice), prejudice within the compass of the "cause and prejudice" requirement exists when the suppressed evidence is "material"
> for *Brady* purposes.... [T]he materiality standard for *Brady* claims is met when the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Banks v. Dretke*, 540 U.S. 668, 691, 124 S.Ct. 1256 (2004) (quotations omitted).

Favorable evidence is material, and its suppression is unconstitutional, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the

result of the proceeding would have been different." *United States. v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Reasonable probability "is a probability sufficient to undermine confidence in the outcome." *Id.*

Materiality "must be evaluated in the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The mere possibility that undisclosed information might have helped the defense, or might have affected the outcome of the trial, is insufficient to establish materiality in the constitutional sense. *Id.* at 109–10, 96 S.Ct. 2392. In addition, in order to be material information within the meaning of *Brady*, the undisclosed information or evidence acquired through that information must be admissible. *United States v. Kennedy*, 890 F.2d 1056, 1059 (9th Cir.1989). Petitioner must show how the information or evidence would be both material and favorable to his defense. *Pennsylvania v. Ritchie*, 480 U.S. 39, 58 n. 15, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987).

## V. Ineffective Assistance of Counsel

The clearly established United States Supreme Court law governing ineffective assistance of counsel claims is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Baylor v. Estelle*, 94 F.3d 1321, 1323 (9th Cir.1996) (stating that *Strickland* "has long been clearly established federal law determined by the Supreme Court of the United States"); *Jones v. Wood*, 114 F.3d 1002, 1013 (9th Cir.1997). A habeas petitioner must satisfy two requirements to demonstrate his assistance of counsel was so defective that habeas relief is warranted. First, the petitioner must show that counsel's performance was deficient. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

"This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Second, the petitioner must show counsel's deficient performance prejudiced the defense. *Id.* The test for prejudice requires that the defendant show that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome would have been different. *Id.* at 694, 104 S.Ct. 2052. In other words, petitioner must demonstrate his counsel's error rendered the result unreliable or the trial fundamentally unfair. *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993); *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. Review of counsel's performance is "highly deferential" and there is a "strong presumption" that counsel rendered adequate assistance and exercised reasonable professional judgment. *United States v. Ferreira–Alameda*, 815 F.2d 1251, 1253 (9th Cir.1987); *see Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. Petitioner must prove both elements. The court may reject his claim upon finding either that counsel's performance was reasonable or that the claimed error was not prejudicial. *Strickland*, 466 U.S. at 700, 104 S.Ct. 2052.

In this third federal habeas petition, Petitioner repeats several issues and arguments raised in his trial, along with challenges already made on direct appeal and in prior post-conviction challenges. Petitioner cannot be heard with respect to claims that have already been adjudicated in his prior federal petition for habeas corpus relief. 28 U.S.C. § 2244(b)(1). Even if Petitioner presents a claim that has not been previously adjudicated by this Court, he must demonstrate that the factual predicate for the claim could not

have been discovered previously with due diligence; and he must also show by clear and convincing evidence that if the facts underlying his claim are proven, and viewed in light of the evidence as a whole, no reasonable factfinder would have found him guilty. 28 U.S.C. § 2244(b)(2). In addition, in order for the Court to consider his constitutional claims, Petitioner must show it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *See Schlup*, 513 U.S. at 327, 115 S.Ct. 851. As to each of his claims, Petitioner must demonstrate compliance with the requirements of 28 U.S.C. § 2244(b).

## DISCUSSION

Petitioner is on death row because he is the person who brutally chose to slaughter a father, a mother, and two children in the sanctity of the Ryen home, and leave another child barely clinging to life. The post-conviction DNA testing has confirmed Petitioner's guilt, and the Court rejects Petitioner's claims on the merits. After having conducted mitochondrial DNA testing and EDTA testing, reviewed the parties' papers, heard from testimony from forty-two experts and witnesses, reviewed numerous exhibits, considered the prior record, and listened to the parties' oral arguments, the Court **DENIES** Petitioner's petition pursuant to 28 U.S.C. §§ 2254 and 2244, and on all grounds, including *Schlup v. Delo, Herrera v. Collins, Brady v. Maryland*, and *Strickland v. Washington*.

### I. Ninth Circuit's En Banc Decision Regarding Mitochondrial DNA Testing and EDTA Testing

Petitioner's successive petition challenges the post-conviction DNA evidence of guilt by alleging that his blood was planted on a T-shirt, Trial Exhibit 169, and that further testing of hairs would reveal the assailant. Based on representations made by Petitioner regarding scientific testing capabilities, the Ninth Circuit en banc panel stated:

> In his brief to us, Cooper states, "Through readily available mitochondrial testing of blond hairs found in one of the victim's hands, and testing for the presence of the preservative agent EDTA on a T-shirt[ ] the State belatedly claimed contained Mr. Cooper's blood, the question of Mr. Cooper's innocence can be answered once and for all."

> The district court may be in a position to resolve this case very quickly. As soon as Cooper's application is filed, it should promptly order that these two tests be performed in order to evaluate Cooper's claim of innocence.

*Cooper*, 358 F.3d at 1124.

Therefore, on February 9, 2004, the Ninth Circuit issued an en banc decision that allowed Petitioner to file a second or successive habeas corpus petition in this Court. *Cooper v. Woodford*, 358 F.3d 1117 (9th Cir.2004). Specifically, the Ninth Circuit stated that Petitioner's guilt may be resolved through two scientific tests: (1) mitochondrial DNA testing of hairs found on the victims, and (2) testing of the T-shirt for EDTA preservative. *Id.* at 1123–24.

### II. Mitochondrial DNA Testing Fails to Establish that the Hairs in the Hands of Jessica Ryen are from Other Potential Assailants

The Court conducted mitochondrial DNA testing of hairs found in the hands of the victims pursuant to the Ninth Circuit order. After remand, the Court held a tutorial on April 2, 2004 regarding mito-

chondrial DNA and EDTA testing. Dr. Terry Melton, President and CEO of Mitotyping Technologies, LLC; Dr. Kevin Ballard, Director of Analytical Toxicology of National Medical Services; and Dr. Peter DeForest,[5] a criminalist, participated as Petitioner's experts. Dr. Eva Steinberger, Assistant Chief for New Programs at the California Department of Justice participated as Respondent's expert. (4/2/04 HRT.) On June 3–4, 2004, the Court held an evidentiary hearing where Dr. Edward Blake, Dr. John Thornton and Mr. Steven Myers testified regarding previous examination of the hair evidence for nuclear DNA testing in 2001. Dr. John Thornton was a criminalist who was Petitioner's expert at trial. Dr. Edward Blake was Petitioner's expert during the post-conviction DNA testing. Steven Myers is a Senior Criminalist at the California Department of Justice Bureau of Forensic Services who was involved in the post-conviction DNA testing.

### A. Post–Conviction DNA Testing of the Hairs

At the evidentiary hearing, Dr. Blake and Mr. Myers testified regarding work conducted during the post-conviction DNA testing and forensic examination of the hair evidence. (*See* 6/03/04 HRT 135–178; 6/4/04 HRT 28–111.) In connection with the hearing, Dr. Blake submitted a report detailing the previous forensic hair exami-

nation for post-conviction DNA testing. (04–CV–656, Dr. Blake's Report detailing Previous Examination and Current Evaluation of the Hair Evidence dated 6/04/04, Doc. No. 161 ("Dr. Blake's Report").)

In post-conviction DNA testing in 2001, the hair was examined by highly qualified scientists for suitability for nuclear DNA testing at the Department of Justice DNA Laboratory in Richmond, California. (Dr. Blake's Report at 2–18; 6/3/04 HRT 134–165; 6/4/04 HRT 31–91; 2 State Evidentiary Hr'g Reporters' Tr. ("SEHRT")[6] 253–54.) The selection and documentation of biological specimens suitable for DNA testing, including hair, was done by Petitioner's expert, Dr. Blake, DOJ Laboratory Director Gary Sims, and Mr. Myers. (Dr. Blake's Report at 2–18; Joint DNA Testing Agreement, ¶ 2.10.) Dr. Blake and Mr. Myers looked at approximately 1,000 hairs visually and microscopically. (Dr. Blake's Report at 6–7; 6/3/04 HRT 140–41; 6/4/04 HRT 33–34; 2 SEHRT 275, 280.) All of the hairs were examined using a stereomicroscope. Selected hairs were mounted in order to be viewed under a compound microscope, which provides a higher magnification. (Dr. Blake's Report at 6–7; 6/3/04 HRT 157; 6/4/04 HRT 33–37; 2 SEHRT 278, 300.) There were only three hairs possessing anagen roots that were identified by Dr. Blake and Mr. Myers for nuclear DNA testing.[7] (Dr.

---

5. Dr. DeForest appeared telephonically at the tutorial.

6. Reporters' Transcripts of an evidentiary hearing before Judge Kennedy of the San Diego Superior Court in 2003 are designated by a "SEHRT" and are lodged with the Court in *Cooper I*, 92–CV–427, NOL filed Feb. 3, 2004, Reporter's Tr., Vols. 1–3 dated June 23, 24 and 25, 2003 before Hon. William H. Kennedy in Case No. CR–72787.

7. "Hairs that are forcefully removed from the skin typically possess ribbon-like or club-like root structures and a coating of root sheath

cells ... [and] called anagen roots. Hairs that have this type of root structure contain moderate levels of nuclear DNA. When hair with this type of root structure also possesses root sheath cells, the nuclear DNA levels may be quite large. Hairs that naturally fall out of the skin after the hair root cells die and atrophy typically have the shape of the tip of a Q-tip swab; hair roots with this type of root structure are called telegen roots. These hair roots do not possess any significant amount of nuclear DNA. ... Hair shafts and all hair roots contain at least some level of detectable mitochondrial DNA." (Dr. Blake's Report at 6–7.)

Blake's Report at 7–17; 6/3/04 RT 140–41; 6/4/04 RT 33–37; 2 SEHRT 281.) These hairs were two human hairs collected from Doug Ryen's right hand and a human hair collected from Chris Hughes' arm. (Dr. Blake's Report at 17; *see also* 2 SEHRT 281.) The results of the DNA testing of the there hairs were unsuccessful because no DNA was detected. (Dr. Blake's Report at 17; 6/3/04 RT 148, 156.)

Dr. Blake confirmed that the focus of the examination of the hair in 2001 was to "identify, if possible, hairs recovered from the hands of the Ryen/Hughes victims that possessed the properties of hair forcefully removed from the skin that would be expected to be successful in a PCR based DNA analysis of nuclear genes." (10 Resp. Evidentiary Hr'g Ex. VV at 6; *see* Dr. Blake's Report at 7; 6/4/04 HRT 33–37.)

Dr. Blake and Mr. Myers spent six days examining the hairs removed from the hands of the victims in an effort to find hairs with anagen roots. (6/3/04 HRT 157–158.) As Dr. Blake explained, during this forensic examination of the hair, Dr. Blake and Mr. Myers were looking for pulled hairs from the hands of the victims and the arm of Christopher Hughes so that they could potentially identify the assailant: "For the fairly obvious reason that we were looking for here are hairs that may have come from the bad guy or guys. So cut or broken hairs don't fall into that category." (6/4/04 HRT 38.) The examination of the hairs in 2001 by Dr. Blake and Mr. Myers revealed only three anagen hairs. (Dr. Blake's Report at 17; 6/3/04 HRT 140–41; 6/04/04 HRT 34–37; 2 SEHRT 281.)

As Dr. Blake's report detailing the previous examination and evaluation of the hair evidence explains, there is no evidence to support the theory that hairs were pulled from the assailant during the murders:

Hairs jerked from the scalp are expected to posses anagen root structures and also frequently possess root sheath material at the hair root end.

. . .

The vast majority of the hairs associated with the hands of the Ryen/Hughes victims of either broken or cut human hairs or animal hairs.

. . .

Since the vast majority of the hairs associated with the hands of the Ryen/Hughes are either cut or broken human hairs or animal hairs, there is no evidence to support the assertion that these hairs were pulled from the scalp of an assailant or assailants.

(Dr. Blake's Report at 17–18.)

From the previous forensic examination of the hairs by Dr. Blake and Mr. Myers, three hairs possessing anagen roots were found and were tested for DNA extraction and analysis. No human DNA was recovered from these hairs. (Dr. Blake's Report at 17.)

### B. Mitochondrial DNA Testing Results

At the tutorial, Dr. Terry Melton, Petitioner's mitochondrial DNA expert, testified that mitochondrial DNA testing is different from nuclear DNA testing. (4/2/04 HRT 19–25.) With nuclear DNA testing, it is possible to match with a high degree of specificity an unknown sample of nuclear DNA to a reference sample of nuclear DNA. This is because, except for twins, nuclear DNA is unique to the individual. (4/2/04 HRT 19.) In contrast, mitochondrial DNA found in the hair is inherited maternally and is shared by all maternal

relatives. (4/2/04 HRT 19.) For this reason, mitochondrial DNA testing is not able to conclusively identify the source of the hairs, but rather serves as an exclusionary tool to rule out certain individuals as a possible donor of the hair:

[Mitochondrial DNA is] inherited from the mother. And all siblings of that mother will have the same type. The mother will have the same type as her mother and her grandmother and so forth. So, the primary difference between nuclear and mitochondrial DNA, when it applies to forensics, is that it is not a unique identifier.... It is a maternal lineage identifier....

(4/2/04 HRT 19–25.) [8]

After considering the extensive post-conviction hair analysis done by Petitioner's expert and the testimony of Dr. Melton, Dr. Blake and Dr. Thornton, the Court ordered mitochondrial DNA testing. The Court authorized Petitioner's expert, Dr. Peter De Forest to select ten hairs that were recovered from Jessica's right and left hands and to select, as a control, one animal hair covered with blood from the hair evidence sent from the DOJ DNA Laboratory. (See 6/4/04 Order Re Mitochondrial DNA Testing, 04–CV–656, Doc.

No. 75.) In addition, the Court ordered testing of the two remaining hairs identified in the 2001 post-conviction DNA testing as having anagen roots, D–4A (one hair from the right hand of Doug Ryen), E–1A (one hair from the arm of Chris Hughes) and D–4C,[9] (one hair from the right hand of Doug Ryen). (See 04–CV–656, Doc. No. 75, Order RE Mitochondrial DNA Testing, filed 6/4/04.)

On August 2, 2004, Dr. Melton submitted a report regarding the results of the mitochondrial DNA testing. (04–CV–656, Doc. No. 155, Mitochondrial DNA Testing Report ("Dr. Melton's Report").) According to the report, the hairs contained in Jessica Ryen's hands were either animal hairs or hairs from Jessica herself or from someone maternally related to her. (Dr. Melton's Report at 6–8.) Two of the ten hairs selected by Dr. DeForest, Petitioner's expert, were from domestic dogs. (Dr. Melton's Report at 3.) The results confirmed that Jessica Ryen, Peggy Ryen, and Josh Ryen and their maternal relatives could not be excluded as the donors of the tested hairs, including the hairs found in Jessica Ryen's hand. (Dr. Melton's Report at 6–8.)

Six days of hair analysis in post-conviction DNA testing plus mitochondrial DNA testing of hairs have been conducted to address Petitioner's claim that a third-party assailant committed the crime.[10] This

**8.** Consistent with Dr. Melton's testimony and verified by Dr. Edward Blake (6/4/04 HRT 59), Mr. Steven Myers testified that up to seven percent of the Caucasian population have the most common mitochondrial DNA sequence. (6/3/04 HRT 159.) Because mitochondrial DNA is unable to match an unknown mitochondrial DNA type to a particular individual with an acceptable degree of certainty, this testing is not able to positively identify the assailant of the Ryen/Hughes murders as contemplated by the Ninth Circuit en banc order permitting a second or successive petition. In fact, mitochondrial DNA testing cannot even positively identify whether any of the hairs are from one of the victims since maternal relatives share a common mi-

tochondrial DNA type. What the mitochondrial DNA testing may do, however, is exclude people not sharing the mitochondrial DNA type found in the tested hairs.

**9.** It was acknowledged that D–4B was consumed in nuclear testing and had no root. Therefore, the Court allowed testing of D–4C, a hair with a telogen root structure. (6/4/04 HRT 112.)

**10.** Mitochondrial DNA analysis of one hair costs $2,500. In total, analysis of the fourteen hairs cost approximately $50,000 which includes testing and analysis by Dr. Melton, who conducted the mitochondrial DNA testing and Dr. De Forest, who selected the hairs.

Court has responded fully to the concern expressed by the Ninth Circuit regarding mitochondrial DNA testing of the blond or light brown hair in Jessica's left hand. In fact, this Court allowed Petitioner to test hairs from both of Jessica's hands. The Court also permitted the testing of two hairs from Doug Ryen's right hand and one hair from Christopher Hughes. The testing failed to identify another assailant and confirmed that all tested hairs most likely came from one or more of the victims.

This should not be surprising. The hairs adhered to the victims' bodies, including their hands, because there was a large amount of blood on the victims and a large amount of hair on the debris-ridden carpet. Also, the victims each sustained hatchet wounds to the head, causing clumps of cut hair to fall to the ground. Both animal and human hair were recovered from the hands of the victims. Just as with the animal hairs, the cut and shed human hairs adhered to the bloodied victims' hands because the victims came in contact with the carpet when they were dying on the floor. In this case, both the state and federal courts have thoroughly reviewed the evidence, making reasoned decisions that the evidence of Petitioner's guilt is overwhelming. The Court concludes that mitochondrial DNA testing has failed to show that someone other than Petitioner committed the murders.

### C. Ineffective Assistance of Counsel Regarding Hair Evidence

Petitioner claims he received ineffective assistance of counsel regarding counsel's failure to introduce photographic evidence regarding the hair evidence. Petitioner's claim does cannot satisfy the requirements of 28 U.S.C. 2254 or § 2244(b). The examination of the hairs in 2001 by Dr. Blake

and Mr. Myers revealed no pulled hairs, let alone clumps of pulled hairs, in the hands of the victims. (Dr. Blake's Report at 17–18; 6/3/04 HRT 140–41; 6/4/04 HRT 34–37.)

Pursuant to this successive petition, the Court ordered mitochondrial DNA testing of hair evidence. The mitochondrial testing results show that Jessica Ryen, Peggy Ryen, and Josh Ryen and their maternal relatives cannot be excluded as the donors of the tested hairs, including the hairs found in Jessica Ryen's hand. (Dr. Melton's Report at 6–8.) Thus, Petitioner's "clutching" theory has no merit and is not a proper basis of an ineffective assistance of counsel claim. Accordingly, the Court **DENIES** this claim on the merits and under 28 U.S.C. § 2244(b).

### 1. The Court DENIES the Claim of Ineffective Assistance of Counsel Regarding Hair Evidence

This Court accords deference to the California Supreme Court decision denying Petitioner's claim on the merits. 28 U.S.C. § 2254(d). The state court's denial of Petitioner's claim on the merits is not contrary to federal law as enunciated by the United States Supreme Court in *Strickland* and does not rest on an unreasonable determination of the facts within the meaning of 28 U.S.C. § 2254(d). As both the California Supreme Court and this Court have already expressly found, Petitioner " 'received an extraordinarily vigorous and able defense.' " *Cooper I*, 92–CV–427, Aug. 25, 1997 Order at 8 (quoting *Cooper*, 53 Cal.3d at 824, 281 Cal.Rptr. 90, 809 P.2d 865). Defense trial counsel's extensive educational background and prior litigation experience were developed in the evidentiary hearing before this Court in *Cooper I*, 92–CV–427, Aug. 25, 1997 Order

at 8. Moreover, both this Court and the California Supreme Court found the combination of evidence of Petitioner's guilt to be overwhelming. *Cooper I*, 92–CV–427, Aug. 25, 1997 Order at 8 (quoting *Cooper*, 53 Cal.3d at 836, 281 Cal.Rptr. 90, 809 P.2d 865). Accordingly, the California Supreme Court's decision rejecting the merits of Petitioner's claim is not contrary to federal law, nor an unreasonable determination of the facts, since defense counsel was not deficient, nor was Petitioner prejudiced by his attorney's failure to pursue an erroneous theory. This Court therefore **DENIES** this claim pursuant to 28 U.S.C. § 2254(d).

### 2. Petitioner Does Not Satisfy the Requirements of § 2244(b)

If Petitioner has previously adjudicated a claim of ineffective assistance of counsel in this Court, his pending claim of ineffective assistance of counsel must be dismissed. 28 U.S.C. § 2244(b). New factual grounds in support of a legal claim that has already been presented, i.e., ineffective assistance, are not sufficient to evade the mandatory dismissal requirement of 28 U.S.C. § 2244(b). *See Babbitt*, 177 F.3d at 746. Petitioner already complained about his defense trial counsel's performance in a myriad of claims of ineffective assistance of trial counsel in his first habeas corpus petition, *Cooper I*, 92–CV–427, Suppl. Pet. at 63–147, all of which were denied on the merits by this Court. *Cooper I*, 92–CV–427, Aug. 25, 1997 Order at 7–33. The gravamen of the claim of ineffective assistance of trial counsel is the same, regardless of whether Petitioner presents new and different legal arguments or different factual allegations. *See Babbitt*, 177 F.3d at 746. Petitioner made allegations about trial counsel unreasonably failing to advocate regarding forensic evidence. (*See Cooper I*, Suppl. Pet. at 121–141.) The

thrust of Petitioner's attack on his defense counsel's failure to advocate regarding the evidence of the hair in the victims' hands is the same here. The Court therefore **DENIES** this claim pursuant to 28 U.S.C. § 2244(b).

Petitioner's claim is also **DENIED** because he could have presented the legal and factual basis of his claim previously with due diligence in the first petition. 28 U.S.C. § 2244(b). That hair was recovered from the victims' hands was a fact known to the defense before and throughout the trial. (Answer, Ex. 103 (defense trial file).) Hair evidence was collected from the victims during the autopsy and provided for examination to Petitioner's defense trial expert Dr. Thornton, then a practicing criminalist and forensic science professor.

Assuming arguendo that Petitioner could demonstrate that the factual and legal basis of his claim could not have been discovered previously with due diligence, he would still be required to demonstrate that the facts underlying his claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable juror would have found him guilty of the Ryen/Hughes murders. 28 U.S.C. § 2244(b). Petitioner does not meet this standard. The guilt of Petitioner was demonstrated by overwhelming evidence at trial and reaffirmed through post-conviction DNA testing. Moreover, the mitochondrial DNA testing failed to substantiate his theory of another assailant. Accordingly, the Court **DENIES** his claim of ineffective assistance of counsel.

### III. EDTA Testing

At trial, Petitioner introduced a T-shirt (Trial Exhibit 169) found within two miles

from the crime scene into evidence in support of his claim that it belonged to the real killer. (Trial Ex. 169; 87 RT 3065; 105 RT 7587). This exhibit was never used by the prosecution at trial as incriminating evidence, but solely by the defense. As a result, the prosecution at trial did not link the T-shirt to Petitioner's judgment of conviction and sentence of death.

The T-shirt was subject to DNA testing in 2001 at Petitioner's request. The results of the DNA testing indicated that blood on the T-shirt belonged to Petitioner and the victims. These DNA tests were done pursuant to a Joint DNA Forensic Testing Agreement entered on May 10, 2001. (Joint DNA Agreement dated May 10, 2001.)

These results provide strong evidence of Petitioner's guilt. Specifically, as to the T-shirt, the joint DNA testing report found the following:

a bloodstain on a tee shirt found on the side of a road within two miles of the Ryen home had DNA matching Cooper's and partial DNA profiles matching that of two of the victims, Doug and Peggy Ryen. The DNA matching Cooper's found on the t-shirt occurs at random in the population with a frequency of about 1 in 110 million for African Americans, 1 in 16 million for Caucasians, and 1 in 12 million for Western Hispanics.

(Supplemental DOJ Physical Evidence Exam Report dated Sept. 24, 2002 at 1–4.)

Faced with the overwhelming evidence confirming Petitioner's guilt obtained from the agreed-upon post-conviction testing, Petitioner claimed to the Ninth Circuit that the blood on the T-shirt had been planted. Based on the last-minute representations made by Petitioner regarding scientific testing capabilities, the en banc panel of the Ninth Circuit concluded:

First, Cooper asks that the blood on the t-shirt be tested for the presence of the preservative EDTA. The presence of such a preservative would show that his blood was not on the t-shirt at the time of the killings, but was rather placed there at some later time.

Cooper, 358 F.3d at 1124.

In a separate concurring opinion, Judges Silverman and Rawlinson observed as follows:

If the blood was planted, [Cooper] says, it will reflect a high level of EDTA, a preservative agent contained in the vial in which the blood was stored. A high level of EDTA will show that the blood came from the vial rather than directly from him, proving that the police tampered with evidence in an effort to frame him. Conversely, if the blood is not contaminated by EDTA, the shirt conclusively proves his guilt.... Since Cooper's guilt can be quickly and definitively determined by means of a simple test, there is no reason not to have it performed prior to his execution.

Id. at 1125.

Petitioner represented to the Ninth Circuit that Dr. Ballard and his lab could perform a scientific test that would reveal whether tampering with the blood on the T-shirt had occurred. According to Dr. Kevin Ballard's declaration:

NMS [National Medical Services] and myself specifically can perform the EDTA test to determine whether the blood on the T-shirt ... had been previously stored in a test tube containing EDTA.

(Petitioner's Application to the Ninth Circuit, Appendix No. 42 at 3, 10.)

On remand, this Court complied with the Ninth Circuit's order to test the T-shirt for

elevated levels of EDTA to determine whether tampering occurred. Now, over one year after the remand, the process has not been "quick," as Petitioner promised. Nevertheless, the tests have not supported Petitioner's theory of evidence tampering. Tests performed by Petitioner's chosen expert, Dr. Ballard, failed to find elevated levels of EDTA in the subject stain. These results confirm that Petitioner's tampering theory lacks merit, and supplement the already overwhelming evidence of Petitioner's guilt in the murders of the Ryen family and Christopher Hughes.

## A. Development of the EDTA Testing Protocol

On April 2, 2004, the Court held a tutorial presented by the parties which addressed EDTA testing. Dr. Ballard participated in the tutorial for Petitioner and Dr. Eva Steinberger participated in the tutorial for Respondent. Both experts testified that the known concentration in one microliter of blood from a purple-topped tube [11] was 1300 nanograms.[12] (*See* 4/2/04 HRT 54, ll. 22–25; 113, l. 9.)

Based on the recommendations of the parties, the Court adopted a "control" method of testing in which the amount of EDTA detected in a stain would be compared to the amounts of EDTA found in various control swatches from other non-stained portions of the T-shirt. This method was proposed by Dr. Ballard and by Mr. Marc LeBeau, Chief of the Chemistry Unit of the FBI Laboratory in Quantico, Virginia. (04–CV–656, Doc. No. 51, Ballard Decl. ¶ 3; Doc. No. 23, Ex. 2, LeBeau Decl. ¶¶ 7–10.) Dr. Ballard agreed that "while it is always helpful if it is possible to measure the amount of blood,[13] it is actually not necessary because there are ways to determine whether or not EDTA findings are meaningful, specifically through the appropriate use of unstained control specimens from the same evidence item." (04–CV–656, Doc. No. 51, Ballard Decl. ¶ 3.) Because blood does not naturally contain any EDTA,[14] the EDTA levels in the stain and the background material should be comparable. If the EDTA found in the stain greatly exceeded the amount of the EDTA found in the background material, Petitioner and Dr. Ballard advanced that it may support a theory of planting. In this case, there appeared to be an adequate area for control testing in the T-shirt, so that a control method of comparison of relative levels of EDTA could theoretically be done consistent with the Ninth Circuit order to conduct EDTA testing.

The Court reserved judgment on the admissibility of the test results under *Dau-*

---

11. Petitioner alleged a theory of tampering involving blood from a purple-topped tube. (04–CV–656, Doc. No. 97 at 8.) Following his arrest for the murders, Petitioner's blood was drawn into a purple-topped tube for the San Bernardino County Sheriff's Crime Lab. (*Id.*) This purple-topped tube contains only EDTA as a preservative. (*Id.*) The San Bernardino County Sheriff's crime lab records do not reflect the receipt of any other samples. (*Id.*)

12. A nanogram is one billionth of a gram, a microgram is one millionth of a gram, and a milligram is one thousandth of a gram. Similarly, a microliter is one millionth of a liter, or one thousandth of a milliliter. (Tutorial Tr., April 2, 2004, at 55, ll. 11–24.)

13. Dr. Ballard had offered to "eyeball" the volume of blood in a subject stain. (4/2/04 HRT 123.) For obvious reasons, Dr. Ballard's "eyeball" measurement of blood volume was not acceptable to the Court.

14. EDTA is not a naturally occurring molecule. It is a synthetic chemical that was patented in 1935. (4/2/04 HRT 54.)

bert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and ordered briefing and a hearing to address the admissibility of EDTA evidence. (See 04–CV–656, Doc. Nos. 95 & 7.) Respondent vigorously maintained that any EDTA testing ran afoul of Daubert. After briefing was submitted by the parties, on June 17, 2004, the Court denied without prejudice Respondent's motion regarding inadmissibility of the EDTA evidence and reserved the right to later rule on the admissibility of the EDTA testing evidence under Daubert. (04–CV–656, Doc. No. 97.)

The EDTA protocol was developed by the parties and the Court over a three-month period. By invitation of the Court, Petitioner filed the proposed protocol on June 4, 2004,[15] and Respondent filed its opposition on June 29, 2004. Respondent objected that Petitioner's proposed testing of "any areas that appear to contain blood that have not previously been tested and, if possible, the remainder of any stains previously tested" was vastly overbroad. (04–CV–656, Doc. No. 106 at 1.) The Court agreed that such expansive testing was not warranted under Petitioner's own theory. Because Petitioner's theory was that all stains containing his blood were planted, testing of any one of his known blood stains from the post-conviction DNA testing should confirm or disprove Petitioner's guilt.

The Court ordered Petitioner to submit a more detailed revised proposed protocol for EDTA testing, which Petitioner filed on July 13, 2004. Respondent was then ordered to submit a response, which Respondent filed on July 27, 2004. Petitioner filed a reply to Respondent's response on

August 4, 2004. At the hearing on August 13, 2004, the Court ordered that the parties meet and confer regarding the EDTA protocol and report back to the Court on August 24, 2004. The Court held additional status conferences to revise the EDTA testing protocol with the parties on August 25, 26, and 27, 2004 and September 3 and 7, 2004 to finalize the EDTA testing protocol and discuss EDTA testing procedures.

Petitioner consulted with experts for the development of the protocol. For example, at a status conference on August 26, 2004, the Court provided the parties with a copy of its proposed testing order and offered that "[w]e could just go through it right now and get your comments ... [and] incorporate it." (8/26/04 HRT 209, ll. 17–18.) Petitioner declined and asked for an additional day to review the proposed order so that he could consult with Drs. De Forest and Ballard "to make sure that they don't see any issues[.]" (8/26/04 HRT 210, ll. 1–3.) At that time, an issue also arose as to the appropriate buffer solution to use in testing, methanol or phosphate buffered saline ("PBS"). Before any decision was made regarding the buffer solution, Petitioner's counsel requested and was granted permission to consult with Dr. Ballard. (8/26/04 HRT 207, ll. 13–15.) On August 27, 2004, in another telephonic conference in which the parties had the opportunity to comment on the proposed order, Petitioner's counsel explained that PBS rather than methanol was the appropriate buffer, based on his consultations with his experts: "[Dr. De Forest] actually expressed concern about the methanol issue and the like, and he gave me a long discussion about it, and it was enough chemistry

---

**15.** The Court authorized over thirty hours for Petitioner to consult with Dr. Ballard prior to June 4, 2004, and twenty additional hours

thereafter. In addition, the Court authorized $12,063 for Dr. DeForest.

for me." (8/27/04 HRT 2, ll. 15–18.) Based on this recommendation, the Court adopted PBS as the appropriate buffer solution for the EDTA protocol.

The record is replete with examples where Petitioner's counsel represented to the Court that he was consulting with his experts on the details of the EDTA protocol. (*See, e.g.,* 8/27/04 HRT 7, ll. 12–19 ("I'd have to defer to ... De Forest on that and ... Dr. Ballard."); 5/12/04 HRT 45, l. 25; 8/26/04 HRT 202, ll. 7–11; 9/3/04 HRT at 8–9.)

Following this extensive dialogue with the parties, on Aug. 27, 2004, the Court issued an EDTA testing order detailing the procedure for EDTA testing to be conducted on the T-shirt.[16] In the original EDTA testing order, Petitioner's criminalist, Dr. Peter De Forest, was designated to select the appropriate area of stain 6G for testing and to select the appropriate control areas around 6G and to perform the extraction. (*See* 04–CV–656, EDTA Testing Order filed August 27, 2004.) The Court selected 6G because previous DNA testing had indicated that 6G contained Petitioner's blood as the sole, or major donor and further nuclear DNA testing could potentially be avoided. The Court recognized that any testing should resolve Petitioner's theory of tampering, which asserts that all blood from Petitioner found on the T-shirt is necessarily planted.

After working with the parties for three months to develop the EDTA testing order, the Court scheduled the testing to begin on September 7, 2004. On the evening of September 3, 2004, the Friday before testing was to begin the following week, Dr. De Forest informed the Court via fax that he did not wish to continue working on this case based on the court-ordered protocol. Dr. De Forest stated that he would "not agree do (sic) any sampling according to this protocol" and that "unless [he] ha[d] the freedom and flexibility to design the sampling protocol in conjunction with a criminalist representing the prosecution, [he] d[id] not wish to continue." (04–CV–656, Ltr. from Dr. Peter R. De Forest to Court dated Sept. 3, 2004 filed under seal on Nov. 9, 2004.)

Therefore, on September 7, 2004, the Court held a status conference concerning the selection of another expert and laboratory to conduct the extraction part of the testing. During that conference, the Court permitted the parties to suggest alternative labs of their choosing but stated that "[i]n the absence of an agreement, I will choose Selmark (sic), a reputable lab, to just do the prep." (9/7/04 HRT 6, ll. 12–14.) At that time, Respondent stated "we have no objections to Selmark (sic). We consider it to be a well-qualified and respected lab." (*Id.* at 7.) Petitioner also agreed that Cellmark is "very highly qualified" with a "very high reputation." (*Id.* at 13, l. 15.) Dr. Lewis Maddox of Cellmark was designated to conduct the extraction, with Dr. Ballard and Dr. Gary Suizdak, Associate Professor and Senior Director of the Mass Spectrometry Lab at the Scripps Research Institute, to do separate EDTA testing. (*Id.* at 22.) On September 7, 2004, the Court issued an amended EDTA Testing Order addressing the change in experts replacing Dr. De

---

16. At no time during this three-month period did Petitioner suggest the inclusion of presumptive blood testing as part of the EDTA testing protocol, even for the control areas. In fact, Petitioner's expert at the time, Dr. DeForest, recognized the protocol as "unusually detailed" in his letter dated July 20, 2004. (*See* 04–CV–656, De Forest Ltr. dated 7/20/04.)

Forest with Cellmark to conduct the extraction, and retaining Dr. Ballard as Petitioner's chosen expert for the EDTA testing.

## B. Administration of the EDTA Test

On September 13, 2004, Cellmark's Dr. Maddox and Respondent informed the Court that area 6G had been consumed in prior testing and was not suitable for EDTA testing and requested the Court's guidance.[17] The Court ordered Dr. Maddox, in consultation with Mr. Steven Myers,[18] to select an appropriate stain area and to prepare it for EDTA testing in accordance with the Amended EDTA Testing Order filed September 7, 2004. (*See* 04–CV–656, Doc. No. 235.) Prior post-conviction DNA testing done by Petitioner's expert and Respondent showed that areas 6J and 6K "were consistent with having Kevin Cooper as a clear majority contributor." (Resp't Opp. to Motion for Order Re EDTA Testing, Ex. A ¶ 14.) Therefore, Dr. Maddox, in consultation with Mr. Myers selected an area between stains 6J and 6K.[19] (*Id.*)

After the extraction was completed, the vials containing the samples were shipped to Dr. Ballard and Dr. Suizdak to conduct double-blind EDTA testing. The test results were submitted to the Court on October 4, 2004. The Court issued an order regarding the EDTA test results and provided the reports of Drs. Maddox, Ballard and Suizdak to the parties. On October 29, 2004, Petitioner and Respondent filed their respective analyses of the EDTA test results. On November 5, 2004, Respondent filed a response to Petitioner's analysis of the EDTA test results and Petitioner filed a response to Respondent's analysis of the EDTA test results on November 8, 2004.

On November 15, 2004, the Court held a hearing concerning EDTA testing results of the T-shirt. The parties agreed that DNA testing was required to determine whether the main stain fabric cut-out from the EDTA testing contained Petitioner's blood.[20] Petitioner and Respondent concurrently filed a proposed protocol for DNA testing on November 8, 2004 and both parties filed responses on November 12, 2004. On November 19, 2004, the

---

**17.** Petitioner's post-conviction experts also knew that area 6G had been consumed in prior testing. In good faith, both sides mistakenly thought that 6G was still available.

**18.** The Court declined to fund a third expert on the short notice following Dr. DeForest's decision not to participate. This additional expenditure was not approved as part of the budget required to be submitted to the Court, the Ninth Circuit Capital Committee and the Judicial Council. Petitioner had already agreed to Cellmark as a "very highly qualified" and "very well respected" substitute (9/7/05 HRT 13, l. 15), and Dr. Maddox of Cellmark participated in the selection. Moreover, the stain selected by Dr. Maddox and Mr. Myers had previously been identified by

Petitioner's DNA expert as having Petitioner as the major donor.

**19.** This was a logical choice. Because Petitioner's claim is that only his blood was planted, this theory would be most relevantly explored by testing an area known to contain Petitioner's blood. As Dr. Ballard has previously testified, "Once EDTA is extracted from a sample, the sample can no longer be used for DNA testing." *See Pompey,* No. S–1594–89 slip op. at 11.

**20.** Dr. Ballard did not inform this Court or the Ninth Circuit what he had previously testified to in *Pompey*—that DNA testing cannot be performed on a sample following EDTA analysis. *Pompey,* No. S–1594–89, slip op. at 11.

Court held a telephonic hearing about the proposed DNA protocols. After discussion with the parties, the telephonic hearing was continued to November 22, 2004 in order to allow the parties to further consult with their respective experts. On November 24, 2004, based on the proposed protocols, the Court filed a Protocol for DNA Testing of the Main Stain Fabric Cut–Out and Control. Steven Myers, Respondent's expert, and Marc Taylor, Petitioner's expert, performed the DNA testing.

From the results of that testing, Petitioner cannot be excluded as a contributor of the DNA extracted from the subject cut-out[21] while Peggy Ryen, Jessica Ryen, Josh Ryen, Doug Ryen, and Chris Hughes are each eliminated as a possible contributor of the interpreted profile. (04–CV–656, Doc. No. 305, Physical Evidence Examination Report and Report of Monitoring of DNA testing filed 12/23/04.)

---

**21.** The subject stain revealed a partial profile with interpretable results at four STR loci and amelogenin. (See 04–CV–656, Doc. No. 305,

## C. The EDTA Test Results Do Not Support Petitioner's Theory of Tampering

### 1. Summary of the EDTA Test Results

On September 13, 2004, Cellmark performed extraction procedures on the T-shirt in accordance with the Court's September 7, 2004 order. The extracts were prepared in PBS buffer from a stained area of the T-shirt and from five control areas of the T-shirt that did not appear to be stained. (04–CV–656, Doc. No. 244, Report at 1.) A Control T-shirt was prepared in compliance with the Court's order. (Id.) From that Control T-shirt, extracts were prepared using a human blood stain containing EDTA, a human blood stain without EDTA, and an area that was not stained with human blood. (Id.) A PBS buffer reagent blank control that contained no EDTA was also prepared. In total, there were ten extracts. The extracts were divided, the specimens coded to conceal their contents and sent to the experts.

Dr. Ballard's results were as follows:

---

Physical Evidence Examination Report filed 12/23/04.)

| Specimen No. | Specimen Contents Prepared from: | Approximate Amount of EDTA (in nanograms) on the Original Cloth Cutting[22] |
|---|---|---|
| F041568 01.2 | Stained area of T-shirt | 110 |
| F041568 02.2 | Control 1 of T-shirt | 220 |
| F041568 03.2 | Control 2 of T-shirt | 360 |
| F041568 04.2 | Control 3 of T-shirt | 160 |
| F041568 05.2 | Control 4 of T-shirt | 110 |
| F041568 06.2 | Control 5 of T-shirt | 16 |
| F041568 07.2 | Stain made from unpreserved blood on the Control T-shirt | 7 |
| F041568 08.2 | Stain made from blood preserved in a purple-topped tube on the Control T-shirt[23] | 1100 |
| F041568 09.2 | Unstained area from the Control T-shirt | 6 |
| F041568 10.2 | PBS Buffer Reagent Blank Control | None detected |

[22] Dr. Ballard estimated this total using the levels of EDTA he found in 100 microliters of fluid to calculate the amount in the entire 600 microliter sample prepared by Cellmark from each cloth cutting.

[23] This blood contained the standard concentration of EDTA found in a purple-topped tube, 1300 ng/L.

(04–CV–656, Doc. No. 22, Dr. Ballard's Test Results at 2.)

Dr. Suizdak also conducted EDTA testing on the ten specimens. Dr. Suizdak was without the benefit of Dr. Ballard's method for EDTA testing, as Dr. Ballard requested that his EDTA testing methodology be sealed.[24] On October 27, 2004,

24. Although Dr. Suizdak, an Associate Professor and Senior Director of the Mass Spectrometry Lab at the Scripps Research Institute (04–CV–656, Doc. No. 204), was qualified in mass spectrometry, he had never done EDTA testing and analysis and agreed to participate based on the goal of publication. (8/27/04 HRT at 22, ll. 203; 23, ll. 6–8.) One problem encountered in this case was while many labs like the Scripps Research Institute possess the equipment for the test, there are no other scientists that regularly perform this type of testing.

after he had completed his EDTA testing and submitted his measurements to the Court, Dr. Suizdak retracted his report based on EDTA contamination. (04–CV–656, Doc. No. 322, Ltr. from Dr. Gary Suizdak to Court filed under seal on October 27, 2004). Dr. Suizdak had found significant levels, 313 nanograms, of EDTA in the PBS buffer reagent blank control sample where zero EDTA was the known control. PBS buffer reagent contains no EDTA. If the test had been properly carried out, the PBS buffer reagent blank control sample should have been found to contain zero nanograms of EDTA. According to both Dr. Suizdak and Respondent's expert Terry D. Lee, Ph.D., the presence of EDTA in the control sample indicates that Dr. Suizdak's samples were most likely contaminated by EDTA present in his lab prior to his testing. (Resp't Analysis of EDTA Test Results filed Oct. 29, 2004, Lee Decl. ¶ 6.) As Dr. Lee explained, "once a sample is contaminated, there is no way to go back and obtain an accurate result." (*Id.*) Because, in the absence of valid control specimens, the Court cannot rely on Dr. Suizdak's results, it will focus its analysis on the results of Petitioner's chosen expert, Dr. Ballard.

## 2. Analysis of EDTA Testing Results

Petitioner's post-conviction DNA expert identified the area in between 6J and 6K to have Petitioner as the majority contributor to those stains. This stain area ("subject stain") was tested by Dr. Ballard, along with five control areas around the subject stain. The testing conducted by Petitioner's expert, Dr. Ballard, is inconsistent with Petitioner's theory of tampering. If Petitioner's theory were correct, there would be spiked levels of EDTA in the subject stain on the shirt relative to the levels of EDTA found in the background material. Dr. Ballard's testing re-

vealed the opposite: that the subject stain contains a level of EDTA (1) lower than most of the controls on the T-shirt, and (2) dramatically lower than the level of EDTA expected in a tampering scenario involving blood from a purple-topped tube.

According to Dr. Ballard, approximately 110 nanograms of EDTA were present in the subject blood stain. This amount was the second lowest for all of the samples taken from the T-shirt. For the controls, the average amount of EDTA found was 173 nanograms, with a range from 16 to 360 nanograms. The EDTA in the subject blood stain is below the average for all five control areas on the T-shirt. This similarity between the level of EDTA found in the background and the level found in the subject stain does not support Petitioner's theory that the blood was planted. As Petitioner represented to the Ninth Circuit, "[i]f the blood was planted ... it will reflect a high level of EDTA." *Cooper,* 358 F.3d at 1124. But the flip side of that coin, as observed by Judges Silverman and Rawlinson in their concurrence, is that "if the blood is not contaminated by EDTA, the shirt conclusively proves [Cooper's] guilt." Dr. Ballard's results place Petitioner squarely within that second scenario. The EDTA level in the subject stain is not elevated, but is instead lower than that of most of the control areas. As a result, the test refutes Petitioner's tampering theory.

The results from the subject stain dramatically differ from the results from the Control T-shirt, on which blood was "planted" from a purple-topped tube. On the Control T-shirt, blood from a purple-topped tube containing EDTA as a preservative was "planted" in a stain similar in size to the subject stain. In that sample, Dr. Ballard found 1100 nanograms of

EDTA, as expected. The "planted" blood on the control T-shirt reflects an EDTA level *ten times as great* as the level of EDTA detected in the subject stain (110 ng). If, as Petitioner contends, Petitioner's blood had indeed been placed on the T-shirt unnaturally, there should be a level of EDTA similar to—not dwarfed by—that found in the "planted" blood on the Control T-shirt.

## Dr. Ballard's EDTA Test Results

### (in nanograms)

The controls built into this testing process confirm Dr. Ballard's results. The PBS buffer reagent blank control contains no EDTA, and Dr. Ballard found none. (Resp't Analysis of EDTA Test Results filed Oct. 29, 2004, Lee Decl. ¶ 3.) The specimens from the unstained area of the Control T-shirt, as well as the area stained with blood without EDTA, had minuscule levels of EDTA—6 and 7 nanograms, respectively. The specimen created from the blood stain with EDTA had 1100 nanograms, which represents an 84% recovery

of the expected amount of EDTA in that sample. (*Id.*) These controls confirm that the levels of EDTA in the T-shirt were accurately measured.

From the test data, the Court concludes that the level of EDTA in the subject stain is 110 nanograms. Comparing the EDTA level of the subject stain to that for the control specimens, the Court concludes there is no reliable evidence of tampering. Similarly, when one compares the EDTA level in the subject stain to the high level present in the preserved blood "planted" on the Control T-shirt, 1100 ng, tampering becomes even less probable. In short, 110 ng of EDTA in the subject stain is not significant to show tampering.

Further testing is unnecessary given Petitioner's inability to show from these results the support for his tampering theory. Accordingly, the Court finds Petitioner's theory of tampering to be without merit.

### D. EDTA Testing Falls Short of the Standards for Reliability Set by Daubert and the Federal Rules of Evidence

Although the absence of elevated levels of EDTA does not support Petitioner's theory of evidence tampering, the Court additionally concludes that EDTA testing lacks sufficient indicia of reliability to be admissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). When EDTA testing was presented as an option to the en banc Ninth Circuit on the eve of execution, it was promoted as a basic, reliable test that could be easily administered to establish Petitioner's culpability in the murders "once and for all." *Cooper,* 358 F.3d at 1124. These representations regarding the simplicity of EDTA testing in the forensic context were misleading.

Petitioner admits that EDTA testing has only been offered for admission in two cases: *People v. Orenthal J. Simpson,* and *State of New Jersey v. Josh Pompey,* No. S–1594–89 (N.J.Super. April 10, 1997). In *Pompey,* the EDTA test results were excluded by the court after scathing criticism of Dr. Ballard's credibility and scientific methodology: "[Dr.] Ballard skewed the presentation of his data, obscured the significance of his findings and changed his hypothesis to suit defendant's tampering theory[,]" rendering "his ultimate conclusions worthless." *Id.* slip op. at 29. In the O.J. Simpson case, neither side raised a scientific challenge for strategic purposes, although its admissibility under the more lenient state-court *Kelly/Frye* standard was in question. *See* Henry C. Lee, Ph.D. & Frank Tirnady, *Blood Evidence, How DNA is Revolutionizing the Way We Solve Crimes* 279–80 (2003)[*Blood Evidence* ] (Suppl. Ex. to Resp't's *Daubert* Brief, Doc. No. 375 filed April 18, 2005.). While the extraction and measurement of EDTA in a sample may theoretically be accomplished, the ubiquity of EDTA in the environment prevents any meaningful interpretation of the significance of an "elevated" level of EDTA within a forensic sample. This shortcoming is underscored by the lack of acceptance of EDTA forensic testing in the scientific community. Petitioner concedes that there has been no peer review or publication on the subject of EDTA testing to prove tampering in the scientific community. (04–CV–656, Doc. No. 51, Ballard Decl. ¶ 8.) Lacking any evidence to show that EDTA testing is a reliable means of determining whether a blood sample has been planted, the Court concludes that Petitioner's EDTA evidence fails the *Daubert* test. *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786.

### 1. *Daubert* and the Federal Rules of Evidence Control the Admissibility of Expert Testimony

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), a case originating from this district, the United States Supreme Court held that Federal Rule of Evidence 702 commands the primary focus for courts evaluating the admissibility of expert testimony. Rule 702 provides: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," an expert "may testify thereto." Fed.R.Evid. 702. "Expert testimony is admissible pursuant to Rule 702 if it is both relevant and reliable." *Elsayed Mukhtar v. California State University, Hayward,* 299 F.3d 1053, 1063(9th Cir. 2002) (citing *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786).

The trial court acts as a "gatekeeper" to exclude expert testimony that does not meet the relevancy and reliability threshold requirements. *Elsayed Mukhtar,* 299 F.3d at 1063. "A trial court not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Id.* at 1064(citations omitted); *see also Hangarter v. Provident Life & Accident Ins. Co.,* 373 F.3d 998, 1017 (9th Cir.2004) ("[F]ar from requiring trial judges to mechanically apply the *Daubert* factors ... *Kumho Tire* heavily emphasizes that judges are entitled to broad discretion when discharging their gatekeeping function.") (quoting *United States v. Hankey,* 203 F.3d 1160, 1168 (9th Cir.2000)). "It is the proponent of the expert who has the burden of proving admissibility." *Lust v. Merrell Dow Pharms., Inc.,* 89 F.3d 594, 598 (9th Cir. 1996); *see Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1316 (9th Cir.1995) ("*Daubert II*") ("[T]he party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology.").

As to the first prong of *Daubert,* relevance means that the evidence will assist the trier of fact to understand or determine a fact in issue. *Daubert,* 509 U.S. at 591–92, 113 S.Ct. 2786. The evidence must logically advance a material aspect of the party's case. *Daubert II,* 43 F.3d at 1315. "Encompassed in the determination of whether expert testimony is relevant is whether it is helpful to the jury, which is the 'central concern' of Rule 702." *Elsayed Mukhtar,* 299 F.3d at 1063 n. 7 (citation omitted). "*Daubert* [also] adds that the gatekeeping inquiry must be 'tied to the facts' of a particular 'case.'" *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (quoting *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786).

The proposed expert testimony must satisfy a second hurdle, reliability, before it can be admitted. "The trial court must [also] act as a 'gatekeeper' to exclude 'junk science' that does not meet Rule 702's reliability standards by making a preliminary determination that the expert's testimony is reliable." *Elsayed Mukhtar,* 299 F.3d at 1063. "Rule 702 demands that expert testimony relate to scientific, technical or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs." *Diviero v. Uniroyal Goodrich Tire Co.,* 114 F.3d 851, 853 (9th Cir.1997) (citing *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786).

*Daubert* provides the following non-exclusive list of factors to guide the assess-

ment of the reliability of scientific evidence: (1) whether a scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the technique is generally accepted. *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786; *see Kumho Tire,* 526 U.S. at 151, 119 S.Ct. 1167("[*Daubert*] made clear that its list of factors was meant to be helpful, not definitive. Indeed, those factors do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged.")

The Court's analysis of the relevance and reliability of expert testimony is "vital to ensure accurate and unbiased decision-making by the trier of fact." *Elsayed Mukhtar,* 299 F.3d at 1063. The goal is to "make certain that an expert ... employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* (quoting *Kumho Tire,* 526 U.S. at 152, 119 S.Ct. 1167.). If evidence lacks either reliability or relevance, it must be excluded.

### 2. Dr. Ballard's EDTA Testing Does Not Satisfy the Criteria for Reliability Set Forth in Daubert

Petitioner has argued repeatedly that this Court's only inquiry under *Daubert* is whether Dr. Ballard's EDTA testing will "assist" the trier of fact in resolving the

ultimate issue—the likelihood of tampering. (*See, e.g.,* 4/22/05 HRT 50, ll. 12–16.) This grossly understates the level of scrutiny required by *Daubert,* which compels the Court to look beyond whether expert testimony can merely "assist" the trier of fact, and confirm that the expert uses a reliable and scientifically valid method. It is that second inquiry, into reliability, that is dispositive in this case. Petitioner's proposed EDTA testing evidence unquestionably falls short of the standards set by *Daubert* for reliability.

### a. With Only One Exception, No Court has Admitted Either the Testimony of Dr. Ballard or his EDTA Test Results

This Court is not alone in its dubious view of EDTA forensic testing. To date, the sole case in which EDTA test results[25] have been admitted is *People v. Orenthal James Simpson.*[26] (4/22/05 at 50, ll. 17–19.) There, Dr. Ballard did not participate directly in the EDTA testing. (4/2/04 HRT 92 ll. 20–22.) In the only case where Dr. Ballard's testing results were offered, *New Jersey v. Josh Pompey,* the New Jersey Superior Court soundly rejected both the credibility of Dr. Ballard and the reliability of EDTA testing in ruling that EDTA evidence was not admissible. *Pompey,* No. S–1594–89.

In the O.J. Simpson case, the FBI attempted to create a test that could differentiate preserved from fresh blood by analyzing EDTA content, but its witness was called by the defense at trial.[27] *Blood*

---

**25.** The court notes that Petitioner concedes that no court has admitted Oxalic or Citric Acid testing into evidence. (*See* Pet'r's Ex Parte Request for Further Testing and Budget filed under seal Jan. 7, 2005.)

**26.** Petitioner also points to the Office of the Inspector General ("OIG") report as "validation" of the forensic validity of EDTA test-

ing. The Court has reviewed the report of the OIG, a non-scientific investigatory entity within the Department of Justice, and has concluded that it provides no such endorsement of the scientific reliability of Dr. Ballard and EDTA testing.

**27.** The FBI no longer conducts EDTA testing.

*Evidence*, at 278–79. In contrast to this case, there was no objection raised to the admissibility of the EDTA test although the prosecution had been concerned that it was inadmissible under the state-court *Kelly/Frye* standard. *Id.* at 279–80.[28] No review of the scientific methodology of EDTA testing was conducted by the parties or the Court in the O.J. case: "[T]he testing protocol … was never called into question. It was simply a matter of interpretation." [29] *Id.* at 280. "[T]he results of the tests permitted both sides to claim a measure of victory." *Id.*

In the only other case where the admissibility of EDTA test results has been considered, *New Jersey v. Pompey*, Dr. Ballard conducted the testing and claimed to have found "forensically significant" amounts of EDTA in several blood stains. However, the *Pompey* court strongly rebuked Dr. Ballard for failing to "provide[ ] a simple, scientific context within which to measure and compare his findings" leaving

the court "with the impression that Ballard omitted the information to simultaneously maintain, magnify and disguise the import of his allegedly significant findings of EDTA." [30] *Pompey*, No. S–1594–89, slip op. at 14. The *Pompey* court accused Dr. Ballard of "selectively adher[ing] to a scientific method" and that he "had an agenda to effectuate outcomes that support the defendant's tampering theory." *Pompey*, No. S–1594–89, *Id.* slip op. at 21, 19.

For example, in *Pompey*, one of the stains in which Dr. Ballard found an "elevated" EDTA level consisted solely of the victim's blood, which had never been preserved in a purple-topped tube. *Pompey*, No. S–1594–89, slip op. at 7. Similarly, Dr. Ballard was criticized for testing two stains together, neither of which had been linked to the alleged perpetrator, and pronouncing the aggregated EDTA number as forensically significant. *Pompey*, No. S–1594–89, slip op. at 9–10. Dr. Ballard

28. The state-court *Kelly/Frye* standard, 17 Cal.3d 24, 30, 130 Cal.Rptr. 144, 549 P.2d 1240 (1976); *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), is less rigorous than *Daubert*. Under *Kelly/Frye*, "the proponent of evidence derived from a new scientific methodology must satisfy three prongs, by showing, first, that the reliability of the new technique has gained general acceptance in the relevant scientific community, second, that the expert testifying to that effect is qualified to do so, and, third, that correct scientific procedures were used in the particular case." *People v. Roybal*, 19 Cal.4th 481, 505, 79 Cal.Rptr.2d 487, 966 P.2d 521 (1998).

29. That forensic EDTA testing was engendered and cultivated solely within the context of litigation discounts the reliability of the technology under *Daubert*. The Advisory Notes to Federal Rule of Evidence 702 specify that a court may also consider "whether experts are 'proposing to testify about matters growing naturally and directly out of their research they have conducted independent of

the litigation, or whether they have developed their opinions expressly for the purposes of testifying.' " Fed.R.Evid. 702 advisory committee's notes (amended 2000) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir.1995)). In light of this genesis for forensic EDTA testing, the Court concludes this factor also weighs heavily against Petitioner.

30. The *Pompey* court was troubled by Dr. Ballard's failure to explain the units for his various calculations. In this case, Dr. Ballard provided certain standard "concentrations" for EDTA in blood at the tutorial. In the report of his results, an "EDTA concentration" heading appears without any further explanation. Only after noticing an important disparity in the units presented at the tutorial (ng/L) and the units employed in Dr. Ballard's results (ng/mL) was the Court able to discern that the "EDTA concentration" referenced in his results denoted the concentration of EDTA in the buffer fluid, not the concentration of EDTA in blood.

did not normalize the aggregated numbers to account for the multiple stains. *Pompey*, No. S–1594–89, slip op. at 9–10.

Calling Dr. Ballard's analytical methods "haphazard and unreliable," the *Pompey* court stated the following conclusions:

> In sum, he used valid science (gas chromatography/ mass spectrometry) to obtain a product, glibly and unscientifically dismissed EDTA from sources other than the purple-topped tubes, and took a gargantuan leap to a conclusion that is unsupported by science, facts in the record or even common sense.
>
> . . .
>
> Ballard skewed the presentation of his data, obscured the significance of his findings and changed his hypotheses to suit defendant's tampering theory. Ballard did not demonstrate that his conclusions were predicated on a reliable foundation. Rather, his constant equivocations discredited his method of reasoning and thus rendered his ultimate conclusions worthless.

*Pompey*, No. S–1594–89, slip op. at 21, 29.

The *Pompey* court's sharp disagreement with Dr. Ballard's methodology and conclusions strengthen this Court's own doubts about the admissibility of EDTA testing in this case. The Court's diligent efforts to wade through this alleged "science" of EDTA has elicited many of the same concerns as those expressed by the court in *Pompey*.

A scientific test is not automatically admissible. For example, a polygraph test can reliably measure a person's heart rate, blood pressure, and breathing. However, a polygraph test is inadmissible to show that person's veracity. *See, e.g., United States v. Ramirez–Robles*, 386 F.3d 1234, 1247(9th Cir.2004) (affirming district court exclusion of polygraph testimony, citing its "highly influential nature"); *United States v. Benavidez–Benavidez*, 217 F.3d 720, 725 (9th Cir.2000) (affirming district court's decision to exclude potentially exculpatory polygraph results); *United States v. Cordoba*, 104 F.3d 225, 227–28 (9th Cir.1997) (noting the "inherent problematic nature" of polygraphs).

EDTA testing presents an equally "inherent problematic nature." *Cordoba*, 104 F.3d at 227–28. Like polygraph testing, the error rate of EDTA testing cannot be determined. The widespread presence of EDTA in the environment can never be ruled out as the source of any EDTA detected in the specimen. In addition, since the history of each specimen's exposure to environmental EDTA is unknown, there are no established standards against which a test result can be compared. As a result, the factfinder can never reliably conclude from the presence of EDTA in a stain that tampering occurred. There are no industry standards that bind the testing scientist to a certain test protocol. If anything, this problem is more pronounced in the EDTA testing field, where Dr. Ballard appears to be almost the only individual who performs this type of test.[31]

---

**31.** Initially, the Court declined to fund Dr. Ballard as an expert. (04–CV–656, Doc. Nos. 81, 97, Court's Order filed 6/10/04 and 6/17/04.) In declining to fund Dr. Ballard as an expert, the Court requested that Petitioner provide the Court with "an independent expert and laboratory not affiliated with Dr. Ballard or law enforcement that is qualified to perform the proposed EDTA testing." (04–CV–656, Doc. No. 81, Court Order filed 6/10/04.) In response, the only name provided by Petitioner was Michael Vickery at NMS where Ballard works, a scientist with a community college degree. (04–CV–656, Doc. No. 208, Court's Order filed Aug. 27, 2004 at 4.)

The Court concludes that the measurement of EDTA cannot be reliably used to decide the ultimate issue at hand, the probability of tampering. Under the Advisory Committee notes to the Federal Rules of Evidence, a court may weigh this disconnect—"whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion"—against admissibility. Fed.R.Evid. 702 advisory committee's notes (amended 2000) (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) for the proposition "that in some cases a trial court 'may conclude that there is simply too great an analytical gap between the data and the opinion proffered' ").

### b. The Application of EDTA Testing to the Forensic Context is Not Scientifically Accepted and Has Not Been Subjected to Either Peer Review or Publication

Petitioner cites only one article from 1997 that discusses EDTA measurement in the tampering context. This article does not "subject" Dr. Ballard and his methodology to meaningful "peer review." Publication and peer review are the process by which new scientific methodology is rigorously scrutinized and verified. By referencing peer review as a factor to be considered under *Daubert*, the Supreme Court indicated that only methods tested and subsequently accepted by the scientific community are methods on which the courts should rely. Indeed, it is illogical that a court would accept a new scientific methodology before it had been adequately reviewed and accepted by the scientific community.

Petitioner attempts to explain the dearth of publication and peer review by claiming that this technology is "new," serves no significant commercial purpose,

and is of limited interest to the general population. The Court is not persuaded that these explanations allow the Court to overlook the fact that Dr. Ballard's methodology has undergone no scientific scrutiny. Dr. Ballard's use of EDTA testing is not new; EDTA testing was utilized in the O.J. Simpson trial a decade ago. It defies our modern experience to term science from ten years ago as "new." The Court finds it telling that, since 1997, Petitioner has been unable to identify any publication or peer review of EDTA testing, and only identifies Dr. Ballard's own abstracts. This void is especially conspicuous given the extreme notoriety of the O.J. Simpson case: if any case were to catapult a new technology to the forefront of forensic science, it would have been one of national recognition like the O.J. Simpson trial.

Despite numerous opportunities, Petitioner was unable to find any qualified expert or lab that would perform EDTA testing other than Dr. Ballard. That no lab in the country and no scientist other than Dr. Ballard has ventured into this allegedly "new" science of EDTA testing since that time speaks volumes about its reliability. As this Court previously explained, "[h]aving Dr. Ballard as the only scientist willing to perform the proposed EDTA testing indicates that not only has his methodology not been tested or subject to peer review, it is an indication that his methodology is not generally accepted and not reliable under *Daubert*." (04–CV–656, Doc. No. 97, Court Order filed June 17, 2004 at 16.)

### c. There are No Standard EDTA Levels Against Which Test Results Can Be Compared, Permitting Significant Manipulation of the Results and Preventing Definitive Conclusions

Even if the amount of EDTA in a forensic sample can be properly measured,[32]

---

**32.** It is unclear to the Court whether this is even the case, given the inability of Dr. Suiz-

several variables prevent the reliable interpretation of that number to accurately answer whether tampering with that sample has occurred. EDTA is ubiquitous in the environment. (04–CV–656, Doc. No. 51, Ballard Decl. ¶ 3e.) It is a simple chemical compound with numerous applications. EDTA is used in food products to prevent rancidity; cleaning agents such as laundry and dish detergent, and bathroom and kitchen tile cleaners; and personal care products such as cosmetics, hand lotions, deodorant, and soap in concentrations up to 20% (or 200,000 ng/# CE# L). *Pompey,* No. S–1594–89, slip op. at 4, 29; (04–CV–656, Doc. No. 23, Ex. 3, Phillips Decl. ¶ 9; Doc. No. 51, Ballard Decl.¶ 3e; 4/2/04 HRT 54, ll. 10–14.) By comparison, EDTA is used as a blood preservative in the purple-topped tubes in a concentration of .13% (or 1,300 ng/# CE# L). (04–CV–656, Doc. No. 23, Ex. 3, Phillips Decl. ¶ 5.) The court in *Pompey* likened the abundance of EDTA in our environment "to saying that we are like fish swimming in an ocean of EDTA." *Pompey,* No. S–1594–89, slip op. at 4–5.

The common presence of EDTA precludes the establishment of known, standard levels of EDTA against which a test measurement could reliably be compared. Since EDTA is commonly found in the environment, there is no scientifically valid method, even through the testing of controls, to ascertain whether the EDTA present in a stain resulted from benign environmental sources. (*See* 04–CV–656, Doc. No. 23, Ex. 3, Phillips Decl. ¶ 11.) According to Petitioner, EDTA may also have "migrated"[33] from one area of the background material to another, muddling further the interpretation of the EDTA levels. (*See* 04–CV–656, Doc. No. 51, Ballard Decl. 4("Can EDTA testing tell you how the EDTA got there? Of course not.").) In short, EDTA does not bear a signature that denotes its source. This is convenient. This uncertainty, however, precludes the reliable and consistent interpretation of EDTA test results, as is required for admission under *Daubert.*

Under the theory Petitioner presented to the Ninth Circuit, the absence of a spiked level of EDTA disproved tampering. Under a theory Petitioner now espouses, a low or constant level of EDTA does not foreclose the possibility of tampering. With a technology where results can be so easily manipulated, there are no definite and reliable conclusions. Moreover, EDTA testing may undermine the ability to perform further DNA testing. Dr. Ballard has previously testified that once EDTA is extracted from a sample, the sample can no longer be used for DNA testing.[34] *Pompey,* No. S–1594–89 slip op. at 11; (*see also* 04–CV–656, Doc. No. 23, Ex. 3, Phillips Decl. at ¶ 8.)

---

dak, an accomplished expert in mass spectrometry from Scripps Institute, to arrive at accurate results.

**33.** EDTA is readily soluble in water. (4/2/04 HRT 54: ll. 3–4.)

**34.** Additional testing will not clarify any interpretation of the EDTA level in the subject stain. Given the presence of EDTA in products like deodorant, hand lotion, and laundry detergent, a constant level of EDTA in the background material cannot be expected. Different areas of a T-shirt could reflect different levels of EDTA. (4/2/04 HRT 67, ll. 4–13.) According to Petitioner's theory, those variant levels of EDTA could also "migrate" to different areas of the T-shirt. Thus, there is no certainty about which EDTA came from which source, and where that EDTA has since "migrated." Because of the widespread presence of EDTA in the environment, EDTA levels cannot be reliably interpreted. There is simply an unacceptable risk of error.

The Court concludes that EDTA testing does not satisfy *Daubert* standards. Because there are so many variables that potentially skew the EDTA test administration and the interpretation of the results, a factfinder is unable to draw any reliable conclusions that assist its resolution of whether tampering occurred. The Advisory Committee notes to the Federal Rules of Evidence instruct the Court to consider "whether the expert has adequately accounted for obvious alternate explanations." Fed.R.Evid. 702 advisory committee's notes (amended 2000). This factor is relevant here, where it is simply impossible for an expert to "adequately account" for the myriad "obvious alternate explanations" for the detection of elevated EDTA levels within a forensic sample. *Id.*

Contrary to how EDTA testing was portrayed to the Ninth Circuit, it is far from "definitive." *Cooper*, 358 F.3d at 1125. Instead, its admission here would require the Court to "glibly and unscientifically dismiss EDTA from sources other than the purple-topped tubes, and t[ake] a gargantuan leap to a conclusion that is unsupported by science, facts in the record, or even common sense." *Pompey*, No. S-2594-89, slip. op. at 21. The Court declines to do so as Petitioner's EDTA testing does not meet *Daubert* standards.

### E. The Court's Conclusions as to the Reliability of EDTA Testing Do Not Affect Its Previous Finding That Dr. Ballard's Results Disprove Petitioner's Theory of Tampering

The Court's serious concerns about the reliability of EDTA testing do not negate the Court's conclusion that Dr. Ballard's test results do not support Petitioner's theory of tampering. In Petitioner's case, the level of EDTA found in the subject stain is so low (110 ng) that it cannot be considered significant to show tampering.[35]

Here, where the amount of EDTA detected in the controls, on average, exceeds the amount found in the subject stain, Petitioner's theory of tampering is without support. As Petitioner represented to the Ninth Circuit, "If the blood was planted, ... it will reflect a high level of EDTA." *Cooper*, 358 F.3d at 1125. With only a small amount of EDTA found in the subject stain compared to the control specimens and the "planted" blood on the Control T-shirt, the EDTA test results are not consistent with evidence of tampering.

### F. The Court Denies The Request to Subject A-41 to Further Testing

The Court's grave reservations about the reliability of EDTA testing are more pronounced with Exhibit A-41, blood found on the wall of the victims' home.[36] The Court's *Daubert* ruling bars Petitioner's request for EDTA testing of A-41, but even were that not the case, the Court concludes that A-41 is not suitable for

---

**35.** Were the results for the subject stain high relative to the control areas, the Court would have concerns under *Daubert* due to the widespread presence of background EDTA as a variable that may result in a false positive. In that scenario, the Court could not evaluate whether the elevated level of EDTA resulted from tampering or some benign factor.

**36.** Petitioner's request to test A-41 was not included in its successive petition, filed on April 1, 2004. (04-CV-656, Doc. No. 1.)

EDTA testing using the control method or any other method of testing.

The totality of the record supports the Court's conclusion that A–41 is not suitable for further scientific testing. Petitioner's expert, Dr. Blake and Steven Myers testified that there is no visible blood remaining on the paint chips comprising A–4. Additionally, the blood used for the nuclear DNA testing performed pursuant the Joint DNA Testing Agreement was found as a dried substance at the bottom of the container holding A–41. Petitioner's expert Dr. Edward Blake testified at the June 3, 2004, evidentiary hearing regarding A–41:

> Dr. Blake: ... you open up the A–41 tin, and you look at it, and for all intents and purposes, there's no blood there. However, when you look at it with a stereo microscope, a little bit different story (sic). There is a very fine powder of blood that remains on the inside of the tin. And that's what was collected for PCR [37] analysis.

(See [04–CV–656, Doc. No. 116 at 7] Petr's Mem. of P & A. in Supp. of the July 12, 2004 Mot. for Reconsideration (quoting excerpts from 6/4/04 HRT).)

Dr. Blake's credible testimony is corroborated by Mr. Myers' testimony at an evidentiary hearing before Judge William H. Kennedy in the California Superior Court on June 24, 2003, regarding A–41 at the time of the 2001 post-conviction nuclear DNA testing. Mr. Myers testified that when he tested A–41 for nuclear DNA he used the remaining paint chip and some of the blood powder inside the tin containing the paint chip:

> Mr. Bernstein: With A–41A, you described that as the blood powder, plus inside the tin there was a little open tube with a hole at the bottom and a paint chip inside it?
>
> Mr. Myers: Correct.
>
> Mr. Bernstein: And you combined the chip with the powder?
>
> Mr. Myers: Not all of the powder, because that tube with the hole in it actually—and I took a stereomicrograph of this—had some of the powder adhering to the outside of the tube. So I swabbed the inside of the tin and I took the paint chip, combined those into making my DNA extraction sample. But whatever might have been adhering to the outside of that tube when the tube was put back into the tin, it still exists.
>
> Mr. Bernstein: So you extracted the chip and the powder together?
>
> Mr. Myers: The chip and the powder that I swabbed from the inside of the tin; but, as I said, there's some powder that may still be present.

(See 04–CV–656, Doc. No. 28, NOL filed February 4, 2004 at 298–99.) The California Supreme Court has also noted that "[o]nly a minute amount of the blood remained after these tests." *Cooper,* 53 Cal.3d at 799, 281 Cal.Rptr. 90, 809 P.2d 865. This "minute amount" of blood has already been subjected to extraction for

---

**37.** When testing for DNA, a small sample size can be overcome through polymerase chain reaction ("PCR"). Using PCR, minuscule amounts of DNA can be replicated and the sample size increased so that the amount of available DNA is sufficient for testing. PCR is limited in its application to DNA and cannot replicate or regenerate from a minute amount of blood powder the amount of EDTA (if any) present in the original sample. Given this critical limitation, even if any sparse remnants of fine, blood powder remaining in A–41 could be tested, it would be impossible for the factfinder to extrapolate from those results to determine whether the original drop was planted.

DNA testing, which may alter the sample such that the original EDTA level could not be accurately measured. (4/2/04 HRT 71–72.)

In addition, Dr. Blake's and Mr. Myers' credible testimony support the conclusion that A–41 is not able to be tested for EDTA using the control method. Both Dr. Ballard and Mr. LeBeau describe the control method as requiring control areas around the blood sample to determine if there is a significant difference between the amounts of EDTA in the stain compared with areas immediately surrounding the stain. The post-conviction record demonstrates that the state of A–41 does not provide such controls. As a result, the Court concludes that A–41 is not able to be scientifically and reliably tested for the presence of EDTA. Indeed, the totality of the record before this Court supports the conclusion that A–41 is not suitable for further scientific testing. In addition, given the Court's *Daubert* concerns, the Court concludes that EDTA testing of A–41 is unlikely to be of interpretative value and is unwarranted destructive testing of the evidence.

## IV. Actual Innocence

In the first claim of the successive petition, Petitioner alleges that his federal constitutional rights have been denied because he is innocent of all but the escape charge. However, the post-conviction DNA testing confirmed Petitioner's guilt. Petitioner's blood was found at the crime scene and on cigarette butts found inside the Ryen station wagon after the car was recovered in Long Beach.

### A. DNA Evidence Establishes Petitioner's Guilt

Subsequent to the passage of California Penal Code section 1405, the California authorities agreed to have certain DNA testing performed in 2001. Petitioner had the assistance of two nationally recognized DNA experts, Dr. Edward Blake and Christopher Plourd. The parties entered into a Joint Forensic DNA Testing Agreement that specified the items of evidence to be tested, how they were to be shipped and the method of DNA testing. (*See* Joint DNA Agreement dated May 10, 2001.)

Pursuant to the Joint DNA Agreement, the evidence to be tested was shipped to the DOJ DNA Laboratory in Berkeley from two locations: the San Diego Superior Court and the San Bernardino County Sheriff's Identification Division. (92–CV–427, Third Supplemental NOL filed Jan. 23, 2004, Ex. No. 33, Judge Kennedy Order dated May 10, 2001.) The items shipped from the custody of the San Diego Superior Court, Evidence Clerk, were: a hand-rolled cigarette butt recovered from the Ryen station wagon in Long Beach (Trial Exhibit 584A) (Laboratory item no. V–12); a hatchet (Trial Exhibit 42); the major portion of a T-shirt found near the Canyon Corral Bar (Trial Exhibit 169) (Laboratory Item CC); and a button found in the hideout house bedroom (Trial Exhibit 97). (*Id.*) The remaining items to be tested were shipped by the San Bernardino County Sheriff's Identification Division. Those items were: a manufactured cigarette butt (Laboratory item no. V–17), found in the Ryen station wagon in Long Beach; the cutout portion from the same T-shirt (Trial Exhibit 169), which remained in the custody of the San Bernardino County Sheriff's Identification Division following Petitioner's trial; hair recovered from the hands of the victims; the remains of bloodstain A–41 (the drop of blood found in the hallway outside the Ryen master

bedroom); and the reference hair and blood samples from Petitioner and the victims. (Joint DNA Agreement dated May 10, 2001 at 2–5.)

The Agreement provided for STR Profiler Plus DNA testing to be performed by DOJ Berkeley on the specified items of evidence in two stages: "blind" STR Profiler Plus DNA testing was to be performed on specified pieces of crime scene evidence, followed by STR Profiler Plus DNA testing on the known exemplars from Petitioner and the victims. (*Id.* at 11.) The "blind" test results from the crime scene evidence would then be compared with the results obtained from the known reference samples from Petitioner and the victims. (*Id.* at 11–12.) STR DNA testing is a forensic DNA testing method that is generally accepted within the relevant scientific community for forensic testing of biological specimens. (*Id.* at 6.)

The results are summarized in the Physical Evidence Examination Report dated July 7, 2002, and in the Supplemental Report dated September 24, 2002. (DOJ Physical Evidence Exam Report dated July 2, 2002; Supplemental DOJ Physical Evidence Exam Report dated Sept. 24, 2002.) The DNA testing that was done provides the most probative evidence of the identity of the murderer. In his July 24, 2001 report, Petitioner's own DNA expert, Dr. Edward T. Blake, stated that the "most relevant biological evidence in this case is contained within the blood and cigarette butt evidence described above." (92–CV–427, Third Supplemental NOL filed Jan. 23, 2004, Ex. 24, Dr. Blake Letter dated July 24, 2001 at 4.) Dr. Blake had been one of the defense experts on Petitioner's defense team prior to trial, at trial and during the post-conviction DNA testing procedure.

The Supplemental Report concludes that the DNA testing provides strong evidence that Petitioner is the donor of the DNA extracted from: the drop of blood found in the hallway outside the Ryen master bedroom (A–41), saliva from the hand-rolled and manufactured cigarette butts found inside the abandoned Ryen station wagon, and blood smears on the T-shirt found near the Canyon Corral Bar. (Supplemental DOJ Physical Evidence Exam Report dated Sept. 24, 2002.) Petitioner's DNA profile is consistent with the DNA profiles obtained from each of those items of evidence. (*Id.*) The DNA profiles that do not match Petitioner are all consistent with the victims' DNA profiles. The testing did not reveal any unidentified DNA profiles. (*Id.*)

The STR Profiler Plus DNA result obtained from A–41, the bloodstain found on the hallway wall outside the Ryen master bedroom, has been determined to match Petitioner's DNA profile. (Supplemental DOJ Physical Evidence Exam Report dated Sept. 24, 2002 at 1–2.) The probability of a random match is approximately 1 in 310 billion for African Americans, 1 in 270 billion for Caucasians, and 1 in 340 billion for Western Hispanics. (*Id.*) The evidentiary significance of this result is twofold. First, at trial Petitioner testified at length and he denied ever "approaching the Ryen house." *Cooper,* 53 Cal.3d at 802, 281 Cal.Rptr. 90, 809 P.2d 865. Second, the presence of Petitioner's blood inside the Ryen home confirms that Petitioner was inside the Ryen house, in the middle of the crime scene.

The STR Profiler Plus DNA also showed that Petitioner's DNA was found on two cigarettes butts found in the Ryen station wagon. The probability estimates for the manufactured cigarette butt, item

V–17, was 1 in 19 billion and for the hand rolled cigarette butt, item DOJ–5, was 1 in 110 million. (*Id.* at 2.) The STR Profiler Plus DNA results from both cigarette butts that were recovered from the Ryen station wagon in Long Beach also has particular significance when considered with the other evidence introduced at trial. The DNA results from the cigarette butts establish that Petitioner took the Ryen station wagon to make his escape after committing the murders. There was a massive manhunt for Petitioner after he escaped from Chino, and there was evidence at trial that shortly prior to committing the murders Petitioner had made telephone calls from the hideout house in an unsuccessful attempt to get help so he could escape from the Chino Hills. *Cooper*, 53 Cal.3d at 796, 281 Cal.Rptr. 90, 809 P.2d 865. The DNA results obtained from the two cigarette butts fortify the conclusion stated by the California Supreme Court that Petitioner "had an obvious motive both for stealing the Ryen car—to get transportation away from the area—and for killing the family—to facilitate the theft and gain time to perfect his escape." *Id.* at 771, 832, 281 Cal.Rptr. 90, 809 P.2d 865.

Similarly, the STR Profiler Plus DNA results obtained from the T-shirt found by the roadway leading from the Ryen house to the nearest freeway link Petitioner to the crime. Blood on the cutout portion of the T-shirt (DOJ item CC–1B) matches Doug Ryen's blood. (Supplemental DOJ Physical Evidence Exam Report dated Sept. 24, 2002 at 3.) In addition, several blood smears/spatters found during the course of the STR Profiler Plus testing match Petitioner's DNA profile. (Supplemental DOJ Physical Evidence Exam Report dated Sept. 24, 2002 at 3.) These blood smears/spatters, from which DNA

profiles matching Petitioner were obtained, were found on Trial Exhibit 169 (Laboratory Item CC), the portion of the T-shirt which remained in the custody of the San Diego Superior Court Evidence Clerk, since the time of Petitioner's trial in 1984 and 1985 prior to the post-conviction DNA testing. (92–CV–427, NOL filed Jan. 20, 2004, Ex. 6, Judge Kennedy's order dated July 2, 2003 at 10.)

The state court conducted a post-conviction evidentiary hearing in 2003 to address, among other items, Petitioner's claim of evidence tampering. The Honorable William H. Kennedy concluded that there was no merit to Petitioner's claim of evidence tampering. (92–CV–427, NOL filed Jan. 20, 2004, Ex. 6, Judge Kennedy's order dated July 2, 2003 at 10.)

The T-shirt was found by the side of a road which connected the Ryen home with a freeway system that eventually leads to Long Beach, where the Ryen station wagon was found abandoned. The STR Profiler Plus DNA results from this T-shirt establish the presence of Petitioner's and victim Doug Ryen's blood on the same article of clothing. The DNA results provide additional evidence establishing Petitioner's guilt.

In sum, this Court concludes that the DNA test results obtained from the evidence presented at trial establish Petitioner's guilt. (*See* Supplemental DOJ Physical Evidence Exam Report dated Sept. 24, 2002 at 3.)

**B. Petitioner's Challenge to the DNA Evidence is Without Merit**

Petitioner attempts to undermine the post-conviction DNA testing results by claiming that Criminalist Dan Gregonis might have contaminated or tampered with the evidence. However, his unsupported

assertion ignores the consistent DNA test results which were obtained from the hand-rolled cigarette butt found in the Ryen vehicle after its recovery in Long Beach (DOJ–5, crime lab item V–12) and from blood smears/spatters on the T-shirt (DOJ–6) found near the roadway linking the Ryen home to the nearest freeway. The DNA profiles obtained from these items (DOJ–5 and DOJ–6) match the corresponding portion of the full DNA profile obtained from A–41—major donor and Petitioner's DNA profile. All these items were in the custody of the San Diego Superior Court Exhibit Clerk from 1984 until 2001, when they were shipped directly to the DOJ Berkeley DNA Laboratory for analysis. Gregonis has had no contact since the time of trial with either the hand-rolled cigarette butt (DOJ–5, crime lab item V–12) or the portion of the T-shirt on which the blood smears matching Petitioner's DNA profile were obtained (Trial Ex. 169). Consistent DNA test results confirming Petitioner's guilt have been obtained from evidence Gregonis had no contact with in 1999, and as to which he has had no contact since the time of Petitioner's trial. The items, which have remained in the custody of the San Diego Superior Court Evidence Clerk, operate as an independent control on the DNA results obtained from the items that were in the custody of the Sheriff's Department.

Criminalist Gregonis and others testified at the post-conviction evidentiary hearing held before Judge Kennedy of the California Superior Court on June 23, 2003.(92–CV–427, Third Supplemental NOL filed Jan. 23, 2004, Exs. 20, 23, Decl. and Mot. Test. of Dan Gregonis at 97, 99–107, 110–17, 122–23, 128–29, 131–33.) Judge Kennedy found at the conclusion of the hearing that Petitioner "has not made any showing that law enforcement personnel tampered with or contaminated any evidence in this case." (92–CV–427, NOL filed Jan. 23, 2004, Ex. 6, Judge Kennedy Order dated July 2, 2003 at 10.)

After reviewing the transcripts of Judge Kennedy's evidentiary hearing, his findings and conclusions, the parties' submissions and all relevant evidence, the Court finds no merit to Petitioner's challenge of the veracity of the DNA evidence. Moreover, EDTA testing ordered by this Court fails to show Petitioner's blood was planted on the T-shirt.

Accordingly, the Court **DENIES** his claim of actual innocence. Petitioner is unable to meet his burden of establishing by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense. 28 U.S.C. § 2244(b)(2). Even if he met the burden of 28 U.S.C. § 2244(b)(2), Petitioner's claim is denied on the merits pursuant to 28 U.S.C. § 2254. Alternatively, Petitioner failed to show that in light of all the evidence, including new evidence, it is more likely than not that no reasonable juror would have found Petitioner guilty beyond a reasonable doubt. *Schlup,* 513 U.S. at 327–28, 115 S.Ct. 851. Further, the Court concludes that Petitioner has not met the stringent burden of *Herrera,* which requires an "extraordinarily high" showing of "a truly persuasive demonstration of 'actual innocence.'" As detailed below, Petitioner fails his burden and the Court **DENIES** these claims under 28 U.S.C. 2244(b)(2), and alternatively, under *Schlup* and under *Herrera,* and on the merits pursuant to 28 U.S.C. § 2254(d).

As a result, the Court concludes that all claims in this successive petition are properly **DENIED** either under AEDPA, which requires among other things, a "fac-

tual claim [ ] not discoverable through the exercise of due diligence" that establishes by "clear and convincing evidence that, but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense," or under *Schlup*, which requires a showing that it "in light of all the evidence, including new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."

### C. Prior Court Rulings and Findings Document Overwhelming Evidence of Guilt

#### 1. Trial Court Rulings and Findings

The trial judge, Richard Garner, made an independent determination of Petitioner's guilt at sentencing. (92–CV–427, Third Supplemental NOL filed Jan. 23, 2004, Ex. 7, Transcripts of Judge Garner's rulings at sentencing, May 15, 1985 at 8144–50.) Judge Garner stated on the record:

> The Court has examined and reviewed all of the evidence that was presented to the jury, the trier of the fact, and in making this determination, the Court has also examined all of the exhibits admitted into evidence and studied the daily transcripts on both phases.
>
> The law, from all of the evidence admitted at the guilt phase, the Court is satisfied beyond a reasonable doubt, all reasonable doubt that the defendant, Kevin Cooper, is the one who entered the Ryen home and committed the various murders, and that he is thus guilty beyond a reasonable doubt, of Counts Two through Six.... (P.Ex. No. 7, p. 8145.) Now, some of the more particular points persuading me of the defendant's guilt are the following: The proof showed, apart from his own statements at trial, that he was in the hideout home next

door, in effect to the Ryen home, for several days. He admitted that indeed he could not deny it. He was next door at least until 8:30 p.m. the night of the murder, a fairly short period of time before the crimes occurred.

> I am convinced that the hatchet in evidence was one of the murder weapons and that it came from the hideout house where the defendant spent a lot of time.
>
> I am convinced that the defendant stole the Ryens car; I thought that that was adequately proved by the evidence found therein, particularly the tobacco, the same tobacco that was also found at the home was the same that comes from the state prison.

(*Id.* at 8146.)

Judge Garner further discussed the evidence linking the Ryen house to the hideout house where Petitioner had hid, including (1) Petitioner's blood found in the Ryen house, (2) evidence that established after the murders the killer returned to the hideout house where Petitioner stayed, took a shower and brought blood into that house, and (3) Petitioner's manner of flight out of the country as additional pieces of evidence that established Petitioner's guilt. (*Id.* at 8147–48.)

#### 2. California Supreme Court Rulings and Findings

The California Supreme Court addressed the issue of Petitioner's guilt at length after his conviction:

> [T]he evidence of guilt was extremely strong. Many items of circumstantial evidence pointed to defendant's guilt. Some alone were quite compelling; others less so. In combination, the evidence established defendant's guilt overwhelmingly.

First, there was the fact of defendant's escape and hiding out at the house nearest the crime scene at precisely the time of the crime. Defendant left the house the very night of the murders. The Ryen house could be seen from the Lease house. Since defendant's telephonic appeals for help had proved vain, he desperately needed a means to get out of the area, a means the Ryen station wagon could provide. The hatchet that was one of the murder weapons came from within the Lease house, near the window through which the Ryen house was visible. The sheath for this hatchet was found on the floor of the very room defendant slept in. Items that could have been the remaining murder weapons were missing from the Lease house.

In addition to these circumstances, there was the strong shoe print comparison evidence, the cigarette and tobacco comparison evidence, the match between defendant's blood type and the drop of blood in the Ryen house that was not from a victim, the bloodstained prison issue button on the Lease house floor, the bloodstained rope (not defendant's blood, consistent with a victim's blood) found in the closet of the bedroom defendant used, the blood in the Lease house shower and elsewhere, the hair comparisons, and the other evidence summarized earlier in this opinion.

It is utterly unreasonable to suppose that by coincidence, some hypothetical real killer chose this night and this locale to kill; that he entered the Lease house just after defendant left to retrieve the murder weapons, leaving the hatchet sheath in the bedroom defendant used; that he returned to the Lease house to shower; that he drove the Ryen station wagon in the same direction defendant used on his way to Mexico; and that he happened to wear prison issue tennis shoes like those of defendant, happened to have defendant's blood type, happened to have hair like defendant's, happened to roll cigarettes with the same distinctive prison issue tobacco, and so forth. Defendant sought to discredit or minimize each of these items of evidence, but the sheer volume and consistency of the evidence is overwhelming.

*Cooper,* 53 Cal.3d at 795–800, 281 Cal. Rptr. 90, 809 P.2d 865.

An analysis of some of the specific items of evidence the California Supreme Court set forth in their opinion is mentioned below:

[1.] After his escape from C.I.M. Cooper hid in the Lease Home, the closest house to the Ryen's residence for several days immediately prior to the murders.

[2.] The Ryen home was clearly visible from the Lease home. Various items of circumstantial evidence connected defendant with the massacre.

Defendant had been an inmate at CIM since April 29 under the name of David Trautman. On June 1, he was transferred to a minimum security portion of the prison. The next afternoon, June 2, he escaped on foot.

Undisputed evidence, including fingerprints, showed that after his escape, defendant took refuge in a nearby house owned by Larry Lease and brothers Roger and Kermit Lang (hereafter the Lease house). He slept in the closet of the bedroom nearest the garage. The Lease house was the closest neighbor to the Ryen house, about 126 yards away. The window by the Lease house fireplace provided a view of the Ryen house.

Kathleen Bilbia, an employee of Lease, had been living in the Lease house in May, and she had used the bedroom defendant later slept in (hereafter the Bilbia bedroom). She moved out of the house during May. By May 27, most of her belongings had been removed. On May 30 and June 1, Bilbia vacuumed and cleaned portions of the house, including the bathroom she had used (hereafter the Bilbia bathroom).

[3.] Cooper ended his final telephone call from the Lease house approximately one hour before the Ryen family and Chris Hughes returned home from a barbeque. Telephone records showed that two telephone calls were made from the Lease house to the Los Angeles area telephone number of Yolanda Jackson—one lasting one hundred ten minutes beginning on June 3 at 12:17 a.m., and one lasting four minutes beginning at 2:26 a.m. the same morning. Two calls were also made from that house to the Pittsburgh, Pennsylvania telephone number of Diane Williams—one lasting three minutes beginning on June 3 at 11:46 a.m., and one lasting thirty-four minutes beginning on June 4 at 7:53 p.m. This final call was only an hour or so before the Ryens and Chris Hughes left the Blade house for their unsuspected rendezvous with death.

Yolanda Jackson testified that she visited defendant on May 30 at CIM. Sometime after midnight on June 3, she received a telephone call from defendant. She believed the call lasted about 30 to 45 minutes. Defendant said he had "walked out" of the prison. He asked her to help him in what Jackson believed was a "joking manner." She refused. Defendant asked her where he should go. She said she did not know. At one point in the conversation, defendant said

he was getting a cigarette. Shortly after the first conversation ended, defendant called her again. A brief second conversation ensued.

The parties stipulated that if Diane Williams were called as a witness, she would testify that in June she received two telephone calls from defendant at her Pittsburgh number. Defendant told her that he had been released from prison because of a new law that had been passed, and that he needed money. She said she could not get any. He said he would call back. Defendant called Williams again the next day, and asked if she had gotten any money. She replied that she had not. On June 6, Williams received a collect call from defendant in Tijuana, Mexico.

On June 4, around 10 or 11 a.m., Virginia Lang visited the Lease house briefly to get a sweater. She noticed nothing out of the ordinary.

[4.] A bloodstained green button, identical to the buttons found on CIM inmate jackets was found in the Bilbia bedroom where Cooper slept. Blood from the button could have come from one of the victims or from Cooper.

After the murders, a bloodstained khaki green button was found on the rug in the Bilbia bedroom. It was identical in appearance to buttons on field jackets inmates wore at CIM, including one defendant was seen wearing shortly before his escape. The blood on the button could have come from defendant or one of the victims.

A bloodstained rope was found in the Bilbia bedroom closet. It was similar, but not identical, to a length of bloodstained rope found on the driveway of the Ryen residence.

[5.] Luminol revealed the possible presence of blood in the shower of the Bilbia bedroom and on the rug in the hallway leading to the Bilbia bedroom. Cooper's footprint was found on the sill on this shower.

[6.] Human hair removed from the sink trap in the Bilbia bathroom of the Lease house was consistent with Jessica Ryen's hair. Hair removed from the shower in that bathroom was consistent with Doug Ryen's hair.

A criminalist from the San Bernardino County sheriff's crime laboratory sprayed various areas of the Lease house with luminol, a substance used to detect the presence of blood not visible to the naked eye. A positive reaction consisting of an even "glow" ranging from about two feet to five feet above the floor was obtained on the shower walls in the Bilbia bathroom. Defendant left his footprint on the sill of this shower. There were also four positive reactions to the luminol on the rug in the hallway leading to the Bilbia bedroom that appeared to be foot impressions. Other positive reactions were obtained in the bedroom closet and bathroom sink. The reactions did not prove the presence of blood, but were "an indication that it could be blood." Investigators found matted hair in the bathroom sink trap that appeared to have been there a long time. Other hair was not matted. A microscopic examination of one of the latter revealed characteristics similar to Jessica's head hair. A hair removed from the bathroom shower had characteristics similar to Doug Ryen's head hair.

[7.] The hatchet taken from Lease house where Cooper hid was found on the side of the road leading away from the Ryen home.

[8.] Human hairs on the hatchet were consistent with those of Doug and Jessica Ryen. The blood on the hatchet was consistent with that of Josh Ryen.

[9.] The sheath that covered the blade of the hatchet was found in the "Bilbia" bedroom where Cooper stayed.

During the afternoon of June 5, a local citizen discovered a hatchet in some weeds next to a fence on the side of a road that led from the Ryen home out of the area. The fencepost above the hatchet had a small indentation indicating that something sharp had struck it. The hatchet was covered by bloodstains; its head was covered by dried blood and human hairs. Some of the hairs were consistent with those of Doug and Jessica Ryen. Some of the blood on the hatchet head could have come from Josh. Dr. Root, who performed the autopsies, concluded that the hatchet could have inflicted the chopping wounds.

Witnesses identified the hatchet as missing from the Lease house after the killing. It had been kept in a sheath by the Lease house fireplace. Bilbia recalled seeing it by the fireplace when she was cleaning the house. On June 7, the sheath for the missing hatchet was found on the floor in the Bilbia bedroom. It had not been there when Bilbia vacated the room.

[10.] Buck knives and an ice pick, which could have inflicted some of the injuries on the victims, were missing from the Lease house where Cooper hid. A strap fitting one of the missing knives was found in the bedroom Cooper used.

Some buck knives and one or more ice picks were also missing from the Lease house. These could have inflicted the remaining injuries. A strap fitting one

of the missing buck knives was found on the floor by the Bilbia bedroom closet. [11.] Three separate ProKed Tennis Shoe impressions, consistent with the size and pattern of the shoes given to Cooper at CIM were found in the following locations:

1) in the game room at the Lease house,

2) on the spa cover outside the Ryen master bedroom (which was the scene of the murders);

3) and in blood on the bed sheet in the Ryen master bedroom.

Investigators found three significant shoe print impressions—a partial sole impression on a spa cover outside the Ryen master bedroom, a partial bloody shoe print on a sheet on the Ryen bedroom waterbed, and a nearly complete shoe print impression in the game room of the Lease house. All three appeared to come from tennis shoes.

James Taylor, an inmate at CIM who played on the same prison basketball team as defendant, issued equipment to other inmates. He testified that he issued defendant a pair of P.F. Flyer tennis shoes. Three or four days before defendant was transferred to minimum security (i.e., before June 1) defendant exchanged these shoes for a pair of "Dude" Pro Ked tennis shoes. Taylor did not remember what size shoes were issued to defendant. The Stride Rite Corporation sells Pro Ked tennis shoes to the state for use in institutions such as CIM. All "Dude" tennis shoes contain the same sole pattern. The general merchandise manager for Stride Rite testified that this pattern is not found on any other shoe that the company manufactures nor, to his knowledge (which was extensive), on any other shoe. The shoes are not sold retail, but only to states and the federal government.

William Baird, the manager of the San Bernardino County sheriff's crime laboratory, compared the shoe print impressions from the Ryen and Lease houses to each other, to the type of shoes issued to defendant, and to other shoes. He concluded that the three shoe prints "all possessed a similar tread pattern, which would indicate a similar type shoe was used in each case." They "are consistent with one another, and ... could have been caused by the same shoe." The pattern was similar to the "Dude" tennis shoes used at CIM, probably size 10, but possibly size 9. Baird searched area stores for shoes with similar sole patterns, but could find none. The defendant testified that his shoe size was between nine and ten. Baird believed that the shoes that made the three impressions were nearly new but not brand new.

[12.] The Ryen family station wagon was taken after the murders. Bloodstains located inside the station wagon had the same blood type as some of the victims. The station wagon that was missing from the Ryen house was found on a church parking lot in Long Beach. One witness testified he put a flyer on the car on Sunday morning, June 5, the morning after the killing of the Ryen family. Another saw the car on June 7. Later, the vehicle was reported to the police, who examined it for evidence. The car contained various bloodstains, including one which could have come from one or more of the victims, but not defendant. Several hairs were recovered from the vehicle. Two criminalists microscopically compared the hairs with defendant's hair. One believed that one

of the hairs probably came from a Black person, and that "there was enough similarity between ... the hairs from Mr. Cooper and the unknown hair that I felt the unknown hair was consistent with coming from Mr. Cooper." The second criminalist also found it was consistent with defendant's hair. Both believed it was most likely pubic hair. Unlike fingerprint comparison, an absolute match is not possible when comparing hairs. [13.] Loose prison issued "Role–Rite" tobacco was found in both the closet of the Bilbia bedroom in the Lease house where Cooper slept and on the floor board of the Ryen station wagon when it was recovered in Long Beach.

James Taylor, the inmate who issued the Pro Ked tennis shoes to defendant at CIM, testified that he saw defendant smoke hand-rolled cigarettes using rolling paper and "Role–Rite" tobacco issued free to inmates. This tobacco is not sold retail, but only to institutions in California such as CIM.

Loose tobacco was found inside a white box in the Bilbia closet, and in the Ryen car. In addition, two cigarette butts— one of a hand-rolled cigarette—were found in the Ryen car. The tobacco in the white box was identified as Role–Rite. Criminalist Craig Ogino examined visually and microscopically the two samples of the loose tobacco and the tobacco from the hand rolled cigarette. Each sample was consistent with each other and with Role–Rite tobacco. Ogino also compared them with various other tobacco samples he obtained from a tobacco store. The other tobacco samples were all different.

Aubrey Evelyn, a manager with the company that manufactures Role–Rite tobacco, also testified that he had "no doubt" that the tobacco found in the Ryen car was Role–Rite.

Examination of the saliva on the two cigarette butts from the Ryen car was inconclusive, but was consistent with the cigarettes having been smoked by a nonsecretor such as defendant. Some commercial cigarettes were apparently missing from the Lease house. A Viceroy cigarette butt was found in the Bilbia bedroom. Bilbia did not smoke.

A six-pack of Olympia Gold beer with one can missing was found in the refrigerator of the Ryen house. One bloodstained can was hanging over the edge of a shelf. A nearly empty can of Olympia Gold beer similar in appearance to those in the Ryen refrigerator was found in a plowed horse training arena about midway between the Ryen and Lease houses.

[14.] When Cooper was arrested weeks later he was still in possession of several items taken from the Lease home.

On June 9, defendant met Owen and Angelica Handy in Ensenada, Mexico. Defendant, using the name Angel Jackson, asked for work. Handy offered defendant some food and a place to stay if he would help paint their boat, the Illa Tika. Defendant agreed. After working on the boat for two days, defendant and the Handys set sail for San Francisco. They made several stops, then eventually went to Pelican Bay near Santa Barbara, where they stayed for four or five days. The Coast Guard arrested defendant at that location after he dove off the Illa Tika, swam to a dinghy, and started to row for shore. While he was with the Handys, defendant possessed several items identified as coming from the Lease house.

[15.] A drop of blood collected in the hallway at the Ryen home could not have come from any of the victims. When analyzed many of the serum protein and enzyme types of that drop of blood matched Cooper's profile.

With one exception, all of the blood samples obtained from the Ryen house could have come from one or more of the victims. The exception is a single drop of blood found on the hallway wall opposite the master bedroom door.

Daniel Gregonis, a criminalist with the San Bernardino County sheriff's crime laboratory, examined this drop of blood by a scientific process called electrophoresis. Human blood contains various enzymes and serum proteins. The types of enzymes vary from person to person. Electrophoresis is a technique used to distinguish between enzyme types, so as to exclude or include a person as a possible donor of a blood sample. After electrophoretic testing, Gregonis concluded that the drop could not have come from any of the victims.

Based upon results obtained for several enzymes, Gregonis also concluded that the drop was consistent with defendant's blood. Results for certain other enzymes were inconclusive. Because of various characteristics, the blood had to have come from a Black person such as defendant. One of the enzymes tested is commonly called "EAP." Gregonis initially believed the EAP of the drop of blood was type B. When he later typed defendant's own blood, Gregonis also believed it was EAP type B. Gregonis subsequently learned that defendant's EAP type was RB, a rare type. Gregonis had never before seen an RB type. He reexamined the photograph of the original testing of the drop of blood, but it was inconclusive as to whether it was EAP type B or RB. Gregonis testified, however, that when he tested the drop of blood, it appeared to have the same EAP type as defendant's blood. Brian Wraxall, another expert, described the difference between types B and RB as "fairly subtle."

Before Gregonis learned of his error regarding defendant's EAP type, he and Dr. Edward Blake, an expert employed by the defense, tested the drop further. Because of the limited amount of the remaining sample, they performed tests that they believed had the best chance of excluding defendant as a possible donor. They did not retest for EAP. The additional tests tended to include defendant as a possible donor. Only a minute amount of the blood remained after these tests. Later, after Gregonis learned of his error regarding defendant's EAP type, he tried to test the remaining sample for EAP. Dr. Blake was again present. This final test completely consumed the sample and was inconclusive.

Electrophoretic testing also established the blood on the rope found in the Bilbia bedroom closet could have come from one of the victims but not defendant.

*Cooper*, 53 Cal.3d at 795–800, 281 Cal. Rptr. 90, 809 P.2d 865.

In the latest petition, the California Supreme Court denied Petitioner's claims on the merits and as procedurally barred, finding that "[a]s with the previous five petitions for writ of habeas corpus that petitioner has filed in this court challenging the judgment, this petition casts no doubt on petitioner's guilt or the validity of the judgment." *In re Cooper*, Case No. S122389. This Court agrees.

### 3. Federal Court Findings and Conclusions Confirmed Petitioner's Guilt and Rejected Petitioner's Constitutional Claims

This Court previously reviewed the entire trial court proceedings, the parties extensive briefings, and subsequently conducted an evidentiary hearing. After this thorough review, this Court concluded that (1) Petitioner was represented by an experienced and able trial attorney, (2) Petitioner's trial and appeal were constitutionally conducted, (3) Petitioner was convicted by overwhelming evidence of guilt, and (4) the jury properly weighed the aggravating and mitigating evidence in concluding that four brutal murders justified the death penalty. *Cooper I*, 92–CV–427, Aug. 25, 1997 Order at 1. Thereafter, the Ninth Circuit Court of Appeals affirmed this Court and likewise concluded that Petitioner was convicted by "overwhelming evidence of guilt." *Cooper*, 255 F.3d at 1114–15; *Cooper I*, 92–CV–427, Aug. 25, 1997 Order at 1–3, 49–50, 104–05. The United States Supreme Court denied Petitioner's petition for wit of certiorari regarding this Court's denial of his first habeas petition and the Ninth Circuit's affirmance of this Court's denial of his first petition. *Cooper*, 524 U.S. 963, 118 S.Ct. 2392, 141 L.Ed.2d 757 (1998); *Cooper*, 537 U.S. 861, 123 S.Ct. 238, 154 L.Ed.2d 100 (2002).

### 4. State Court Post–Conviction Evidentiary Hearing

Significantly, the state court conducted a post-conviction evidentiary hearing on June 23–25, 2003. The state court concluded that Petitioner "has not made any showing that law enforcement personnel tampered with or contaminated any evidence in this case." (92–CV–427, NOL filed Jan. 23, 2004, Ex. 6, Judge Kennedy Order dated July 2, 2003 at 10.)

### D. Petitioner's Allegations Do Not Meet the Burden of Establishing Actual Innocence

In this successive petition, the Court heard from forty-two witnesses and reviewed numerous exhibits. After thoroughly considering the evidence and submissions of the parties, the Court denies Petitioner's claims.

#### 1. Canyon Corral Bar

Petitioner contends his innocence is "corroborated" by the actions of others who "likely were involved" in the Ryen/Hughes murders. (Pet.¶ 60.) Petitioner focuses on the same persons—three white males at the Canyon Corral Bar the night of the murders—that he tried to direct suspicion toward at trial. (*Id.*) The Court concludes that the Canyon Corral bar information does not undermine the evidence of Petitioner's guilt.

None of the Canyon Corral bar witnesses are able to refute the physical evidence collected at the crime scene or the post-conviction DNA evidence linking Petitioner to the crime. The blood from the crime scene, A–41, recovered at around 12:25 a.m. on June 6, 1983 came from an African American individual, (93 RT 4424), and post-conviction DNA tests confirmed that it was Petitioner's blood (1 in 310 billion). (*See* Supplemental DOJ Physical Evidence Exam Report dated Sept. 24, 2002 at 1–2.) None of the bar witnesses describe an inebriated African American individual with blood. As such, the evidence from the bar does not undermine Petitioner's guilt.

Petitioner alleges that on the night of the murders three strangely acting patrons covered in blood were asked to leave the Canyon Corral Bar. (Pet.¶ 97.) At trial, the defense tried to cast suspicion away

from Petitioner by calling bartender Ed Lelko to testify that three men entered the bar that night and later left without incident after being refused service for being too drunk. Lelko did not notice any blood on the men. In fact, none of the people known to be at the Canyon Corral bar on the night of the murders noticed blood. (Answer, Ex. 18, at 1; Answer, Ex. 22, at 1; Answer, Ex. 24, at 2; Answer, Ex. 28, at 1; Answer, Ex. 30.) Petitioner's support for his allegation comes from people who over twenty years after the fact allege to have been patrons in the bar: Lance Stark Mary Mellon–Wolfe, Christine Slonaker, Randy Mansfield and Al Ward.

In order to address the issues raised by Petitioner's successive petition, the Court held an evidentiary where several people at the bar that night testified. These people had previously given police interviews the day following the murders and/or testified at trial. These included the bartender Edward Lelko,[38] the bar manager Shirley Killian, two waitresses, Virginia Mansfield and Kathleen Royals, and several bar patrons, including Lester Land, Linda Paulk and Pamela Smith. Lelko, Killian, Mansfield, Royals, Land, Paulk and Smith confirm their earlier statements and testimony that there were no men in the bar that night with blood on their clothes or faces and that the police did not come to the bar that night.

The Court also heard testimony from Lance Stark, Mary Mellon–Wolfe, and Christine Slonaker. Deputy Rodney Ray Hoops who was on patrol the evening of the murders also testified. At the request of Petitioner, the Court heard from Alfred Eugene Ward, Sr., who testified that he was at the Canyon Corral Bar on the night

before the murders, Friday, June 3, 1983, one night too soon to be relevant. He specifically recalls seeing three young white males wearing extremely bloody T-shirts. (8/25/04 HRT 37.) If Mr. Ward is credible, his testimony refutes Petitioner's theory and is consistent with Randy Mansfield's testimony that it was not unusual for patrons to come into the bar with blood on their clothes from the slaughterhouses in the area.

### a. Evidentiary Hearing Testimony of Bar Employees and Patrons Who Were Interviewed After the Murders and/or Testified at Trial

Edward Lelko testified he was the bartender at the Canyon Corral Bar on the night of the murders. (6/25/04 HRT 5.) Lelko stated that he saw three men wearing Levi jeans. (6/25/04 HRT 18.) Lelko confirmed that one of the men was wearing a light colored T-shirt. (6/25/04 HRT 84.) The men were not wearing coveralls. (6/25/04 HRT 18.) Lelko did not call the police and did not see a police officer in the bar that night. (6/25/04 HRT 19–21.)

Shirley Killian was the manager of the Canyon Corral Bar in June 1983 and recalled the three men at the bar. (6/29/04 HRT 106–09.) She was not working on the night of the murders but was at the bar. (6/29/04 HRT 106.) She did not see any blood on the men's clothing or their persons. (6/29/04 HRT 111.) One of the men was wearing a light colored T-shirt and blue jeans. (6/29/04 HRT 133, 140–41.) She did not call the police. (6/29/04 HRT 109.) Killian went outside when the three men left and she saw one get into a pickup and another one get into a smaller

---

**38.** The Court held the hearing in Riverside, California as Mr. Lelko was facing major surgery for lung cancer and unable to travel. (*See* 04–CV–656, Doc. No. 100.)

car. (6/29/04 HRT 108.) Kathleen Royals was a waitress at the bar in June 1983.(6/29/04 HRT 148.) She served the three men drinks. (6/29/04 HRT 153.) She described them as clean-cut men and recalled they wore jeans and one or two of them wore a T-shirt. (6/29/04 HRT 153.) She did not notice any blood on their clothing or their persons. (6/29/04 HRT 153.) She did not call the police, was not aware of anyone calling the police and did not see any officers in the bar that evening. (6/29/04 HRT 154.)

Linda Paulk was a patron at the bar and testified that three clean-looking men entered the bar on the night of the murders. They looked like they were military personnel. (6/28/04 HRT 183, 187.) They all wore T-shirts and had short haircuts. (6/28/04 HRT 183.) One wore a white T-shirt. (6/28/04 HRT 184.) Ms. Paulk stated she did not notice blood on any of the three men. She did not see anyone with coveralls. (6/28/04 HRT 187.)

Pamela Smith was a patron at the bar on the night of the murders. (6/28/04 HRT 202.) She noticed three men at the bar. (6/28/04 HRT 203–04.) The three men were in their 20's wearing T-shirt and jeans. (6/28/04 HRT 205.) One man had a T-shirt with a logo making Ms. Smith think he liked heavy metal bands. (6/28/04 HRT 204–05.) Ms. Smith stated that she did not notice any blood or stain on the three men's clothing. (6/28/04 HRT 209.) She did not see a police officer at the bar. (6/28/04 HRT 209.) After hearing about the murders, Ms. Paulk and Ms. Smith, contacted the Sheriff's Department regarding the three men at the bar. (6/28/04 HRT 187–88.)

Virginia Mansfield is married to Larry Mansfield and the daughter in law of Shirley Killian, the manager of the bar. (6/29/04 HRT 81.) She was a waitress at the Canyon Corral Bar along with Kathleen Royal. (6/29/04 HRT 82.) On June 5, 1983, she reported to the police that one of the men wore a "white short-sleeved cotton shirt (not an undershirt)." (6/29/04 HRT 91.) She did not see anyone with clothing that had blood on it. (6/29/04 HRT 83.) She does not recall seeing a uniformed officer inside the bar that night and she was not aware of any problems in the bar that evening. (6/29/04 HRT 83.)

Lester Land was the maintenance man, bouncer and sometimes bartender at the Canyon Corral Bar and was at the bar the night of the murders. (6/29/04 HRT 2–3.) Mr. Land remembered three men but did not remember what they looked like. (6/29/04 HRT 6.) He did not notice anyone with blood on their clothing and did not recall seeing a law enforcement officer inside the bar. (6/29/04 HRT 10.)

Land's interview by Detective Wilson on June 5, 1983 was documented in a police report. (Resp't Evid. Hearing, Notebook 11, Ex. AAAA.) He stated that there were three white men that arrived around 9:00 p.m. They were in their 20's. One guy had very short light colored hair and wore a plaid shirt, the second male had short black hair wearing a light colored plaid shirt and the third male had shoulder length dark colored hair. He stated that they left the bar and returned a short time later pretty intoxicated. (Resp't Evid. Hearing, Notebook 11, Ex. AAAA.)

The credible version of the three men in the Canyon Corral Bar comes from those who were interviewed at the time of the crimes. The two waitresses and bartender who were working the night of the murders, the manager of the bar who stopped by that night, as well as three patrons at the bar that night, were interviewed by authorities close in time to the murders.

(6/05/04 HRT 17; 6/28/04 HRT 187, 196, 226; 6/29/04 HRT 3, 6, 89, 126.) Ed Lelko, the bartender was interviewed within three days of the murders. (102 RT 6526–27, 6529.) The bar's manager, Shirley Killian, was interviewed on June 5, 6, and 8, 1983. (106 RT 7649.)

Lelko was called as a witness by the defense to cast suspicion on the three strangers in the Canyon Corral Bar for the Ryen/Hughes murders. At trial, he testified that around 9:00 p.m. three Caucasian men entered the bar who were not "regulars." Each man had a short, military-style haircut, and all were wearing light-colored T-shirts and Levis; none wore coveralls. (102 RT 6530, 6536, 6538.) The men spent about 15 to 20 minutes in the bar before leaving. The three men returned around 11:30 p.m. One was noticeably inebriated. The waitress refused them service and they left the bar without incident. (102 RT 6531.) Lelko noticed no blood on their T-shirts. (102 RT 6533, 6544.)

At trial, Killian was called as a rebuttal witness by the prosecution. She saw three young men with close-cut, military style haircuts. They wore light colored T-shirts. She did not see any blood or stains on their clothing. (106 RT 7641, 7645.) The men were "cut-off" from further drinks. They did not seem upset and left the bar around 11:30 p.m. (106 RT 7647.)

b. **Evidentiary Hearing Testimony of Lance Stark, Mary Mellon–Wolfe, Christine Slonaker, Randy Mansfield, and Al Ward**

The Court also heard from the descriptions of the men supposedly at the bar that night provided by Petitioner's witnesses. Lance Stark testified at the evidentiary hearing. (7/23/04 HRT.) He claims he was at the bar the night of the murders and

saw three men come into the bar that night who were making inappropriate comments to some women sitting at the bar. (7/23/04 HRT; Pet'r Evid. Hr'g, Ex. 30.) As an initial matter, Stark was known to the defense at trial so that information may not be the basis of an actual innocence claim. *See Schlup*, 513 U.S. at 324, 115 S.Ct. 851; *Thompson*, 523 U.S. at 559, 118 S.Ct. 1489. At trial, Petitioner was provided information from the San Bernardino Sheriff's Department ("SBSD") that Stark claimed to have seen "subjects" in the Canyon Corral Bar on the night of the murders and that he talked to them and saw their vehicle. (*See* 04–CV–656, NOL of Blue Slip Re Lance Stark, Doc. No. 202).

During his testimony before this Court, Stark claimed to have initially seen two white men on the night of the murders, who were visibly intoxicated. (7/23/04 HRT 28.) Later, Stark stated that he saw three men leave the bar. (7/23/04 HRT 40.) The men appeared dirty looking and not clean cut. (7/23/04 HRT 60.) One of the men had a short military style haircut that was light and unkept, and was wearing a pair of blue jean "Farmer John" bib overalls with the top half down. (7/23/04 HRT 23–24, 85, 97.) Stark testified that the man in the "Farmer John" bib overalls also had a light T-shirt on with what appeared to be some grease or mud stains, and he had a tattoo on his right shoulder. (7/23/04 HRT 23–24.)

Stark further testified that after he heard the men talking about how they were in a bar fight he thought that maybe the substance on one man's shirt he thought was grease or mud may have been blood, but he was not sure about the substance. (7/23/04 HRT 23, 64.) At the time, the incident did not stick out in

Stark's mind and he thought it was not significant, even after he learned of the murders in Chino the next day. (7/23/04 HRT 95.) In fact, Stark stated that he had not thought about this incident beyond the day it happened until nearly twenty years later when a defense investigator came and visited him in early to mid 2004. (7/23/04 HRT 95.) Because of the twenty year gap between the incident at the Canyon Corral Bar and Stark's effort to recall, he is not even sure if the incident happened the night of the murders on June 4, 1983. (7/23/04 HRT 95–96.) He states that he knows on some date that these three men came to the Canyon Corral Bar but he cannot personally correlate that date to the night of the murders. (7/23/04 HRT 95–96.)

At the evidentiary hearing, Mary Mellon–Wolfe described spots of blood on the front of one of the men's T-shirt and a small amount of blood on his upper lip. (6/28/04 HRT 123–24, 164–65.) Wolfe said his shirt was a "light tan or white, off white shirt [ ] with jeans" and that he had longer hair than the other two men, who had "really short hair." (6/28/04 HRT 121–23.) One of the other men was wearing tan coveralls that were "zipped down and thrown over" down to his waist. (6/28/04 HRT 121–22.) The three were refused service shortly after arriving and they left without incident. (6/28/04 HRT at 125–26.)

In contrast, Slonaker's declaration describes two white men with blond hair in their 20's. (6/28/04 HRT 21.) One was wearing a light colored T-shirt and jeans and the other man was wearing coveralls with buckles. (6/28/04 HRT 21–22.) They were "all covered in blood." (Traverse, Ex. 212 at 2.) During her testimony, she described the man in a white or dirty T-shirt and jeans with blood "[a]ll over him.

It was on his arms. It was all over his face. It was on his—it was all over his shirt. It was on his feet and on his shoes. It was everywhere." (6/28/04 HRT 25.) She then testified that the men were refused service and left the bar. (6/28/04 HRT 26–27.) Both Mellon–Wolfe and Slonaker describe an incident where the men approached them at the bar and began hitting on their friend, who had on a low cut blouse. (6/28/04 HRT 23–24; 6/28/04 HRT 120–21.)

Petitioner also presented the testimony of Randy Lee Mansfield, the son of the bar manager Shirley Killian. (8/25/04 HRT 87.) He said he worked at the bar practically every night back at the time of the murders. (8/25/04 HRT 81, 93.) Mr. Mansfield testified that a couple of men wearing butcher smocks with blood on them came into the bar on some day around the time of the murders, but that he could not place the men in the bar the day of the murders. (8/25/04 HRT 86–87.) Mr. Mansfield testified that these men were Hispanic with dark hair and appeared to work at one of the local slaughterhouses. (8/25/04 HRT 84–85.) The men came into the bar during the day and were wearing butcher smocks, the kind that tie behind the back. Since there were several slaughterhouses in the area, Mr. Mansfield made the logical conclusion that these men were simply coming from work and that is why they had blood on them. (8/25/04 HRT 94.) He did not think anything of these men even after he learned of the murders. (8/25/04 HRT 84–85.) Moreover, Mr. Mansfield is not sure when he saw these men, but he does recall that he was not alarmed when he saw them and did not call law enforcement. (8/25/04 HRT 97–98.)

The observations of the employees and patrons at the bar the night of the murders all confirm the trial testimony of Lelko and Killian, and contradict the accounts of Stark, Mellon–Wolfe, and Slonaker. The sworn declarations of a number of employees and patrons who were also at the bar that night contradict the information belatedly recounted by Stark, Mellon–Wolfe, and Slonaker. (*See* Answer, Exs. 18 (Lelko Decl.); 20 (Killian Decl.); 22 (Mansfield Decl.); 24 (Royals Decl.); 26 (Paulk Decl.); 28 (Smith Decl.); 30 (Land Decl.).) The three belated and inconsistent accounts on which Petitioner relies are simply not credible evidence, let alone clear and convincing evidence that would rebut the presumption of correctness attached to the state courts' implied and express factual findings. *See* 28 U.S.C. § 2254(e).

Petitioner requested an evidentiary hearing with Al Ward and learned prior to the testimony that he would not corroborate Petitioner's theory because he would testify that he was there on Friday night, a day too early to be relevant. Petitioner claims that the Court erroneously ordered Al Ward to testify. However, Petitioner's request for evidentiary hearing requests the testimony of Al Ward and Al Warren. (04–CV–656, Doc. No. 121 at 13.) The request specified that Al Warren was not there the night of the murders. (04–CV–656, Doc. No. 121 at 13.) Since Ed Lelko was the bartender on the night of the murders, he confirmed that Al Warren was not bartending the night of the murders. (6/25/04 HRT 5.) Al Warren had a stroke and is deceased. (4/22/05 HRT 45.)

Mr. Ward, an African American individual, testified that he was at the Canyon Corral Bar on the night before the murders, Friday, June 3, 1983, and that he specifically recalls seeing three young white males wearing extremely bloody T-shirts. (8/25/04 HRT 46.) Mr. Ward testified that this was his only visit to the Canyon Corral Bar. (8/25/04 HRT 45.) Mr. Ward worked at the El Toro Marine Corps Air Station and that he would drive by the Canyon Corral Bar every weeknight on his way home. He did not work on Saturday, so he was not in the bar on the night of the murders. (8/25/04 HRT 42.) As a family man, he never stopped at the bar. (8/25/04 HRT 45.)

On Friday night, June 3, 1983, Mr. Ward testified that he was driving home from work just before midnight, as he did every weeknight, when he came across a couple whose car had broken down on Carbon Canyon Road approximately eight miles from the Canyon Corral Bar. (8/25/04 HRT 42–43.) Mr. Ward gave the couple a ride to the bar and they invited him in for a drink to thank him for helping them. (8/25/04 HRT 44.) As he was walking in the bar, Mr. Ward testified that he saw three men coming from around the back of the bar that had unmarked T-shirts covered in blood. (8/25/04 HRT 46.) Mr. Ward testified that he was approximately ten feet from the men and they were covered all over in blood. It was on the front of their shirts and all over their arms and skin. (8/25/04 HRT 64.) The men also were all wearing similar khaki pants and similar shoes. (8/25/04 HRT 66.) Two of the men had blond hair and the third man had sandy brown hair. (8/25/04 HRT 48.) Two of the men had shorter hair while the third man with blond hair had longer hair tucked into the back of his T-shirt. (8/25/04 HRT 48.) Mr. Ward and the couple he picked up proceeded into the bar and Mr. Ward had one beer and left shortly after midnight. (8/25/04 HRT 45–46.) In total, Mr. Ward

testified that he was at the bar twenty minutes. (8/25/04 HRT 45.)

Both parties expressed doubt about the credibility of Mr. Ward. (4/22/05 HRT 45.) However, Mr. Ward's testimony may explain why Stark, Mellon–Wolfe, and Slonaker recall seeing men with blood on them at the bar. Yet Mr. Ward specifically recalls seeing the bloody men at the bar on Friday, a day too early for it to be relevant. Given that all of the bar employees and patrons interviewed contemporaneously after the murders and/or testified at trial and before this Court, recall no bloody men at the bar on the night of the murders, the Court concludes that the testimony of the witnesses from the trial have greater weight compared to the additional witnesses whose recollections over twenty years later are not as reliable.

### c. Detective Wilson

Detective Timothy Wilson of the San Bernardino Sheriff's Department testified that nothing about three men covered in blood had come up in his interviews and investigation into any suspicious men being at the bar the night of the murders, Saturday, June 4, 1983. (8/26/04 HRT 78.) Later, he heard hearsay information. Det. Wilson is not sure where he heard this information, it may have been from any number of hearsay sources such as the newspaper or "word on the streets." (8/26/04 HRT 76.) The information did not come from his investigation or interviews with witnesses. (8/26/04 HRT 78.)

### 2. No *Brady* Violation Regarding Canyon Corral Bar

After reviewing all of the evidence and hearing from the witnesses, the Court concludes that the more credible version of the events at the Canyon Corral Bar the night of the murders comes from the bar employees and patrons interviewed shortly after the murders who also testified at the trial. At the evidentiary hearing, these credible witnesses testified on the night of the murders, there were no bar patrons with blood on them and the police were not at the Canyon Corral Bar.

Petitioner argues that the prosecution withheld evidence that a police officer was called to the Canyon Corral bar the night of the murders. The Court disagrees, and the extensive evidentiary hearings do not support Petitioner's claim.

For example, Mellon–Wolfe admitted that she had no recollection of seeing a uniformed officer inside the bar, and believed she was confusing the night of the murders with another night at the bar when a uniformed officer came into the bar, and she saw the officer speaking to the woman manager of the bar. (6/28/04 HRT 173, 175.)

Slonaker's testimony and declaration similarly have changed. In her declaration, she stated a uniformed officer came into the bar. (Traverse, Ex. 212 ¶ 11.) In her testimony, however, she stated that no uniformed police officer came into the bar the night of the murders. She now claims that as she got up to leave the bar by way of the back door, she looked out the open front door of the bar and saw a uniformed officer outside the bar wearing tan pants and a tan shirt, not the uniform of the Sheriff's officers. (6/28/04 HRT 73–75, 80.)

Randy Mansfield testified that he did not call law enforcement. (8/25/04 HRT 97–98.) Since there were slaughterhouses in the local vicinity, Mansfield was not alarmed at seeing a couple of men wearing butcher smocks with blood. (8/25/04 HRT 84–85.) Bartender Edward Lelko, bar

manager Shirley Killian, two waitresses, Virginia Mansfield and Kathleen Royals, and several bar patrons, including Lester Land, Linda Paulk and Pamela Smith did not see men with blood on them or see the police at the bar. (6/25/04 HRT 17; 6/28/04 HRT 123–24, 187, 189, 209; 6/29/04 HRT 10, 19, 83, 88, 111, 153–54; *see also* Answer, Ex. 18 at 1; Answer, Ex. 22 at 1; Answer, Ex. 24 at 2; Answer, Ex. 28 at 1; Answer, Ex. 30.)

The seven witnesses who were at the bar that night all confirmed that there was no reason to call the police to the bar and that none placed an officer in the bar that night. (6/25/04 HRT 19, 21; 6/28/04 HRT 209; 6/29/04 HRT 10, 35, 83, 109, 154.) In addition, Respondent also produced the dispatch log from the Sheriff's Department for the night of the murders, and there was no call for assistance from the bar. (Resp't. Evidentiary Hearing Notebook 12, Ex. MMMM; *see also* 6/29/04 HRT 47, 53–54 (Dep. Rodney Hoops testimony)).

Deputy Rodney Hoops, the deputy sheriff patrolling the area that included the bar from 3:00 p.m. to 11:00 p.m. on June 4, 1983, credibly testified that he did not go to the Canyon Corral Bar that night and that he did not hear any broadcast over the radio relating to the bar or its immediate vicinity. (6/29/04 HRT 45, 47.) No other law enforcement agency would respond to the bar unless a mutual aid request was made, and the request would come from the Sheriff's Department and be reflected on the dispatch log. (6/29/04 HRT 47.) [39]

Paul Beltz, a SBSD officer, testified that he was in the parking lot of the Canyon Corral Bar when he got the call to the Ryen home on June 5th at approximately 12:48.(8/25/04 HRT 8.) He got the call the morning of June 5th when the bodies were discovered. Beltz was not at the Canyon Corral Bar parking lot on the night of the murders.

Also, the law enforcement officer in tan pants Slonaker claimed to have seen outside that bar on the night of the murders does not match the uniform of the San Bernardino Sheriff's deputy. Their uniforms consisted of forest green pants. (6/29/04 HRT 59; *see also* Resp. Evidentiary Hr'g Ex. TTTT (picture of uniformed San Bernardino Sheriff's Officer); 8/13/04 HRT (testimony of San Bernardino Sheriff's Dispatch Supervisor Debra Holman that Ex. TTTT is the uniform worn by the San Bernardino Sheriffs with green pants).)

■ After conducting an extensive evidentiary hearing, the Court concludes that there was no *Brady* violation based on the absence of a report form in response to the Canyon Corral Bar the night of the murders. The evidence, including Petitioner's own witnesses disputes Petitioner's claim that a uniformed officer came to the bar the night of the murders. In addition, the employees on duty and the patrons in the bar were aware of what transpired with the three men in question, and the defense had the benefit of that information before trial and elicited testimony during trial of

---

39. The Court also heard testimony from Det. Wilson that when he was a deputy at the west end station, he would regularly check on the Canyon Corral Bar. (8/26/04 HRT.) This is consistent with Dep. Hoops testimony that he would regularly check on the bar when he was on patrol. (6/29/04 HRT at 76–77.) But as Dep. Hoops testified, if there was nothing to report from the bar check, then there would be nothing noted on the log. (*Id.*) Thus, even if there were a bar check the night of the murders, there were no incidents to report, such as bloody men, since nothing is reflected on the logs.

the events at the bar that night. (Answer, Ex. 35.) Therefore, Petitioner's allegations do not present a viable *Brady* claim.

### 3. Daily Logs and Dispatch Information Available at Trial to the Defense

■ On August 8, 1983, and January 16, 1984, Petitioner's defense counsel David Negus filed a subpoena duces tecum for materials that included "the complete daily logs, dispatch records, tape recordings of dispatch or communications made from June 2, 1983 to July 31, 1983, by the Sheriffs or any deputy of the SBSO concerning the investigation and search for suspects in the deaths occurring at [the Ryen home] and the escape and attempt to apprehend David Trautman, aka: Kevin Cooper, from CIM on June 2, 1983." (I CT 75–76.) Negus' declaration stated in his request: "The logs, dispatch records, and tape recordings include actions of officers which may not be memorialized in reports. The actions are relevant to the integrity of physical evidence, other suspects to the crime, and the issue of flight." (I CT 90.)

On September 2, 1983, after the state's compliance, defense trial counsel David Negus stated to the court that the daily logs had been received:

> I can indicate to the court that with respect to the four items in the amended subpoena [*see* I CT 75–76], that with respect to Item 1 [complete daily logs, dispatch records, tape recordings of dispatch or communications made from June 2, 1983, to July 31, 1983], all items except the tapes that were requested have been received.

(IV RT 6.)

Also, John Kochis, one of the prosecuting attorneys at the Petitioner trial, testified that the San Bernardino Sheriff's daily logs from June 4–6, 1983 (Resp't Evidentiary Hr'g Exs. MMMM–PPPP), were subject to a subpoena duces tecum filed by the defense and those documents were released to the defense directly by the San Bernardino Sheriff's Department. (8/13/04 HRT 183.)

Petitioner points to the June 5, 1983 daily logs of the San Bernardino County Sheriff, which lists in the incident detail of the Ryen/Hughes murders a description of the suspect vehicle as a Buick station wagon "occupied by three young males." (*See* Resp't Evidentiary Hr'g, Ex. NNNN at 9; *see also* Resp't Evidentiary Hr'g, Ex. RRRR (handwritten page by Holman having information on the suspect vehicle); Resp't Evidentiary Hr'g, Ex. SSSS (teletype dispatches regarding the suspect vehicle).) The Court held an evidentiary hearing on August 13, 2004, to address the Sheriff's daily log, where dispatchers Nancy Simendich and Debra Holman testified. (8/13/04 HRT 4, 78.) Both Simendich and Holman were on duty the day the murders were discovered, June 5, 1983. (8/13/04 HRT 10–11, 79–80.) Neither Simendich nor Holman had any independent recollection of the suspect vehicle or who may have conveyed the vehicle/occupant information to the dispatch that was entered into the daily logs and broadcast on the teletype. (8/13/04 HRT 101.) This was not new information as Douglas and Paula Leonard, the couple that made the report, testified to this information at trial at the request of the defense. (102 RT 6586–6604.)

The Court also heard testimony from Deputy Paul Beltz, who was dispatched to the murder scene when the crimes were discovered and was the Sheriff who advised dispatch about the suspect vehicle and the "three young males." (8/25/04

HRT.) Deputy Beltz credibly testified that he could not recall the source of the suspect vehicle and the description of the three young males. (8/25/04 HRT 24–25.) He stated that it may have been information that he heard on the Sheriff radio or from Robert Howey, the neighbor of the Ryen family that made the initial call to the Sheriffs to report the murders. (8/25/04 HRT 24–25.)

Petitioner was aware of the daily logs at trial because they were provided to him during discovery via a subpoena duces tecum. Additionally, the defense elicited the testimony from Douglas and Paula Leonard at trial. (102 RT 6586, 6599.) The daily logs, therefore, cannot be a basis for an actual innocence claim. *See Schlup,* 513 U.S. at 324, 115 S.Ct. 851; *Thompson,* 523 U.S. at 559, 118 S.Ct. 1489.

### 4. T-shirt (Trial Exhibit 169)

Petitioner alleges his innocence is shown by the T-shirt discovered less than one half mile [40] from the Ryen home near the Canyon Corral Bar. (Pet. at 19.) Moreover, there is nothing inconsistent with Petitioner's guilt and the T-shirt being left on the side of the road by the bar, inasmuch as Petitioner stole the Ryens' station wagon and would have driven past the Canyon Corral Bar on his way to Long Beach where he abandoned the station wagon. (Answer, Ex. 15.) Petitioner could have tossed the T-shirt out of the window of the Ryen station wagon, just as he tossed the hatchet out the window. (89 RT 3519; 90 RT 3791.) The cigarettes from inside the vehicle contained Petitioner's DNA. (Supplemental DOJ Physical Evidence Exam Report dated Sept. 24, 2002.) Also, since the T-shirt was intro-

duced into evidence at trial by Petitioner in an effort to direct suspicion at the three bar patrons at the Canyon Corral Bar, it does not constitute evidence of actual innocence. *See Schlup,* 513 U.S. at 324, 115 S.Ct. 851; *Thompson,* 523 U.S. at 559, 118 S.Ct. 1489.

Petitioner also attempts to connect the T-shirt on the side of the road by the bar to Lee Furrow, but Petitioner's DNA was on the T-shirt with the blood of the victims, linking Petitioner to the crime. (*See* Supplemental DOJ Physical Evidence Exam Report dated Sept. 24, 2002.) The stories told by Ms. Roper, now deceased, do not establish that Petitioner is innocent. (Answer, Ex. 51.) Ms. Roper's allegations lack credibility. She was on drugs and hallucinating the night she claims she saw Furrow, and Furrow was at a rock concert on the night of the murders. (Answer, Exs. 45 at 1; 54 at 1.)

Petitioner also points out that no one identified the T-shirt as having come from the Ryen home, and the owners of the hideout house did not recognize the T-shirt. (Pet. at 20.) Since all of the occupants of the Ryen home except for eight-year-old Josh were dead, the failure to identify the T-shirt as coming from the Ryen home certainly does not exclude the possibility that it did. Also, the owners of the hideout house made it clear that items of clothing were kept at the house for various uses around the ranch. (87 RT 2991, 3044, 3065.) Petitioner admitted taking clothing from the hideout house. (97 RT 5410–12.) Given the presence of both Petitioner's blood and the victims' blood, and that the T-shirt was on the side of the road leading from the Ryen house to the

---

**40.** In fact, the distance between the Ryen home and the Canyon Corral Bar driving along the only paved road leaving the Ryen

home is 1.75 miles. (Answer, Ex. 17; Answer, Ex. 16(map).)

freeway, it is entirely possible Petitioner used the T-shirt following the murders. In any event, what Petitioner claims was known at trial, and cannot serve as a basis for a claim of actual innocence. *See Schlup*, 513 U.S. at 324, 115 S.Ct. 851; *Thompson*, 523 U.S. at 559, 118 S.Ct. 1489.

To put Petitioner's innocence claim in perspective, the primary newly discovered evidence pertaining to the T-shirt is that it is stained with Petitioner's blood. (Answer, Ex. 88.) Petitioner's claim that blood was planted on the T-shirt ignores that the T-shirt was never used as evidence against him. Moreover, the San Diego County Superior Court made express findings in a recent post-conviction evidentiary hearing rejecting Petitioner's evidence tampering claims, (Answer, Ex. 9 at 10), and Petitioner fails to present clear and convincing evidence to rebut the presumption of correctness that attaches to those findings. 28 U.S.C. § 2254(e). Notwithstanding, EDTA preservative testing ordered by this Court fails to show any evidence tampering relating to Petitioner's blood found on the T-shirt.

### 5. Shoe Evidence

Investigators discovered three shoeprint impressions that the prosecution argued linked Petitioner to the murders: a partial sole impression on a spa cover outside the Ryen master bedroom, (88 RT 3363), a bloody shoe print on a bed sheet in the master bedroom, (89 RT 3506–07), and a shoe-print impression in the hideout house. (87 RT 2925.) All three appeared to come from tennis shoes, specifically the Pro–Keds Dude tennis shoes. (88 RT 3364–65; 94 RT 4764; 4778.)

Petitioner seeks to undermine the shoeprint evidence presented at trial. Petitioner begins by insinuating there is a problem with the bloody shoe print recovered from the sheet in the Ryen master bedroom because Deputy Duffy testified initially that he did not see any shoe impressions in the master bedroom, but later testified to seeing and photographing such an impression. (Pet. at 21.) Duffy testified to this at trial. (89 RT 3457–58, 3497, 3505, 3506.) Petitioner's insinuation was also rejected by his own expert at trial, Dr. Thornton. (105 RT 7560 ("no particular quarrel concerning the collection and preservation of" the shoe print in blood).) Petitioner may not make a showing of actual innocence based on what was known at the time of trial and presented to the jury. *See Schlup*, 513 U.S. at 324, 115 S.Ct. 851; *Thompson*, 523 U.S. at 559, 118 S.Ct. 1489.

Petitioner claims that the prosecution withheld information concerning criminalist William Baird's heroin use undermining his conclusion that the tread patterns on the shoeprints matched the tread patterns of the Pro–Keds Dude tennis shoes. Petitioner's claim concerning criminalist William Baird was previously adjudicated by this Court, *Cooper I*, 92–CV–427, Aug. 25, 1997 Order at 69–71. Therefore, his claim regarding Baird is barred. *See* 28 U.S.C. § 2244(b)(1). Additionally, at trial, Dewey Newberry, general merchandise manager of Stride Rite, viewed the photographs of the three shoe impressions from the Ryen home and the hideout house and concluded that the shoe impressions were from the Pro–Keds Dude tennis shoes. (86 RT 2642.)

█ The Court set an evidentiary hearing to address Petitioner's claim that the tennis shoes used at CIM Chino were common tennis shoes available to the general public through any number of retail and department stores such as Sears. (Pet. at 21–22.) The Court heard from Midge Carroll; Lt. Donald Smith, a for-

mer investigator at CIM under Midge Carroll; Don P. Luck, a former executive and sales manager for the Stride Rite Corporation, the company that manufactured the Pro–Keds Dude tennis shoes; Sandra Coke, the defense investigator that obtained the declarations from Midge Carroll; James Taylor; and Detective Derek Pacifico of the San Bernardino Sheriff's Department.

### a. Testimony of Former Warden Midge Carroll

Petitioner alleges that the prosecution failed to provide information to the defense from the former warden of CIM, Midge Carroll, that the prison-issued Pro–Keds Dude tennis shoes that matched the shoe prints from the crime scene were "common tennis shoes available to the general public through Sears and Roebuck and other such retail stores." *Cooper*, 358 F.3d at 1121. The Court finds no material *Brady* violation. Midge Carroll was known to the defense at the time of trial. There are phone messages from her to defense counsel and notes about securing her testimony in the defense file. (Answer, Ex. 81.) Moreover, in December of 2001, Ms. Carroll permitted Petitioner's defense investigator Paul Ingels to spend a week with her going through her papers. This was two-and-a-half years before she submitted her eleventh-hour declaration to the Ninth Circuit. (6/02/04 HRT 125 (Carroll's testimony); 8/13/04 HRT (Ingels' testimony).) Ms. Carroll even gave a telephonic interview to defense investigator Ingels back in November of 2001. (8/13/04 HRT (Ingels' testimony).)

Ms. Carroll testified at the evidentiary hearing that after reading a newspaper article stating that shoe prints found at the Ryen/Hughes murder scene were from a prison made tennis shoe, she commenced an informal inquiry into whether CIM manufactured any special tennis shoes. (6/2/04 HRT 102–06.) In a telephonic interview by Detective Pacifico in 2004, Ms. Carroll explained what alerted her to conduct an inquiry was a newspaper article she read describing the tennis shoes as prison made. (Answer, Ex. 64 at 11.) Ms. Carroll indicated that she did not personally conduct an investigation but rather she "asked her staff to look into this special shoe and get back to me." (6/2/04 HRT 102.) These people may have included the CIM business manager, Hal Panner, associate warden Bob Bales, or her executive assistant Regina Stevens. (6/2/04 HRT 103.) Robert Bales was the Associate Warden at CIM, in charge of the minimum facility at the time of Petitioner's escape. Mr. Bales states he was never personally asked to check on any information regarding inmate shoes nor does he recall any conversations with Ms. Carroll about shoes, and no records regarding shoes were exchanged between Mr. Bales and Ms. Carroll. (Answer, Ex. 78 at 1.)

Following their investigation, Ms. Carroll's staff reported to her that the tennis shoes available at CIM were not prison-manufactured or specially manufactured tennis shoes but were commonly available at retail stores such as Sears. They allegedly told her CIM had bought the shoes at Sears, but this was incorrect. (6/2/04 HRT 102–06.) The contracts from Stride Rite for the CIM purchase of 1,390 Pro–Keds Dude shoes were admitted into evidence at trial. (Trial.Exs.84–88.) At the evidentiary hearing, Ms. Carroll testified that she had no personal knowledge as to the availability of Pro–Keds Dude tennis shoes at CIM:

> Ms. Wilkens: So you have no personal knowledge whatsoever about the availability of the tennis shoes at CIM.

You only know what you heard from your staff.

Ms. Carroll: That is correct.

(6/2/04 HRT 158.)

Ms. Carroll failed to request the relevant purchasing records which were readily available or contact the investigators assigned at CIM for any assistance. She did not review the relevant contracts related to the tennis shoes purchases and only informally asked her staff what was going on with the tennis shoes. (6/2/04 HRT 154.) Her investigative staff worked closely and directly with the SBSD in assisting to provide information about Petitioner. (6/2/04 HRT 154.) Ms. Carroll, without conducting her own direct investigation, relied on incorrect information given to her by her staff. Ms. Carroll was relying on her own incorrect assumptions when she allegedly called to inform law enforcement about the CIM tennis shoes.[41] She had erroneously concluded that: (1) CIM did not purchase the Pro–Keds Dude tennis shoes directly from the manufacturer, and (2) the particular brand of shoes was readily available at retailers in southern California such as Sears. Evidence supporting a claim of innocence must be reliable evidence. *See Schlup*, 513 U.S. at 324, 115 S.Ct. 851; *Thompson*, 523 U.S. at 559, 118 S.Ct. 1489.

Following Petitioner's escape from CIM, Ms. Carroll meticulously began keeping detailed records regarding Petitioner. (6/2/04 HRT 141.) She kept everything, including memos. (6/2/04 HRT 142.) Ms. Carroll testified that, after Petitioner's es-

cape and the murders, she contacted the San Bernardino Sheriff's Department and told them that the shoes given to the inmates at CIM were not manufactured or specially made for the prisons but that they were commonly available to the public through major retailers such as Sears. (6/2/04 HRT 104–06.) Despite her detailed record keeping from this time period, Ms. Carroll did not keep a record of having contacted the Sheriff's office. (6/2/04 HRT 161.)

Ms. Carroll's records from that time period are currently in eight three-ring binder notebooks. (NOL filed 4/15/05, CIM Vault Notebooks.) The Court has reviewed the eight notebooks consisting of 2,484 pages of documents concerning Petitioner's escape, changes to security at CIM, newspaper articles, letters to the warden including a copy of the envelope, memoranda, receipts of mail sent, notes regarding phone calls noting date, time and person contacted, phone messages and many other documents concerning anything related to Petitioner. (NOL filed 4/15/05, CIM Vault Notebooks.) Contrary to her testimony, records of telephone conversations were made and retained. (*See* NOL filed 4/15/05, CIM Vault Notebooks.) Yet, a memo or notation that a phone call made to a lead investigator with the SBSD is not documented, but an interview with the defense investigator with a witness called by the defense from CIM about the shoes is well documented. (*See* NOL filed 4/15/05, CIM Vault, Notebook 6 at 1409–17.) Ms. Carroll thought the information

---

**41.** The Court notes that Petitioner's investigator contacted Ms. Carroll back in November of 2001 and received copies of documents from her personal files in December of 2001. (*See* 6/02/04 HRT 125(Carroll's testimony); 8/13/04 HRT 132–33 (defense investigator Paul Ingels' testimony).) In 2001, Ms. Carroll told the investigator her belief that the tennis shoes were not specific to CIM but available at other locations. (8/13/04 HRT 132.) It is therefore curious that Carroll's declaration submitted to the Ninth Circuit is dated January 30, 2004.

was significant enough to conduct a personal inquiry into the matter, but no documentation is noted despite voluminous notes related to Petitioner. In addition, Detective Pacifico conducted a search of the file for any documents concerning a phone call by Ms. Carroll but nothing was found. (*See* 6/3/04 RT 46–47.)

Carroll's multiple hearsay information contradicts the records maintained by her own institution, and the information known to persons with whom she purports to have spoken. The evidence at trial that contradicts Carroll's multiple hearsay has been confirmed by an Don Luck, former executive of Stride Rite Corporation with forty-two years of experience with the sale of the Pro–Keds shoe brand.

### b. Testimony of Stride Rite employees Dewey Newberry and Don Luck

At trial, Stride Rite general merchandise manager for the Pro Keds division, Dewey Newberry, testified that CIM had a contract with Stride Rite, and had shipped the Pro–Keds Dude shoes to CIM in 1982 and 1983. (86 RT 2613, 2619.) He explained that Stride Rite kept records of the orders placed by its clients including the quantity, color, and size of a particular shoe that is sold to a client. (86 RT 2619–20.) To Newberry's knowledge, the Pro–Keds Dude shoe was not sold anywhere in California, or elsewhere in the United States on a retail basis. (86 RT 2621, 2624.) Newberry was specifically asked if Stride Rite shipped any of the Dude model tennis shoes to J.C. Penney, Montgomery Ward, Fedco, or Target, and he indicated they did not. (86 RT at 2621.) He was asked if it would be a fair statement that the only place the shoes would have arrived in California is at some type of state facility, and he agreed that would be the case. (86 RT 2622.) He authenticated the sales records showing CIM purchased 1,390 pairs of Pro–Keds Dude tennis shoes in 1982.(86 RT 2623; Answer, Ex. 70.)

To the best of Newberry's knowledge, the complete list of invoices of all other institutions in and outside of California to which Pro–Keds Dude shoes were shipped from 1982 to 1983, were introduced into evidence. (86 RT 2623–24; Trial Exs. 84–88.) Those invoices reflect sales to the Naval Training Center, (Answer, Ex. 71) and numerous juvenile and correctional facilities and state hospitals. (Answer, Exs.71–74.)

The Court heard testimony of Don P. Luck at the evidentiary hearing. Mr. Luck is a former executive with the Stride Rite Corporation with forty-two years of experience selling and managing Pro–Keds and familiar with all sales of the Pro–Keds shoes to major retailers. (6/2/04 HRT 223.) Mr. Luck testified that he knew of all the major sales of Keds during the 1980's and that he was personally responsible for the Sears, J.C. Penney's, and military exchange accounts. (6/2/04 HRT 224, 225, 229–32.) He testified that he is positive that there were no sales of the Pro–Keds Dude tennis shoes to Sears or any other large retail companies or chain stores in the western United States. (6/02/04 HRT 225, 231–32, 239–40.) At the hearing, Mr. Luck testified that he has reviewed the trial testimony of Newberry and the records admitted into evidence at trial, and confirms that such testimony and records are consistent with his recollection regarding the sales of Pro–Keds Dude tennis shoes. (6/02/04 HRT 224; Answer, Ex. 66 at 1.) Mr. Luck stated that Mr. Newberry was a thorough person with regards to reviewing and checking files. (6/02/04 HRT 232, 233.)

Rather, the Pro–Keds Dude tennis shoe was a "bid" shoe, the low-end shoe of a particular brand, sold to institutions, such as prisons like CIM. (6/2/04 HRT 226–27.) Mr. Luck also stated he knows that the Dude shoe was not available to the public through any major retailer. (6/2/04 HRT 232.)

Mr. Luck could not rule out from his own personal knowledge sales to small shoe stores because the Pro–Keds Dude shoe was included in the wholesale shoe catalogue and because such sales would not have crossed his desk or been brought to his attention. (6/2/04 HRT 241.) But as Mr. Luck confirmed in his testimony, Mr. Newberry was the person who reviewed the Stride Rite corporate records and testified at trial based on his search of the records that there were no retail sales of the Pro–Keds Dude tennis shoes. (6/2/04 HRT 230, 233, 242.) Mr. Luck did not comment nor dispute the contents of the corporate records or Mr. Newberry's testimony because he did not review those records at the time Mr. Newberry prepared to testify in Petitioner's state court trial. (6/2/04 HRT 230, 233, 242.) So while Mr. Luck cannot rule out sales to small shoe stores from his personal knowledge, nothing in his testimony cast any doubt upon Mr. Newberry's testimony or the corporation records admitted into evidence at Petitioner's trial. (6/2/04 HRT 233, 242, 251.) Mr. Luck stated that Stride Rite kept very complete records and there would be records of sales made to smaller retailers. (6/2/04 HRT 232, 242.)

The Court notes that at trial, Petitioner was aware that the Dude shoes were in the Pro–Keds wholesale catalogue. (86 RT 2638.) Newberry testified that the Dude shoes were in the catalogues for the past fifteen years before Petitioner escaped from CIM. (86 RT 2638.) It is not new information that the Dude tennis shoes were available in the company's wholesale catalogue. In addition, Newberry testified that Don Luck, who worked in the national accounts department for sales would be most knowledgeable about the contracts with the State of California for the Pro–Keds Dude tennis shoes. (86 RT 2640–41.) Information regarding the presence of the Pro–Keds Dude tennis shoes in the wholesale catalogue was presented at trial and available to defense counsel to investigate.

Mr. Luck also placed into perspective the number of the Pro–Keds Dude tennis shoes manufactured by Stride Rite in 1982 in comparison to other retailers of canvas basketball shoes. (6/2/04 HRT 247, 254–55.) He estimated that Stride Rite sold approximately 80,000 of the Dude tennis shoes, (6/2/04 HRT 247) while its competitor Converse was selling thirty million pairs of the Champion Oxford and eighty million pairs of the loose-lined tennis shoes in 1982.(6/2/04 HRT 253–54.)

Although the former warden erroneously believed the Pro–Keds Dude tennis shoes were locally available to the public though major retailers such as Sears, credible testimony by Stride Rite employees Mr. Newberry, at trial, and Mr. Luck, at the evidentiary hearing, establish that Pro–Keds Dude tennis shoes were not sold to Sears or any comparable retail store in the West coast. Moreover, CIM and Stride Rite Corporation records establish that CIM had a purchase contract with Stride Rite Corporation, the manufacturer of Pro–Keds Dude tennis shoes, for the Dude tennis shoes at the relevant time period. In addition, Stride Rite kept accurate records of all its sales and the contracts provided at trial showed that Pro–Keds Dude tennis shoes were not sold to retailers in California but sold primarily to

state institutions including the sale of 1,390 pairs of Pro–Keds Dude tennis shoes to CIM where Petitioner was incarcerated.

### c. Testimony of Lieutenant Donald Smith

At the evidentiary hearing, the Court also heard from Lieutenant Donald Smith, the officer in charge of Investigative Services for CIM. (6/2/04 HRT 211.) At the hearing, he verified his statements and testimony from pre-trial motions and the trial, that he obtained copies of the purchase contracts between CIM and the Keds Corporation, and provided those to the prosecution. (6/02/04 HRT 212; see 22 PRT 108–109; 85 RT 2487 (Trial Exs. 16, 17); Answer, Ex. 69.) Lt. Smith also testified at the evidentiary hearing that he has no recollection of being asked to investigate the source of the prison tennis shoes. (6/2/04 HRT 212.) Lt. Smith also testified the prisoners frequently played basketball and that they organized their own teams. (6/2/04 HRT 219, 221–22.)

### d. Testimony of Detective Pacifico

In order to determine if any records exist at the San Bernardino Sheriff's Department regarding the alleged phone call from Ms. Carroll regarding the CIM tennis shoes, Detective Derrick Pacifico testified at the evidentiary hearing on June 3, 2004. Detective Pacifico testified that he looked through all of the files at the San Bernardino Sheriff's Office and that he could not find any indication of a contact from Ms. Carroll. (6/3/04 HRT 46–47.)

### e. Testimony of Inmate James Taylor

Petitioner's next effort to challenge the shoe-print evidence rests on the alleged recantation of inmate James Taylor's trial testimony. (Pet. at 21.) Mr. Taylor testified at trial that he gave Petitioner a pair of Pro–Keds that Petitioner never returned. (85 RT 2511, 2546.) Mr. Taylor signed an eleventh-hour declaration penned by a defense investigator, who destroyed her notes of the interview. (6/02/04 HRT 11–12.) The declaration stated the only shoes he ever gave Petitioner were P.F. Flyers, not Pro–Keds. Cooper, 358 F.3d at 1121.

### I. Preliminary Hearing Testimony

On November 15, 1983, at the preliminary hearing, Taylor testified for the prosecution that he was housed at Reception Center West at CIM. (4 PRT 3, 4.) Taylor was responsible for checking in and out all inmate recreational activity equipment. (4 PRT 5, 6.) Petitioner came into the gym in the R.C. West facility in May of 1983. (4 PRT 4.) Before Petitioner was transferred from the medium-security facility at CIM to a minimum-security facility, Mr. Taylor issued Petitioner a pair of state-issued tennis shoes. (4 PRT 5.) The shoes were black Pro–Keds. (4 PRT 5.) Mr. Taylor never got the pair of Pro–Keds tennis shoes back from Petitioner. (4 PRT 6.)

### ii. Trial Testimony

At trial, Mr. Taylor again testified for the prosecution. (85 RT 2500.) In May of 1983, Mr. Taylor worked as a recreational instructor at the R.C. West facility at CIM. (85 RT 2500–01.) He handed out equipment, including tennis shoes. The shoes they stocked included Pro–Keds, P.F. Flyers, and assorted Converse tennis shoes. (85 RT 2501–02.) Mr. Taylor identified the Pro–Keds tennis shoes (Trial Ex. 38) and the tennis-shoe box (Trial Ex. 51) as the Pro–Keds that were available for checkout to inmates at the gym in May 1983.(85 RT 2503.)

Mr. Taylor knew Petitioner by the name of David Trautman. (85 RT 2504.) At first, Mr. Taylor issued Petitioner a pair of P.F. Flyers. Three or four days before Petitioner left for minimum security, Mr. Taylor gave Petitioner a pair of black Pro–Keds. (85 RT 2510, 2547.) Mr. Taylor gave Petitioner the shoes sometime in the month of May after the tenth of the month. (85 RT 2546.) He gave Petitioner the P.F. Flyers and then the Pro–Keds on the same day. (85 RT 2546.) Mr. Taylor could not recall the size of the shoes. (85 RT 2511, 2552.) He never got the Pro–Keds shoes back from Petitioner. (85 RT 2511.)

On cross-examination, Mr. Taylor was asked why he did not mention giving Petitioner a pair of P.F. Flyers when he testified at the preliminary hearing. Mr. Taylor explained that "it wasn't the shoe in question." (85 RT 2545.) Mr. Taylor testified the gym had four brands of tennis shoes: Nike, Converse, Pro–Keds, and P.F. Flyers. Mr. Taylor did not have a key to the room with the shoes, and always went into the room with a correctional officer present. (85 RT 2551.) The shoes Mr. Taylor gave to Petitioner were not in a box and Mr. Taylor did not know the condition of the shoe. (85 RT 2552.)

Mr. Taylor did not recall making a statement to CIM Investigator Hernandez that somehow Petitioner had gotten some Pro–Keds. (85 RT 2555.) A tape recording was played to the jury of Mr. Taylor's interview with CIM Investigator Hernandez. In the interview, Mr. Taylor said that Petitioner had a pair of brown Brogan prison issue shoes, and no tennis shoes. (85 RT 2569.) The first pair he gave him was a pair of P.F. Flyers, and then somehow Petitioner came up with a pair of Pro–Keds. (85 RT 2570.) Mr. Taylor then said he gave Petitioner two pairs of shoes,

and he traded him for Pro–Keds when he got the right size. (85 RT 2570.)

### iii. Evidentiary Hearing Testimony

On June 2, 2004, Mr. Taylor testified at an evidentiary hearing. Mr. Taylor began by explaining that in 1983 he could identify the difference between P.F. Flyer basketball shoes and Pro–Keds basketball shoes. (6/02/04 HRT 2, 3.) He also correctly identified pictures of both a Pro–Keds Dude and a P.F. Flyer tennis shoe. (6/02/04 HRT 5, 6; Resp. Evidentiary Hr'g Ex. CC, photo 1 (P.F. Flyer) and photos 2 and 3(Pro–Keds).) He further identified the Dude tennis shoe as being a black canvas shoe with the words Pro–Keds on the back of the shoe. (6/02/04 HRT 4; Resp. Evidentiary Hr'g Ex. CC, photo 1 (P.F. Flyer) and photos 2 and 3 (Pro–Keds)).

He explained that the P.F. Flyer is an everyday tennis shoe and that the Pro–Keds Dude is a better-made shoe that he would give to the basketball players. (6/02/04 HRT 3–6.) This is consistent with Lt. Smith's testimony that the prisoners would organize unofficial basketball teams. (6/02/04 HRT 221–22.) He gave Petitioner a pair of Pro–Keds. (6/02/04 HRT 43.) Mr. Taylor could not recall at the hearing whether he had given Petitioner a pair of P.F. Flyers prior to exchanging them for Pro–Keds Dude tennis shoes. (6/02/04 HRT 36, 41, 42.) He did verify his trial testimony as truthful, however, and stated that he was sure he had given Petitioner a pair of Pro–Keds Dude tennis shoes. (6/02/04 HRT 6.)

During the interview with investigator Coke, Mr. Taylor stated many times that he gave Petitioner Pro–Keds Dude tennis shoes. (6/02/04 HRT 12.) He told investigator Coke that he had told the truth already at trial and that there was nothing

to expound upon. (6/02/04 Id. at 12.) Mr. Taylor explained that he was confused by his conversation with investigator Coke. (6/02/04 HRT 13, 26, 60, 61.) He explained that the Pro–Keds tennis shoes he gave to Petitioner and that he identified in the pictures at the hearing (6/02/04 hearing, Resp't's Ex. CC, photos nos. 2 and 3 of the Pro–Keds) were sometimes called "Pro Keds" or "P.F. Flyer Pro Keds." (*Id.* at 13, 14.)

Mr. Taylor explained that the declaration did not reflect what he was attempting to convey, that he gave Petitioner a pair of Pro–Keds that were not returned. (6/02/04 at 67–69.) Taylor was unequivocal at the hearing that he gave Petitioner Pro–Keds:

> Ms. Wilkens: Mr. Taylor, sitting here today, do you have any doubt whatsoever that the brand of shoes you provided to Kevin Cooper prior to his escape from CIM that were not returned to you were Pro Ked (sic) tennis shoes?
>
> Mr. Taylor: I have no doubt that they were Pro–Ked (sic), and these are the models—middle and bottom on—whatever page you want to call that.
>
> Ms. Wilkens: So Exhibit CC that's in front of you now.
>
> Mr. Taylor. Yes.

(6/02/04 at 21, 22.)

Mr. Taylor's credible testimony at the evidentiary hearing corroborates his trial testimony that he gave Petitioner a pair of Pro–Keds Dude tennis shoes, which Mr. Taylor correctly identified by sight, and that Petitioner never returned those shoes. Mr. Taylor was simply confused by his interview with investigator Coke, who destroyed her notes of the interview. He believed that his recent declaration re-

flected that he gave Petitioner the Pro–Keds Dude tennis shoes. He also correctly identified pictures of the Pro–Keds Dude tennis shoes as the type of shoes that he gave to Petitioner. Therefore, the Court concludes therefore that there was no recantation by Mr. Taylor and that Petitioner had a pair of Pro–Keds Dude tennis shoes when he escaped from CIM.

### f. Correctional Officer Mason's Testimony at Trial

Correctional Officer Sydney Mason testified at trial that he recalled issuing Pro–Keds Dude shoes in either size 9 or 10 to an inmate who resembled Petitioner.[42] (104 RT 7176–78.) Officer Mason said he did not know whether the shoes were new or used but assumed they were new because they were in a box with a lid. (104 RT 7180–81.)

Based on the testimony at the evidentiary hearing and review of the trial and preliminary hearing transcripts, Petitioner has failed to demonstrate a showing of actual innocence. The Ninth Circuit was concerned that the particular type of shoe was not even available at CIM and thus Petitioner could not have been responsible for making the evidence shoe prints in his prison-issued shoes. *See Cooper*, 358 F.3d at 1122. This is not the case as the contracts showing the CIM purchase of the Pro–Keds Dude shoes were admitted into evidence at the trial. Former Warden Carroll was mistaken about the source of the shoes issued at CIM and their availability in retail stores. The corporate records admitted into evidence at trial confirm the sales of the shoes were to the Naval Training Center, U.S. Forestry Ser-

---

**42.** The defense interviewed another prisoner before trial who also confirmed that Petition- er had a pair of Pro–Keds Dude tennis shoes. (Answer, Ex. 61.)

vice, and numerous juvenile and correctional facilities and state hospitals. (Trial Exs. 84–88; Answer, Exs. 69–75.) At trial, it was known that the Pro–Keds Dude tennis shoes were not limited to prison inmates. It was also know that the Pro–Keds Dude tennis shoes were featured in Pro–Keds' wholesale catalogue. (86 RT 2638.) There is no evidence that retail sales of the Pro–Keds Dude tennis shoes were made in California.

In addition, Ms. Carroll was known to the defense at the time of trial. There are phone messages from her to defense counsel and notes about securing her testimony in the defense file. (Answer, Ex. 81.) A note in the CIM vault notebook references a call made to Petitioner's defense investigator on December 17, 1984.[43] (NOL filed 4/15/05, CIM Vault, Notebook 6 at 1408.) In fact, Mr. Forbush conducted an interview of Sydney Mason at CIM regarding the tennis shoes on December 15, 1984.(NOL filed 4/15/05, CIM Vault, Notebook 6 at 1409.) Moreover, in November of 2001, defense investigator Paul Ingels contacted Ms. Carroll by telephone and she told him her belief about the tennis shoes. (8/13/04 HRT 132.) In December of 2001, Ms. Carroll permitted investigator Ingels to spend a week with her going through her papers. This was over two-and-a-half years before her eleventh-hour declaration was presented to the Ninth Circuit. (6/2/04 HRT 125 (Carroll's testimony); 8/13/04 HRT 133 (Ingels' testimony).) She was available to the defense. In addition, at the time of trial, she was

freely available to the defense to freely discuss any issue.

According to Stride Rite executives, Pro–Keds Dude tennis shoes were sold primarily to state institutions. The purchasing records show that CIM purchased the Dude tennis shoes from Stride Rite at the relevant time period. The testimony of Mr. Newberry and Mr. Luck demonstrate that Pro–Keds Dude tennis shoes were not sold retail in California. Carroll's unreliable hearsay is not material inculpatory evidence and does not violate *Brady*. Under the totality of the evidence, the Court concludes that there was no material *Brady* violation. (Answer, Ex. 81.)

Even if the shoe had been sold retail to a few stores on the East coast, it would not change the inculpatory nature of the shoe-print evidence. Defense counsel argued, consistent with the corporate records in evidence, that the Pro–Keds were not available just to prisoners, but were available to the Navy, the Forestry Department, and all kinds of different people besides prisoners. (Answer, Ex. 71–74.) Accordingly, it was never assumed that the distribution of the shoes was limited to prison inmates; what mattered was that the shoes were linked to Petitioner.

Petitioner escaped from CIM, which clearly had the Pro–Keds Dude tennis shoe for its inmates, as established by the purchase contracts. Moreover, Mr. Taylor credibly testified that he gave Petitioner a pair of the Pro–Keds Dude shoes and that

---

**43.** The only newspaper article in the CIM vault notebooks concerning the prison shoes is an article dated December 12, 1984.(*See* CIM Vault, Notebook 8 at 1738–A.) A few days later, on December 15, 1984, defense investigator Forbush was at CIM conducting an interview of Officer Mason regarding the

shoe issue. This shows that the defense had access to CIM to investigate the shoe issue and had cooperation from CIM officials, including Midge Carroll, who was available to the defense during the time when she had read about the prison shoes.

Petitioner never returned them prior to his escape from CIM. These facts, combined with the consistency between the shoe print from the hideout house where Petitioner was sleeping with both the shoe print outside the Ryen master bedroom sliding glass door and the one on the sheet from the Ryens' bed, are what made the shoe-print evidence incriminating.

Finally, statements by the prosecution in opening and closing argument about the availability of the Pro–Keds Dude tennis shoes were not material or prejudicial. *See Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). The prosecutor based his comments on the testimony at trial. Based on testimony of Mr. Taylor and Officer Mason, Petitioner was in receipt of the Pro–Keds Dude tennis shoes at CIM and the shoeprints from these shoes were found inside the hideout house and Ryen home. In addition, there was a myriad of evidence connecting Petitioner to the murders. Therefore, even if there were a misstatement, the prosecutor's statement was not material such that the results of the proceeding would have been different. *See Brady,* 373 U.S. at 83, 83 S.Ct. 1194. Additionally, the California Supreme Court denied Petitioner's *Brady* claim on the merits. (Answer, Ex. 13.) Accordingly, the Court concludes Petitioner has failed to show a material *Brady* violation regarding the Pro–Keds Dude tennis shoes.

### 6. Petitioner's Lack of Credibility

██ Petitioner argues that his innocence is evident because he had no motive to kill the Ryens and Chris Hughes. (Pet. at 22.) Petitioner previously made this argument to the jury at trial, and the jury rejected his testimony. (106 RT 7796–97.) Petitioner's admission of facts says nothing about his credibility considering the evidence connecting Petitioner to the murders. Before Petitioner admitted his presence at the hideout house, he already knew that his fingerprint was on a jar in the kitchen, his semen was in the closet, and he had made phone calls to old girlfriends from the hideout house shortly before the massacre. Petitioner's trial testimony cannot serve to support a showing of actual innocence, both because it is not newly discovered, 28 U.S.C. § 2244(b), and because it does not rebut by clear and convincing evidence the express factual findings of the California Supreme Court which are entitled to a presumption of correctness. *See* 28 U.S.C. § 2254(e).

### 7. Josh Ryen's statements

Petitioner next contends that Josh Ryen gave a description of the assailants that exonerates him, (Pet. at 23), but this evidence was already admitted at trial. (95 RT 4932–70; 4971–73.) The jury already rejected Petitioner's claim of innocence based on the speculation of an eight-year-old child, made shortly after he was brutally attacked, that the three Hispanic males who came to his home looking for work before the family left for the barbeque were responsible for the murders in his home later that night. (95 RT 4932–70; 4971–73.) The post-conviction testing of the physical evidence at the crime confirms Petitioner's guilt. Evidence exhibit A–41, the blood from the crime scene discovered shortly after the discovery of the victims, is consistent with blood from an African American and inconsistent with a Hispanic or White individual. (93 RT 4424.) Moreover, the post-conviction DNA testing confirms that A–41 is Petitioner's blood. (*See* Supplemental DOJ Physical Evidence Exam Report dated Sept. 24, 2002.) Continued exploitation of the speculation of

victim who had been through a horrific experience is not a reliable basis for a finding of actual innocence. *See Schlup,* 513 U.S. at 324, 115 S.Ct. 851; *Thompson,* 523 U.S. at 559, 118 S.Ct. 1489.

### 8. Multiple assailants

Petitioner also revives his argument at trial that the nature and number of the weapons, wounds, and victims confirms his innocence. (Pet. at 23.) The forensic evidence only inculpates Petitioner. There is nothing inconsistent with the forensic evidence and his guilt. As a result, Petitioner's attempts to revive his multiple-assailant argument from trial, (106 RT 7800–04), do not constitute evidence of actual innocence. *See Schlup,* 513 U.S. at 324, 115 S.Ct. 851; *Thompson,* 523 U.S. at 559, 118 S.Ct. 1489.

### 9. Lee Furrow

Petitioner contends the jurors were deprived of a basis for finding reasonable doubt because the prosecution failed to provide the jury with information about the presence of blood on the coveralls, Mr. Furrow's background, and the destruction of the coveralls. (Pet. at 28.) Petitioner is confusing the burden of the prosecution at trial with his burden on habeas in establishing a claim of actual innocence. The jury was aware that the coveralls were destroyed. (102 RT 6545–55.) It is hardly surprising that defense counsel did not present the testimony of Diana Roper. Her credibility issues were readily apparent. (Answer, Ex. 53.) Moreover, the post-conviction DNA testing has confirmed Petitioner's guilt. (*See* Supplemental DOJ Physical Evidence Exam Report dated Sept. 24, 2002.)

The stories about Mr. Furrow and coveralls, T-shirts, and hatchet originate with Diana Roper. Diana Roper, now deceased, was abusing drugs and had a motive for disparaging Furrow since he left her the night of the murders, and had begun a sexual relationship with her childhood friend, Debbie Glasgow. (Answer, Ex. 37 (Furrow Decl.).) Significantly, Furrow had an alibi for the night of the murders. He was seen at a concert that night in Glen Helen Park with Debbie Glasgow. It would have been a poor strategy to claim that they traveled from the concert in Glen Helen to Chino Hills, murdered the Ryens and Chris Hughes, and returned home to Mentone. (*See* Answer, (map); 37 (Furrow Decl.); 39(Darnell Decl.); 41 (Schepling Decl.); 47 (Curry Decl.).) In any event, Roper's statements about Furrow do not constitute reliable evidence that could support an actual innocence claim. *See Schlup,* 513 U.S. at 324, 115 S.Ct. 851; *Thompson,* 523 U.S. at 559, 118 S.Ct. 1489.

### a. Ineffective Assistance of Counsel with Regard to Lee Furrow

The Court also denies Petitioner's claim of ineffective assistance of counsel concerning whether trial counsel should have tried to link the coveralls to Lee Furrow. (Pet. at 61–64.) This Court defers to the California Supreme Court's decision denying Petitioner's claim on the merits pursuant to 28 U.S.C. § 2254(d). Petitioner's claim also does not satisfy the requirements of 28 U.S.C. § 2244(b).

### I. Claim of Ineffective Assistance of Counsel With Regard to Lee Furrow is Denied on the Merits

Petitioner does not show that defense trial counsel's performance fell below the constitutional standard by failing to present evidence allegedly linking Furrow to the coveralls or other evidence at trial. In

fact, defense trial counsel presented evidence of the destruction of a pair of coveralls allegedly linked to the Ryens/Hughes murders through law enforcement witnesses, (102 RT 6545–55), thereby allowing counsel to exploit the destruction of the coveralls without encountering the credibility problems that defense counsel knew would arise with presenting testimony from Diana Roper. The testimony of Karee Kellison Curry, Roper's sister, would encounter similar credibility problems for the defense in attempting to connect the coveralls to the Ryen/Hughes murders through Furrow. (Answer, Ex. 37 at 2.) Moreover, given the overwhelming evidence of Petitioner's guilt before the jury, Petitioner has not shown any prejudice.

As both the California Supreme Court and this Court have already expressly concluded, Petitioner " 'received an extraordinarily vigorous and able defense.' " *Cooper I*, 92–CV–427, Aug. 25, 1997 Order at 8 (quoting *Cooper*, 53 Cal.3d at 824, 281 Cal. Rptr. 90, 809 P.2d 865). Defense trial counsel's extensive educational background and prior litigation experience were developed in the evidentiary hearing before this Court in *Cooper I*. *See Cooper I*, 92–CV427, Aug. 25, 1997 Order at 8.

Moreover, both this Court and the California Supreme Court found the evidence of Petitioner's guilt to be overwhelming. *Cooper I*, 92–CV–427, Aug. 25, 1997 Order at 8 (quoting *Cooper*, 53 Cal.3d at 836, 281 Cal.Rptr. 90, 809 P.2d 865). Accordingly, the California Supreme Court's decision rejecting the merits of Petitioner's claim is not contrary to federal law, nor an unreasonable determination of the facts, since defense counsel was not deficient, nor was Petitioner prejudiced by his attorney's strategic decisions. This Court therefore **DENIES** this claim pursuant to 28 U.S.C. § 2254(d).

#### ii. Petitioner Does Not Satisfy the Requirements of 28 U.S.C. § 2244(b)

█ If Petitioner has previously adjudicated a claim of ineffective assistance of counsel in this Court, his pending claim of ineffective assistance of counsel must be dismissed. 28 U.S.C. § 2244(b). New factual grounds in support of a legal claim that has already been presented are not sufficient to evade the mandatory dismissal requirement of 28 U.S.C. § 2244(b). *See Babbitt*, 177 F.3d at 746.

Petitioner already complained about his defense trial counsel's performance in a myriad of claims of ineffective assistance of trial counsel in his first habeas corpus petition, *Cooper I*, Supp'l Pet. at 63–147, all of which were denied on the merits by this Court. *Cooper I*, 92–CV–427, Aug. 25, 1997 Order at 7–33. The gravamen of the claim of ineffective assistance of trial counsel is the same, regardless of whether Petitioner presents new and different legal arguments or different factual allegations. *See Babbitt*, 177 F.3d at 746. Petitioner made allegations about trial counsel's failure to utilize a second counsel, failure to conduct an adequate investigation, and to advocate in particular ways with respect to the evidence. *See Cooper I*, Supp'l Pet. at 121–41. The thrust of Petitioner's attack on his defense counsel's failure to present evidence connecting Mr. Furrow to the coveralls is the same as his other claims of ineffective assistance of counsel raised in his first petition. Thus, this Court **DENIES** the claim pursuant to 28 U.S.C. § 2244(b)(1).

Also, Petitioner could have presented the legal and factual basis of his claim previously with due diligence. 28 U.S.C. § 2244(b). The connection between Lee Furrow and Diana Roper has been known

since the time of trial. (Answer, Ex. 53.) With due diligence this claim could have been presented in Petitioner's first federal habeas petition. Beyond the due diligence showing, Petitioner would be required to demonstrate that the facts underlying his claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable juror would have found him guilty of the Ryen/Hughes murders. *See* 28 U.S.C. § 2244(b). Petitioner does not meet this requirement. Petitioner's guilt was demonstrated by overwhelming evidence at trial, and has been reaffirmed through post-conviction DNA testing. Petitioner does not establish by clear and convincing evidence that no juror would have convicted Petitioner if presented information concerning Lee Furrow at trial.

### 10. Mental Patient Anthony Wisely's Alleged Report of the Kenneth Koon "Confession"

Petitioner contends that the multiple hearsay statements of a mental patient, Anthony Wisely, demonstrates his innocence and the unreliability of the jury's verdict. (Pet. at 28.) The statements that Petitioner attributes to Kenneth Koon consist of multiple hearsay related by mental patient Anthony Wisely. Petitioner attempts to tie the information attributed to Mr. Koon by the mental patient to Diana Roper. Koon met Roper after Furrow left her, and Koon later married her. Koon has denied any involvement in the Ryen/Hughes murders. (Answer, Exs. 37 (Furrow Decl.); 48 (Curry Decl.); 54(Koon Decl.).)

█ Considerably more than a mental patient's secondhand version of a confession by Koon is required to demonstrate actual innocence. *See Schlup*, 513 U.S. at

324, 115 S.Ct. 851; *Thompson*, 523 U.S. at 559, 118 S.Ct. 1489. The post-conviction DNA testing confirms Petitioner's guilt and refutes Petitioner's allegations regarding Koon. Item A–41 is from an African American, (93 RT 4424); Koon is white. Petitioner's DNA is found on the cigarette butts in the Ryen station wagon. (*See* Supplemental DOJ Physical Evidence Exam Report dated Sept. 24, 2002.) Petitioner's blood and Doug Ryen's blood are on the T-shirt found near the crime scene. (*See* Supplemental DOJ Physical Evidence Exam Report dated Sept. 24, 2002.) The mitochondrial DNA testing and EDTA testing have not undermined the post-conviction DNA testing results confirming Petitioner's guilt. The Court previously considered and adjudicated Petitioner's claims regarding mental patient Wisely's account, and the Court affirmed the ruling and denied a successive petition. *Cooper I*, 92–CV–427, Aug. 25, 1997 Order. This Court has further evaluated the allegations in light of all the evidence, and **DENIES** the claims on the merits.

### a. Ineffective Assistance of Counsel Re Kenneth Koon is Denied on the Merits

Similarly, the Court denies any claims of ineffective assistance of counsel claim as did the California Supreme Court regarding Mr. Koon. (Pet. at 58–61.) This Court defers to the denial of the claim on the merits by the California Supreme Court pursuant to 28 U.S.C. § 2254(d) and also under 28 U.S.C. § 2244(b). (Answer, Ex. 3.) The state court's denial of Petitioner's claim on the merits is not contrary to federal law as enunciated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and does

not rest with an unreasonable determination of the facts within the meaning of 28 U.S.C. § 2254(d).

At trial, the link between Roper, Furrow, and Koon was noted in an in-chambers conference with counsel when defense counsel was provided with the report about mental patient, Wisely and Koon. (97 RT 5324–25.) Counsel was given time to review the new information to determine how to proceed. (97 RT 5325.) The main connection between Koon and Furrow is Diana Roper. Roper met Koon about a week after Furrow left her which was a week after the murders, and she later married Koon. (Answer, Ex. 54 at 1.)

 Defense trial counsel cannot be faulted for a strategic decision not to call Roper at trial. During the time of the murders, Roper was using methamphetamine on a daily basis and in the midst of breaking up with Furrow knowing he was having sexual relations with one of her childhood friends, Debbie Glasgow. (Answer, Ex. 53; Ex. 37.)

What Koon knew about Furrow was hearsay from Roper. (Answer, Ex. 54 at 2.) Such strategic decisions at trial to avoid having Roper, her friends, or Furrow's relatives testify concerning the coveralls, tennis shoes or Roper's relationship with Koon and Furrow are not grounds for a *Strickland* claim under these circumstances. *See Strickland,* 466 U.S. at 690, 104 S.Ct. 2052.

Petitioner has failed to show that his counsel was deficient. *See Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. As both the California Supreme Court and this Court have already expressly found, Petitioner " 'received an extraordinarily vigorous and able defense.' " *Cooper I,* 92–CV–427, Aug. 25, 1997 Order at 8 (quoting *Cooper,* 53 Cal.3d at 824, 281 Cal.Rptr. 90, 809 P.2d

865). Moreover, both this Court and the California Supreme Court found the combination of evidence of Petitioner's guilt to be overwhelming. *Cooper I,* 92–CV–427, Aug. 25, 1997 Order at 8 (quoting *Cooper,* 53 Cal.3d at 836, 281 Cal.Rptr. 90, 809 P.2d 865). Defense counsel was not deficient and Petitioner was not prejudiced as the post-conviction DNA testing has confirmed Petitioner's guilt. Accordingly, the California Supreme Court's decision rejecting the merits of Petitioner's claim is not contrary to federal law, nor an unreasonable determination of the facts. Therefore, the Court **DENIES** this claim pursuant to 28 U.S.C. § 2254(d).

### b. Petitioner Does Not Satisfy the Requirement of 28 U.S.C. § 2244(b)

If Petitioner has previously adjudicated a claim of ineffective assistance of counsel in this Court, his pending claim of ineffective assistance of counsel must be dismissed. 28 U.S.C. § 2244(b). New factual grounds in support of the same legal claim which has already been presented are not sufficient to evade the mandatory dismissal requirement of § 2244(b). *See Babbitt,* 177 F.3d at 746. In prior habeas proceedings, the Ninth Circuit concluded the reference to the Koon confession in the second federal petition was not sufficient to raise a distinct claim of ineffective assistance of counsel on the Koon confession claim in the first federal petition. *Cooper,* 274 F.3d at 1274.

 As the *Babbitt* case illustrates, because the gravamen of Petitioner's ineffective assistance of counsel claim was essentially the same as his earlier claims, new factual grounds such as those presented in the instant claim still pertain to defense counsel's investigation and presentation of

Petitioner's defense and, therefore, do not constitute a different claim within the meaning of 28 U.S.C. § 2244(b)(1). In any event, the Ninth Circuit concluded that Petitioner could not meet the due diligence requirement and he was precluded from filing a successive petition because of his inability to meet the requirements of 28 U.S.C. § 2244(b)(2). *Cooper*, 274 F.3d at 1275. It is axiomatic that Petitioner is not able to meet the due diligence requirement now when he was unable to do so in 2001. Accordingly, Petitioner's claim of ineffective assistance of counsel is **DENIED** under 28 U.S.C. § 2244.

### E. Claim of Actual Innocence is Denied on the Merits

Petitioner's claim of actual innocence was heard and denied on the merits by the California Supreme Court. (Sixth State Habeas Pet. at 12–37; Answer, Ex. 13.) In rejecting the merits of Petitioner's sixth eleventh-hour state habeas petition, the California Supreme Court unanimously found the following:

> As with the previous five petitions for writ of habeas corpus that petitioner has filed in this court challenging the judgment, this petition casts no doubt on petitioner's guilt or the validity of the judgment.

(Answer, Ex. 13.)

The same express finding was reiterated with respect to the denial of Petitioner's seventh state habeas petition. (Answer, Ex. 14.) This Court defers to the California Supreme Court's decision because it is not contrary to federal law as enunciated by the United States Supreme Court, nor is it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

### F. Petitioner Does Not Meet the Requirements of 28 U.S.C. 2244(b), Schlup, or Herrera

In sum, Petitioner has had ample opportunity for review in both the state and federal courts, exploring every possible avenue of challenge to his conviction. All of these challenges have come back the same: there is overwhelming evidence that Petitioner is the person guilty of these murders. New evidence of innocence must be reliable evidence that was not presented at trial. *See Schlup*, 513 U.S. at 324, 115 S.Ct. 851; *Thompson*, 523 U.S. at 559, 118 S.Ct. 1489. Most of Petitioner's allegations relate to evidence that was already presented at trial and previously rejected. In addition, the remainder of his allegations rest on unreliable or incorrect information and sources.

After considering all of the evidence presented by Petitioner and the substantial record from the trial court, direct review, and collateral review, the Court concludes that Petitioner has not meet his burden under 28 U.S.C. 2244(b), which requires among other things, a "factual claim [ ] not discoverable through the exercise of due diligence" that establishes by "clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." Even if Petitioner has met the showing under 28 U.S.C. § 2244(b), the state court's decision is not contrary to or an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d). Neither has Petitioner met his burden under *Schlup*, which requires Petitioner to show that "in light of all the evidence, including new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." For the

same reasons, the Court also concludes that Petitioner has not met the stringent burden of *Herrera*, which requires an "extraordinarily high" showing of "a truly persuasive demonstration of 'actual innocence.'" Further, Petitioner also fails to show that there is "no state avenue open to process such a claim." *Herrera*, 506 U.S. at 417, 113 S.Ct. 853. The California Supreme Court denied Petitioner's actual innocence claim on the merits, (*see* Sixth State Habeas Pet. at 1237; Answer, Ex. 13), and the Governor of California denied his application for clemency. This Court **DENIES** Petitioner's claim as not presenting a cognizable federal habeas claim based upon an assertion of actual innocence under *Herrera*.

This Court therefore **DENIES** Petitioner's claims pursuant to 28 U.S.C. § 2244(b), and alternatively under *Schlup* and *Herrera* and on the merits pursuant to 28 U.S.C. § 2254.

## V. Prosecution's Withholding of Evidence and Presenting False Testimony Regarding the Coveralls

Petitioner alleges that his constitutional rights were violated by the suppression of material exculpatory evidence and by the presentation of false testimony regarding the destruction of the coveralls by Deputy Frederick Eckley of the San Bernardino Sheriff's Office. (Pet. at 54–58.) Petitioner claims that in December 1998, he discovered a disposition report where a "KS" had signed off on the destruction of the coveralls. From this, Petitioner alleges that Deputy Eckley did not act alone in destroying the coveralls, but did so deliberately in consultation with KS, a superior.

(Pet. at 57.) Therefore, Petitioner contends that Deputy Eckley's testimony in pre-trial proceedings and at trial regarding the destruction of the coveralls falsely conveyed that he destroyed the coveralls on his own.

The Court conducted an evidentiary hearing and heard from Deputy Eckley and Deputy Ken Schreckengost, "KS" to address this claim. After considering their testimony and evaluating their credibility as witnesses, the Court **DENIES** Petitioner's claims.

### A. Pretrial Hearing and Trial Testimony

On June 11, 1984, during the pretrial evidentiary hearing, Deputy Eckley testified he was dispatched to the home of Diane Roper in Mentone, California, which was located approximately forty miles from the Ryen home. Ms. Roper directed him to a closet where he found a pair of coveralls. Deputy Eckley testified that the coveralls were not heavily spotted but had stains below the knew that were dry and reddish in color, as opposed to the usually brownish color of dried bloodstains that he had seen in the past. (32 RT 3183–84, 3205, 3211.) Deputy Eckley also testified that the coveralls had hair, sweat, dirt, and manure on them. (32 RT 3183–84.)

Although Ms. Roper did not know who owned the coveralls, her father told Deputy Eckley that Ms. Roper felt that the coveralls had some importance to the Ryen case based on a "vision" she had experienced, as opposed to anything she had actually seen.[44] (32 RT 3204–05.) After

---

**44.** Deputy Eckley stated that Ms. Roper's knowledge regarding the connection between the coveralls and the Ryen/Hughes murders was obtained after she and some other "witches" went through "some kind of trance" which caused her to "just know" that they were worn by someone involved in the murders. (Resp't Evid. Hearing Notebook 13, Ex. LLLLL at 6–7.)

Eckley took the coveralls to the Yucaipa substation and tagged them, he called the San Bernardino homicide department and left a message. Although the homicide department never returned his call about the coveralls, Deputy Eckley testified that he spoke with defense investigator Forbush about the coveralls. (32 RT 3205–06.) In December of 1983, after failing to receive a return call from homicide, and believing the coveralls "had no value to the case," Deputy Eckley destroyed the coveralls. (32 RT 3194.) Deputy Eckley similarly testified about the coveralls at trial. (102 RT 6545–55.)

### B. Evidentiary Hearing Testimony of KS and Eckley

The Court held an evidentiary hearing on April 1, 2004 where former Deputy Sheriff Ken Schreckengost, and former Deputy Eckley testified. Deputy Schreckengost was Deputy Sheriff at the Yucaipa station during the time of the murders. (4/1/05 HRT 8.) In January 1983, he was promoted to Senior Deputy and assigned as watch commander over the deputies in the field. (4/1/05 HRT 54.) He had no recollection of initialing the disposition report, but recognized his initials on the report. (4/1/04 HRT 31.) As a watch commander, the disposition reports would normally have been in his inbox because "nine out of ten times" the person who filled out report would not be on the same shift. (4/1/05 HRT 56.) In reviewing a disposition report, he looked to see if the report was properly filled out. (4/1/05 HRT 56.) Deputy Schreckengost stated he never discussed the coveralls with Deputy Eckley and has never seen the coveralls. (4/1/05 HRT 57.)

Deputy Eckley was a former deputy of the San Bernardino Sheriff's Department and was stationed at Yucaipa from 1980 to 1989. (4/1/05 HRT 73–74.) He had no recollection that Deputy Schreckengost had anything to do with the processing or signing of the report. (4/1/05 HRT 112.) Deputy Eckley did not have a discussion with Deputy Schreckengost regarding the destruction of the coveralls. He testified that he made the decision to destroy the coveralls on his own without consulting anyone. (4/1/05 HRT 115.) The testimony of Deputy Shreckengost and Deputy Eckley do not support Petitioner's claims of perjury or withholding of evidence.

### C. The Claims of Withholding of Evidence and False Presentation of Testimony Have No Merit

Petitioner's claim concerns whether Deputy Eckley consulted someone else before he decided to destroy the coveralls. As the testimony reveals, Deputy Eckley acted on his own in destroying the coveralls. Deputy Eckley and Deputy Schreckengost did not have any discussion about the coveralls. Typically, the disposition report was in Deputy Schreckengost's inbox and he only made sure that the form was properly filled out.

Petitioner comments that Deputy Eckley's destruction of the coveralls was in violation of the policies of San Bernardino Sheriff's Department ("SBSD"). However, the defense was aware at the time of trial that Deputy Eckley did not comply with the written policies and practices in the SBSD manual when he destroyed the coveralls. (32 RT 3194–95.) Evidence of the written policies and practices in SBSO manuals at the time the coveralls were destroyed is not newly discovered evidence. The defense was in possession of the manuals at the time of trial. *See People v. Cooper*, 53 Cal.3d at 817, 281 Cal.Rptr. 90, 809 P.2d 865(trial court did

not err in not admitting into evidence "sheriff's policy manuals regarding the collection and preservation of evidence"). Even if Deputy Eckley violated SBSD policy concerning the destruction of evidence, it does not change his consistent testimony that he destroyed the coveralls without consulting anyone. The discovery of the disposition report does not cast doubt upon the testimony of Deputy Eckley, and does not undermine the findings and conclusions by both this Court and the California Supreme Court that the coveralls were not material exculpatory evidence in Petitioner's case.

■ Petitioner claims that jurors would not have convicted him had they heard of Petitioner's new theories. (Pet. at 57.) Any comment by a juror concerning his/her mental process in reaching a verdict in Petitioner's trial is unsupported, inadmissible, and irrelevant to the claim presented by Petitioner. Fed.R.Evid. 606(b);[45] *Tanner v. United States,* 483 U.S. 107, 117, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987) (in general juror's statements have traditionally been inadmissible to impeach a verdict); *United States v. Elias,* 269 F.3d 1003, 1020 (9th Cir.2001) ("[a] court may not, under Rule 606(b), consider testimony 'regarding the affected juror's mental processes in reaching the verdict.'") Petitioner's reliance on statements from jurors is improper. No statements regarding the deliberative process are admissible. *See* Fed.R.Evid. 606(b). Moreover, the disposition report hardly constitutes evidence "pointing away" from Petitioner and does not undermine the physical evidence linking Petitioner to the crime by proof beyond a reasonable doubt.

This Court accords deference to the California Supreme Court's decision denying Petitioner's claim on the merits. 28 U.S.C. § 2254(d). The state court's denial of Petitioner's claim on the merits is not contrary to clearly established federal law, and does not rest with an unreasonable determination of the facts within the meaning of 28 U.S.C. § 2254(d). Accordingly, the Court **DENIES** this claim on the merits pursuant to 28 U.S.C. § 2254(d).

**D. Petitioner Does Not Satisfy the Requirements of 28 U.S.C. § 2244(b)**

Further, the Court denies the claim pursuant to 28 U.S.C. § 2244(b). If Petitioner has previously adjudicated a claim relating to the destruction of the coveralls in this Court, his pending claim of withholding evidence and false testimony relating to the destruction of the coveralls must also be dismissed. 28 U.S.C. § 2244(b). The gravamen of the claim of withholding evidence and false testimony is the same, regardless of whether Petitioner presents new and different legal arguments or different factual allegations. *See Babbitt,* 177 F.3d at 746. Petitioner is revisiting the reasons the coveralls were destroyed, and renewing his attack on the deputy who was responsible for the coveralls' destruction. *See Cooper I,* 92–CV–427, Amend. Pet. at 310–13. The impact of the destruction of the coveralls on Petitioner's rights at trial has already been adjudicated by this Court, *Cooper I,* 92–CV–427, Aug. 25, 1997 Order at 51–52, and the current legal arguments and different factual allegations stemming from the discovery of a disposi-

---

**45.** Federal Rule of Evidence 606(b) provides that a "juror may not testify . . . to the effect of anything upon . . . juror's mind or emotions as influencing the juror to assent to or

dissent from the verdict or indictment or concerning the juror's mental processes . . . ." Fed.R.Evid. 606(b).

tion report with initials signing off on the destruction of the coveralls are not sufficient to evade the mandatory dismissal requirement of 28 U.S.C. § 2244(b)(1). *See Babbitt,* 177 F.3d at 746.

Even if Petitioner's claim were not subject to mandatory dismissal under 28 U.S.C. § 2244(b)(1), his claim is still denied because he could have presented the legal and factual basis of his pending claim previously with due diligence. *See* 28 U.S.C. § 2244(b). Petitioner already complained about the destruction of the coveralls in his first federal habeas petition. He was aware of Deputy Eckley's role in the destruction of the coveralls, and his testimony at Petitioner's trial regarding his decision and actions regarding the coveralls. *Cooper I,* 92–CV–427, Amend. Pet. at 310–13.

Petitioner's defense investigator reviewed microfiche files in December of 1998, and located a card bearing the initials of the individual who approved the destruction of the coveralls. With due diligence, the card could have been located well before then, and the instant claim could have been presented in Petitioner's first federal habeas petition, that was litigated between 1992 and 1997.

Beyond the due diligence showing, Petitioner would be required to demonstrate that the facts underlying his claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable juror would have found him guilty of the Ryen/Hughes murders. *See* 28 U.S.C. § 2244(b). Petitioner does not meet this requirement. Petitioner's guilt was demonstrated by overwhelming evidence at trial, and has been reaffirmed through postconviction DNA testing. This Court already determined, as did the California

Supreme Court and the trial court, that the coveralls were not material exculpatory evidence and that the law enforcement authorities acted in good faith. *Cooper I,* 92–CV–427, Aug. 25, 1997 Order at 52; *Cooper,* 53 Cal.3d at 811, 281 Cal.Rptr. 90, 809 P.2d 865. Under these circumstances, Petitioner does not meet the requirements of 28 U.S.C. § 2244(b)(2).

## VI. Prosecution's Withholding of Evidence and Presentation of False Testimony

Petitioner alleges his constitutional rights were violated when the prosecution withheld material exculpatory evidence, knowingly failed to correct false testimony, proffered perjured testimony, and knowingly argued false theories to the jury. (Pet. at 43–47.) As detailed below, Petitioner fails his burden and the Court **DENIES** these claims under 28 U.S.C. § 2244(b) and on the merits.

### A. Petitioner's Claims are Denied on the Merits

#### 1. Criminalist William Baird

Petitioner alleges the prosecution failed to provide material exculpatory evidence concerning criminalist Baird's misconduct concerning heroin. (Pet. at 44–45.) If Petitioner has adjudicated a claim relating to the withholding of evidence and false testimony previously, then his latest claim alleging the same transgression must be dismissed. 28 U.S.C. § 2244(b). The gravamen of the claim of withholding evidence and false testimony is the same, regardless of whether Petitioner presents new and different legal arguments or different factual allegations. *See Babbitt,* 177 F.3d at 746. Petitioner already adjudicated a claim relating to Mr. Baird's connection with heroin. *Cooper I,* Amend. Pet. at

387; *Cooper I*, 92–CV–427, Aug. 25, 1997 Order at 69–71.

Even if Petitioner's claim were not subject to mandatory dismissal based on 28 U.S.C. § 2244(b)(1), his claim must still be dismissed because he could have presented the legal and factual basis of his pending claim previously with due diligence. 28 U.S.C. § 2244(b). Petitioner could have discovered, with due diligence, the additional information about Mr. Baird's alleged use of heroin, particularly since Petitioner had already focused on Mr. Baird's dismissal from his employment for allegedly stealing heroin.

Moreover, to support his *Brady* claim, Petitioner must show that the prosecution had knowledge of material exculpatory evidence that was unknown to the defense. *See Agurs*, 427 U.S. at 103, 96 S.Ct. 2392. This Court has already determined in adjudicating Petitioner's first federal habeas petition that the prosecution did not have knowledge of Mr. Baird's alleged dismissal or misconduct while the trial was in progress. *Cooper I*, 92–CV–427, Aug. 25, 1997 Order at 70. Petitioner is not entitled to a second opportunity to litigate this factual question in this Court. 28 U.S.C. § 2244(b).

Petitioner's *Brady* claim also fails to state a prima facie case because he has not established that Mr. Baird's alleged drug abuse constitutes material exculpatory evidence in the context of the entire record. *See Agurs*, 427 U.S. at 112, 96 S.Ct. 2392. Accordingly, the Court denies the habeas claim regarding Mr. Baird.

### 2. A–Troop Allegations

#### i. CIM Correctional Officer Donnie Eddings

Petitioner alleges the prosecution withheld material exculpatory evidence provided by a former inmate at CIM that a Hispanic gang called A–Troop committed the Ryen/Hughes murders. (Pet. at 45.) In order to address this allegation, the Court held an evidentiary hearing on August 6, 2004, where former CIM Correctional Officer Donnie Eddings testified. (8/6/04 HRT 3.) Officer Eddings was a correctional counselor in the Reception Center who conducted intake interviews to determine what level of custody was appropriate for an inmate. She was unaware of the outstanding warrant in the CIM files for Petitioner's rape, aggravated assault, kidnaping, mayhem, and making a terrorist threat arising out of Petitioner's rape and threat to kill victim Lori S. in Pennsylvania. (8/6/04 HRT 4.) The warrant for the rape charges was in the CIM files with the name, David Trautman aka Kevin Cooper, clearly listed, but CIM egregiously erred by not linking its own records of Petitioner's rape to the false name of David Trautman. (*See* NOL filed 4/15/05 CIM Vault, Notebook 9 at 2385–2417.) The Court concludes that Officer Eddings had a substantial motive to deflect guilt from Petitioner due to CIM's institutional error in placing a known rapist in minimum security.

Officer Eddings testified that in 1983, inmate Luparello told her that Doug Ryens's chiropractic office in Santa Ana had been burglarized by a gang called A–Troop. (8/6/04 HRT 8–9.) Officer Eddings was told by this inmate that he thought that Mr. Ryen either pressed charges or testified against the members of the gang following the burglary. (8/6/04 HRT 8–9.) Officer Eddings prepared a written report and submitted it to her supervisor. (8/6/04 HRT 7.)

The prosecution provided defense trial counsel with a memorandum written by

Officer Eddings detailing the information from inmate Luparello, as well as handwritten notes regarding Luparello. (*See* 04–CV–656, NOL filed 7/27/04.) Moreover, the Santa Ana Police Department reports regarding the burglary of the Ryen chiropractic office and other businesses in the same commercial complex were also provided to defense trial counsel by the prosecution. (*See* 04–CV–656, NOL filed 07/27/04.) The burglary of the Ryen chiropractic office was being reported in newspaper articles discussing the Ryen/Hughes murders. A copy of a Los Angeles Times article dated June 7, 1983, which includes information on the burglary, was included in the defense trial file turned over on discovery in 1997 in connection with Petitioner's first federal habeas petition. (*See* Answer, Ex. 56 (copy LA Times article re burglary, from defense trial file).) Given the discovery provided by the prosecution, there was no *Brady* violation.[46] Additionally, defense investigator Ingels testified that in 2002 he checked out the information regarding Eddings' allegation and found no merit to the claim. (8/13/04 HRT 141–143.) Therefore, the Court concludes there was no *Brady* violation regarding the Luparello or A–Troop information.

### ii. CIM Correctional Officer Richard Krupp

Petitioner further alleges that the prosecution withheld material exculpatory evidence from an unidentified inmate at CIM who allegedly told a correctional counsel named Richard C. Krupp that he had overheard a conversation about the murders. (Pet. at 46.) In order to address this allegation, the Court held an evidentiary hearing on August 6, 24 and 26, 2004, where Officer Krupp, correctional counselor Ted Fahey, and Lieutenant Watch Commander Cornelius Shepherd testified. (8/6/04 HRT 51; 8/24/04 HRT 42–55; 8/26/04 HRT 19–30.) After hearing the testimony of the witnesses and evaluating their credibility, the Court concludes that there was no *Brady* violation.

In 1984, Officer Krupp was a correctional counsel. He conducted intake interviews at CIM Chino. (8/6/04 HRT 51–52.) An inmate relayed to him that three Mexicans in the San Bernardino County jail had claimed to have committed the Ryen/Hughes murders. (8/6/04 HRT 51–52.) Because the incident occurred so long ago, Officer Krupp could not remember the inmate's name. (8/6/04 HRT 68.)

Officer Krupp testified that he placed this information regarding the Hispanic males in the inmate's evaluation form and then passed it on to his supervisor, Officer Fahey, and the gang coordinator supervisor, Officer Shepherd. (8/6/04 HRT 53.) Officer Krupp further testified that he discussed a phone call that was placed to the San Bernardino Sheriff's Office by either Officer Fahey or Officer Shepherd with them. (8/6/04 HRT 54–57.)[47]

In contrast to Officer Krupp's recollection, Officer Shepherd credibly testified before this Court that he did not speak to

---

**46.** The Court also notes that Petitioner's attorneys were aware of the information contained in the Eddings memo back in December of 2001 when defense investigator Ingels interviewed Officer Eddings and had her sign a declaration. (*See* 8/13/04 RT (Ingels' testimony).)

**47.** The Court notes that Petitioner's attorneys were aware of the information from Officer Krupp back in August of 2001 when defense investigator Paul Ingels interviewed Officer Krupp and had him sign a declaration. (*See* 8/6/04 HRT 59–61; 8/13/04 HRT (Ingels' testimony).)

Officer Krupp regarding information of an inmate claiming to have committed the Ryen/Hughes murders and that he had not passed information along to the San Bernardino Sheriff's Office:

I was employed at California Institution for Men as a correctional lieutenant at the time of Kevin Cooper's escape. I testified at Cooper's trial regarding his escape from CIM. I have never spoken with Richard Krupp regarding information he obtained from an inmate about the Ryen murders. I did not provide any information to San Bernardino County Sheriff's Department from an inmate at CIM regarding the Ryen murders.

(04–CV–656, Resp't Ex Parte Request filed Aug. 18, 2004, Shepherd Decl.; *see also* 8/24/04 HRT 42.)

Mr. Shepherd further testified that he was a lieutenant watch commander for the east facility at CIM Chino from 1983–84 and that although he may have spoken to Mr. Krupp on occasions, it was not within his duties to discuss the substance of prisoner interviews with correctional counselors such as Mr. Krupp. (8/24/04 HRT 42, 44, 51–52, 55.) Mr. Shepherd then testified that he does not recall any meetings with Mr. Krupp or Mr. Fahey regarding the murders. (8/24/04 HRT 50, 64.) He also stated unequivocally that he did not place any phone calls to the San Bernardino Sheriff's Office because such a phone call would be against procedure. (8/24/04 HRT 59.) The normal procedure would be to contact the institutional investigators at CIM Chino, who would then contact the Sheriff's Office if warranted. (8/24/04 HRT 62–63.)

Consistent with Officer Shepherd's testimony, Officer Fahey, correctional counselor at CIM, also credibly testified before this Court that he does not recall any conversations or information received from any of the correctional counselors, including Officer Krupp, or with Officer Shepherd regarding the Ryen/Hughes murders. (8/26/04 HRT 19, 29–30.) Officer Fahey also testified, consistent with Officer Shepherd's testimony, that as a watch commander in the east facility, Officer Shepherd would have had no job related interaction with correctional counselors in the central facility such as Officer Krupp and Officer Fahey. (8/26/04 HRT 29–30.) He also verified that institutional procedure did not permit correctional counselors to call the Sheriff's Office. (8/26/04 HRT 22–23.) Mr. Fahey testified that in the sixteen years he was at CIM Chino, he did not once call the Sheriff's Office. (8/26/04 HRT 22–23.) The procedure would be to inform the institutional investigators of the information and then they would contact the Sheriff's, if necessary. (8/26/04 HRT 22–24.)

The Court concludes that Mr. Krupp's recollection is contradicted by the credible testimony of Officers Fahey and Shepherd. As Officer Fahey and Officer Shepherd testified, they do not recall receiving any information from Mr. Krupp regarding the Ryen/Hughes murders. Officer Shepherd, as a watch commander in a separate facility would not have been in a professional position to have such information passed on to him from Officer Krupp. Moreover, the alleged phone call placed to the Sheriff's office is not credible given that both Officer Fahey and Officer Shepherd testified that the phone call would never have occurred because it was against procedure for such a phone call to take place, and they did not make the phone call.

Officer Shepherd and Officer Fahey credibly testified that Officer Krupp did not speak to him regarding the hearsay

statements of the three Hispanics. Officers Shepherd, Fahey and Krupp did not speak to the San Bernardino Sheriff's Office regarding those hearsay statements. As with any prominent murder investigation, there were numerous rumors and false claims made in connection with the Ryen/Hughes murders, and a belated report of a multiple hearsay account by an unknown inmate does not constitute a *Brady* violation.

### 3. Anthony Ruiz

Petitioner also claims that a *Brady* violation occurred when the prosecution failed to disclose material exculpatory evidence from Anthony Ruiz that law enforcement was ordered to plant evidence inculpating Petitioner. On the eve of the execution, an acquaintance of Mr. Ruiz appeared at a press conference with information that Mr. Ruiz worked for the San Bernardino County Sheriff's Department and allegedly admitted that the San Bernardino's Sheriff's Department had planted evidence to frame Petitioner.

This allegation was not supported by Mr. Ruiz's testimony at the evidentiary hearing on August 6, 2004. Mr. Ruiz testified that he was never employed or associated with the San Bernardino County Sheriff's Department, that he never worked as an informant for them, that he never had access to the crime scene, and that he never had first-hand knowledge of anything regarding the Ryen/Hughes murders. (8/06/04 HRT 76.) He never received any information from any member of the San Bernardino Sheriff's Department regarding the Ryen/Hughes murders. (8/6/04 HRT 79.) All of the information Mr. Ruiz had regarding the

murders was hearsay and speculation, and he testified that he never received any information or had any contact with anyone in the San Bernardino Sheriff's Office.[48] (8/6/04 HRT 79.)

The only conversations Mr. Ruiz claimed to have had with law enforcement regarding the Ryen/Hughes murders were with Jim Parsons of the Riverside County Sheriff's Department, whom Mr. Ruiz would go with on "ride-a-longs." (8/6/04 HRT 103–04; 132) As admitted by Mr. Ruiz at the evidentiary hearing, these conversations with Mr. Parsons were based upon speculation and things heard on the media and on the street. (8/6/04 HRT 115) This is confirmed by Mr. Parsons, now a lieutenant with the Riverside Sheriff's Department:

> I had no knowledge regarding the Ryen/Hughes murders in the Chino Hills beyond what I read in the newspapers or saw on television. I had no participation in the investigation of the murders, because the crimes did not occur in Riverside County. I have no specific recollection of speaking to Ruiz about the Ryen/Hughes murders. Any conversation I would have had with Ruiz would have been based on information available in the media at that time, because I had no other source of information regarding the crimes.

(04–CV–656, NOL filed Aug. 24, 2004, Parsons Decl., Doc. No. 205.) Mr. Ruiz's speculation and hearsay do not constitute material information under *Brady*.

Petitioner's claim of evidence tampering and withholding evidence was raised in Petitioner's sixth and seventh state habeas

---

48. The Court sustained objections under Federal Rule of Evidence 403 to non-San Bernar- dino's Sheriff's office informant activity.

petitions and denied on the merits by the California Supreme Court. (Sixth State Hab. Pet. at 37–54; Answer, Ex. 13.) Exhibits concerning Ruiz were filed in support of Petitioner's seventh state petition for writ of habeas corpus, and denied on procedural grounds and on the merits. (Answer, Ex. 14.) Accordingly, this Court accords deference to the California Supreme Court decision denying Petitioner's claims on the merits. *See* 28 U.S.C. § 2254(d). The state court's denial of Petitioner's claim on the merits is not contrary to clearly established federal law, and does not rest on an unreasonable determination of the facts within the meaning of 28 U.S.C. § 2254(d).

#### 4. The "Blue" Shirt

Petitioner alleges a *Brady* violation occurred when the prosecution failed to disclose to the defense that Laurel Epler reported finding a "blue" shirt possibly with blood on it on Peyton Drive on the afternoon of June 6, 1983. Petitioner is incorrect. The dispatch log referencing the report of a "blue shirt" was disclosed to the defense before trial. (*See* IV RT 6.) If Petitioner's counsel at trial was on notice as to the possible existence of material evidence and did not raise that at trial, there is a lack of diligence in raising a *Brady* violation. *See Williams*, 529 U.S. at 435, 120 S.Ct. 1479. In this instance, defense counsel was on notice of the possible existence of the "blue" shirt. The state court trial record documents that defense trial counsel received the daily logs from the San Bernardino Sheriff's Department, which contains the reference to a "blue" shirt with possible blood being reported on June 6, 1983, on Peyton Drive, by Laurel Epler at 2:41 p.m., in August of

1983.(*See* I CT 75–75; III (8/12/83) RT 14–15, 19; IV (9/2/83) RT 6.) Petitioner's counsel represented to the Court that he received the daily logs; the record confirms his statement. (IV RT 6.)

On January 16, 1984, an amended [49] attachment to the subpoena duces tecum for materials including the "complete daily logs, dispatch records, tape recordings of dispatch or communications made from June 2, 1983, to July 31, 1983, by the Sheriffs or any deputy of the SBSO concerning the investigation and search for suspects in the deaths occurring at 2943 English Road, Chino, on June 4 or 5, 1983, DR 1211029–02, and the escape and attempt to apprehend David Trautman, aka: Kevin Cooper, from CIM on June 2, 1983." (I CT 75–76.) Defense trial counsel Negus' declaration regarding items of discovery stated: "The logs, dispatch records, and tape recordings include actions of officers which may not be memorialized in reports. The actions are relevant to the integrity of physical evidence, other suspects to the crime, and the issue of flight." (I CT 90.)

On September 2, 1983, defense trial counsel Negus stated:

I can indicate to the court that with respect to the four items in the amended subpoena [*see* I CT 7576], that with respect to Item 1 [complete daily logs, dispatch records, tape recordings of dispatch or communications made from June 2, 1983, to July 31, 1983], all items except the tapes that were requested have been received. Mr. Kochis and I have agreed that the tapes will be held by the sheriff's office until such time as we can agree on what part of those tapes will be needed to be recorded for

---

**49.** On August 8, 1983, Petitioner's defense counsel filed with the San Bernardino County

Municipal Court a declaration in support of a subpoena duces tecum. (I CT 61–62.)

trial. If we cannot agree, then we will be coming back to the court at some future time, but mainly the tapes will be preserved until we can work that out. (IV RT 6.)

The trial prosecutor confirmed the accuracy of Mr. Negus' representations to the trial court. (IV RT 6.) Moreover, it is clear that defense trial counsel appreciated the relevance of the information as it related to the integrity of physical evidence and other suspects to the crime at the time he sought the daily logs and dispatch information. (*See* I CT 75–76.)

John Kochis, one of the prosecuting attorneys in the Petitioner trial, testified at the evidentiary hearing that discovery and documents related to the dispatch records were provided to Petitioner's defense at trial by way of a subpoena duces tecum. (8/13/04 HRT 183–84.) Mr. Kochis testified that the San Bernardino Sheriff's daily logs from June 4–6, 1983 (Resp't Evidentiary Hr'g Ex. MMMM–PPPP), as well as the documents pertaining to the burglary of the Ryen chiropractic business in 1983 (Resp't Evidentiary Hr'g Ex. UUUU), were turned over to Petitioner's defense team at trial. (8/13/04 HRT 182–84.) Petitioner represented to the trial court that he had a copy of the daily log prior to trial. (*See* I CT 75–75; III (8/12/83) RT 14–15, 19; IV (9/2/83) RT 6.) Because Petitioner represented to the trial judge that he had the daily logs, the Court relies on his representation made on the record to the court at that time. As an attorney, trial counsel has a professional obligation to be truthful to the Court. Rule of Professional Conduct of the State Bar of California 5–200. Petitioner had

the daily logs referencing the report of a "blue" shirt and the collection of that evidence was disclosed to the defense before trial.[50]

Petitioner has not presented a viable *Brady* claim, or any other constitutional violation warranting habeas relief. The fact that Petitioner claims that trial counsel has no recollection of a blue shirt twenty-two years later is not surprising. Laurel Epler had no recollection of a blue shirt when she was interviewed about the shirt. (*See* 04–CV–656, NOL filed Aug. 18, 2004, Doc. No. 187 at 5, 12–13 and 20.)

Ms. Epler was contacted on August 3, 2004 about the shirt. In the recorded statement, Ms. Epler stated that she does not remember calling law enforcement regarding the shirt, she does not recall the color of the shirt, and she does not remember where the shirt was found. (04–CV–656, NOL filed August 18, 2004, Doc. No. 187 at 5, 12–13, and 20.) Ms. Epler testified before this Court that her statements at that interview were true and correct and were to the best of her best recollection. (8/26/04 HRT 124.)

At the evidentiary hearing, Ms. Epler testified that she vaguely remembers finding the "blue shirt" when she was driving home. (8/26/04 HRT 133–34.) She testified that she could not recall exactly where the shirt was found and that she could not recall driving and seeing the shirt on the side of the road, although she believes that it must have been close to Peyton and Glenridge because that is where she regularly drove her car. (8/26/04 HRT 133–34.) She also testified that her memory of the shirt was very vague and it was only

---

**50.** Petitioner strategically may not have wanted to focus on a blue shirt since Petitioner testified at trial that he had a blue prison shirt in a bag he was carrying when he left the hideout house the night of the murders. (99 RT 5852.)

after referencing the log that mentioned the "blue shirt" and speaking to Petitioner's defense investigators that she recalled anything about the shirt. (8/26/04 HRT 123–24, 149.)

Finally, Ms. Epler testified that she had been influenced by letters shown to her by Petitioner's attorneys regarding alleged suppression of evidence and law enforcement cover-ups in this case. (8/26/04 HRT 179–80.) She stated that she did not think Petitioner committed the murders after reading the materials sent to her by Petitioner's attorneys. (8/26/04 HRT 179–80.) Due to Ms. Epler's previous statements where she did not recall the T-shirt, its color, or the location or time it was found and given the passage of many years and failure of recollection, the Court questions whether Ms. Epler actually recalls a blue shirt. Notwithstanding, the daily logs referencing the call placed to the Sheriff's Office regarding the shirt were turned over to the defense counsel at trial and therefore are not a proper basis for a habeas claim.

Respondent contends that the report of a "blue shirt" found on Peyton Drive listed on the Sheriff's daily log of June 6, 1983, is actually the tan T-shirt at issue in this case (Trial Ex. 169). According to Mr. Kochis, none of the documents logging the evidence at the San Bernardino Crime Lab show a "blue shirt." (8/13/04 RT 198–201.) Rather, those documents only reflect the receipt of the T-shirt introduced at trial by the defense (Trial Ex. 169). (8/13/04 RT 198–201.) Moreover, Deputy Fields, now deceased, is the officer listed on the daily logs as picking up the "blue shirt" on Peyton Drive after Laurel Epler reported the shirt to the San Bernardino Sheriff's Office on June 6, 1983.(Resp't Evidentiary Hr'g, Ex. OOOO, at 9; 04–CV–656, Doc. No. 143.) Mr. Kochis testified that the only shirt Deputy Fields turned over to the crime lab was the T-shirt in this case (Trial Ex. 169). (8/13/04 RT 199–200.) The existence of the tan shirt is not in dispute. In fact, photographs of the tan T-shirt were taken at the time it was picked near the side of the road on Peyton Drive. (Resp't Evidentiary Hr'g, Ex. CCCCC–1 through CCCCC–5.)

Petitioner argues that the "tan shirt" was picked up by Detective Fields on June 7, 1983, the day after the "blue shirt" was picked. The daily log of June 7, 1983 has no entry regarding a "tan shirt." (See NOL filed May 5, 2005 of Daily Log of June 7, 1983 for In Camera Review.) Although Detective Fields' report, dated June 10, 1983, states he picked up the "tan shirt" on June 7, 1983, he may have meant June 6, 1983. In any event, the "tan shirt" that was picked up by Detective Fields and photographed was collected and tagged with Property Tag No. A–58046 and stored in the Sheriff's evidence locker. (Traverse, Ex. 160.) At trial, Detective Fields identified the "tan shirt" (Trial Exhibit 169) as the T-shirt he recovered on the side of the road. (101 RT 6511.) Therefore, the "blue shirt" reported on June 6, 1983 is most likely the tan T-shirt (Tr. Exhibit 169) at issue in this case as testified by Mr. Kochis. (8/13/04 HRT 198–201.)

Even if there were a blue shirt, there is no showing of a material *Brady* violation. Petitioner's blood and the victims' blood were on the tan shirt. Detective Fields, the officer who was dispatched to pick up the blue shirt, is now deceased, (04CV–656, Doc. No. 143), and Sergeant Billy Arthur, his supervisor in homicide is also deceased. (4/22/05 HRT 22.) Any further investigation would be of limited value as the two main individuals that would have any sig-

nificant knowledge regarding the blue shirt are deceased, and there has been no showing of bad faith in light of the fact that defense counsel represented to the Court that he had received the daily logs.

In evaluating the merits of Petitioner's claim, this Court accords deference to the California Supreme Court decision denying Petitioner's claim on the merits. *See* 28 U.S.C. § 2254(d). The state court's denial of Petitioner's claim on the merits is not contrary to clearly established federal law, and does not rest on an unreasonable determination of the facts within the meaning of 28 U.S.C. § 2254(d). This Court also denies this claim pursuant to 28 U.S.C. § 2244(b) because Petitioner has failed to demonstrate that the facts underlying his claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable juror would have found him guilty of the Ryen/Hughes murders. *See* 28 U.S.C. § 2244(b). Petitioner's guilt was demonstrated by overwhelming evidence at trial, and has been reaffirmed through post-conviction DNA testing.

## VII. Evidence Tampering and Withholding of Evidence

Petitioner contends his constitutional rights were violated when law enforcement tampered with key pieces of evidence, presented misleading and false testimony, and withheld material exculpatory evidence. (Pet. at 29, 31–43.) Petitioner fails to meet his burden and the Court **DENIES** these claims on the merits and pursuant to 28 U.S.C. § 2244(b).

### A. The Court Denies the Claims of Evidence Tampering and Withholding Evidence

Petitioner alleges planting of or tampering with items of evidence. Petitioner's claims of evidence tampering were rejected after a post-conviction evidentiary hearing in 2003. In a post-conviction evidentiary hearing, the Honorable William Kennedy of the San Diego Superior Court concluded that there was no merit to Petitioner's claim of evidence tampering. (92–CV–427 NOL filed Jan. 23, 2004, Ex. 6, Judge Kennedy Order dated July 2, 2003 at 10.)

Petitioner's complaints about the handling of A–41 is repetitive of his complaints that were litigated during trial, on direct appeal, in post-conviction motions and in previous habeas petitions. (Pet. at 33–34.) Petitioner's expert at trial, Dr. Edward T. Blake, had no complaint about the results presented at trial by the prosecution regarding A–41. (105 RT 7559–60.) Defense trial counsel stated in a declaration that in hindsight he would have presented another expert at trial because Dr. Blake confirmed the validity of the prosecution's evidence regarding A–41. *Cooper I,* 92–CV–427, Amended Pet., Ex. T at 560("The district attorney was able to bring out the fact that [Dr. Blake] believed that A–41 had been tested in a proper manner and the results were accurate.") Moreover, Petitioner ignores the fact that the post-conviction testing on A–41 was done with the assistance of Petitioner's own nationally recognized DNA experts, Dr. Blake and Christopher Plourd. Petitioner offers no clear and convincing evidence to rebut the presumption of correctness that attaches to the state court's express factual findings that there was no tampering with A–41 at

the post-conviction evidentiary hearing. *See* 28 U.S.C. § 2254(e).

■ Additionally, at trial, the defense knew about the testing of the UU series. Brian Wraxall testified that he reviewed the evidence series from UU–1 through UU–16 and explained his results. (94 RT 4726.) The defense knew about Mr. Wraxall's testing and results of the UU series since the trial and after trial. (94 RT 4726.) Since Petitioner was on notice as to the existence of material evidence, there is a lack of diligence in raising a *Brady* violation. *See Williams*, 529 U.S. at 435–38, 120 S.Ct. 1479.

As to the T-shirt, found on Peyton Road, it was never used as evidence against Petitioner and cannot be considered as affecting the result in Petitioner's trial. The T-shirt was introduced by the defense and never used to inculpate Petitioner. The San Diego County Superior Court took evidence on Petitioner's tampering claim with respect to the T-shirt, and expressly found that the testimony proffered by the prosecution that no tampering had occurred was credible and unrebutted by a complete absence of evidence by Petitioner. (92–CV–427 NOL filed Jan. 23, 2004, Ex. 6, Judge Kennedy Order dated July 2, 2003 at 10.) The state court's findings are entitled to a presumption of correctness. *See* 28 U.S.C. § 2254(e). The California Supreme Court's denial of Petitioner's writ of mandate relating to the denial of his post-conviction DNA motion does not rest on an unreasonable determination of the facts, and is consistent with federal law within the meaning of 28 U.S.C. § 2254(d). In this petition, Petitioner has not presented any clear and convincing evidence that would overcome the presumption that attached to the state court's factual findings.

Petitioner's allegations about the cigarette butts, the rope, and the hatchet sheath are also without merit. Petitioner was represented by an experienced and capable attorney. *Cooper I*, 92–CV–427, Aug. 25, 1997 Order at 8. The cigarette butts, the rope, and the hatchet sheath were all used as evidence against Petitioner, and defense counsel was focused on that evidence. (*See, e.g.,* 106 RT 7788, 7790, 7794 (defense closing argument).) The state court rejected Petitioner's claims of evidence tampering after an evidentiary hearing in 2003. Finally, EDTA preservative testing of the T-shirt has not undermined the post-conviction DNA testing results confirming Petitioner's guilt.

In addition Petitioner's claims are undermined because he had a very able and skilled defense attorney representing him. Indeed, this Court and the California Supreme Court both made express findings that Petitioner received "an extraordinarily vigorous and able defense." *Cooper*, 53 Cal.3d at 824, 281 Cal.Rptr. 90, 809 P.2d 865; *Cooper I*, 92–CV–427, Aug. 25, 1997 Order at 8. Defense trial counsel David Negus' extensive educational and prior litigation experience were developed at the evidentiary hearing conducted by this Court regarding Petitioner's first federal habeas petition, *Cooper I*, 92–CV–427, Aug. 25, 1997 Order at 8, and he had the benefit of able post-conviction counsel. This weighs against Petitioner's vague suggestions that the evidence introduced against him at trial suffered from any deficiencies beyond those thoroughly litigated and developed in the trial court and in post-conviction evidentiary proceedings. Accordingly, the Court concludes there is no merit to Petitioner's tampering allegation and the state court's rejection of Petitioner's vague and unsubstantiated accusations over two decades after the crimes that evidence was planted is not contrary

to federal law, nor based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

### B. Petitioner Does Not Satisfy the Requirements of 28 U.S.C. § 2244(b)

If Petitioner has previously adjudicated a claim relating to the withholding of evidence, planting of evidence, failure to collect evidence, and false testimony, then his pending claims must be dismissed. 28 U.S.C. § 2244(b). The gravamen of claims of withholding evidence, failure to preserve evidence, and false testimony is the same, regardless of whether Petitioner presents new and different legal arguments or different factual allegations. *See Babbitt,* 177 F.3d at 746.

Even if Petitioner's claim were not subject to mandatory dismissal based upon § 2244(b)(1), his claim is still denied because he could have presented the legal and factual basis of his pending claim previously with due diligence. 28 U.S.C. § 2244(b). As to the cigarette butts, the defense knew about the testing of the cigarette butts by Mr. Wraxall prior to trial and at the time of trial. Mr. Wraxall testified at trial about his testing of V–12 and V–17. (94 RT 4702–43.) He testified he and Dr. Blake, Petitioner's expert, shared the same facility. (94 RT 4730.) Mr. Wraxall stated he conducted testing of the cigarette butts in consultation with Dr. Blake and Dr. Blake had full access to Wraxall's notes and results. (94 RT 4732.) As a result, Petitioner does not satisfy the requirements of 28 U.S.C. § 2244(b).

Petitioner is simply making unsubstantiated allegations of tampering as to evidence that was used against him at trial, or that subsequently confirmed his guilt from post-conviction DNA testing. The defense presented a comprehensive pre-trial motion in an effort to exclude evidence based on allegations the crime scene had not been properly managed, and that evidence was not collected or mishandled. Petitioner was represented by an experienced and capable attorney at trial. *Cooper I,* 92–CV–427, Aug. 25, 1997 Order at 8. Petitioner's allegations have already been addressed at trial, on appeal, and in his first federal habeas petition. Petitioner could have discovered any of the alleged deficiencies with respect to the chain of custody of evidence, mishandling of evidence, or tampering with evidence previously with due diligence. The same is true as to the purported false testimony and withholding of evidence. Petitioner had excellent post-conviction counsel, and Petitioner could have raised the same allegations he chose to present in the eleventh hour of this case previously with due diligence.

Beyond the due diligence showing, Petitioner would be required to demonstrate that the facts underlying his claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable juror would have found him guilty of the Ryen/Hughes murders. 28 U.S.C. § 2244(b). Petitioner does not meet this requirement. Petitioner's guilt was demonstrated by overwhelming evidence at trial, and has been reaffirmed through post-conviction DNA testing. Therefore, the Court **DENIES** these claims.

### VIII. Josh Ryen's Videotape/Audiotape Testimony

#### A. Claim Re Josh Ryen's Videotape/Audiotape Testimony is DENIED on the Merits

Petitioner alleges that his federal constitutional rights were violated because of

the admission of videotape and audiotape evidence. (Pet. at 47–52.) The Court disagrees. The jury heard two taped statements of Joshua Ryen pursuant to a stipulation. The first was a videotape of a December 9, 1984 interview in which Josh, then age ten, was questioned under oath by the prosecutor and defense counsel. The second was an audiotape of a December 1, 1983 interview with Dr. Lorna Forbes, his treating psychiatrist and a specialist in treating children who survived the murder of a family member. Josh did not identify anyone as the assailant. (95 RT 4932–70; 4971–73; Trial Exs. 641, 642.)

The defense received a benefit from the stipulation, as Josh Ryen did not identify his assailant and the jury heard of his earlier statement concerning three Hispanic workers coming to the ranch. The defense also avoided the drama and sympathy that would have undoubted occurred had the defense called victim Josh Ryen to the stand in the trial and heard his firsthand recollection about a man with bushy hair. (4/22/05 HRT 133.) Petitioner's claim was also denied by the state court on independent and adequate state grounds. This Court defers to the denial of Petitioner's claim on the merits by the California Supreme Court pursuant to 28 U.S.C. § 2254(d). Accordingly, Petitioner's claim is **DENIED** on the merits.

### B. Petitioner Does Not Satisfy the Requirements of 28 U.S.C. § 2244(b)

Petitioner does not satisfy the requirements of 28 U.S.C. § 2244(b)(2). Petitioner must demonstrate that he could not have presented his claim previously with due diligence. 28 U.S.C. § 2244(2)(b)(I). The facts and circumstances surrounding Joshua's statements and the manner in which his testimony was presented to the jury have been matters of record since trial. *Cooper,* 53 Cal.3d at 800–801, 281 Cal.Rptr. 90, 809 P.2d 865.

Assuming arguendo that Petitioner could demonstrate that the factual and legal basis of his claim could not have been discovered previously with due diligence, he would still be required to demonstrate that the facts underlying his claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable juror would have found him guilty of the Ryen/Hughes murders. *See* 28 U.S.C. § 2244(b). Petitioner does not meet this standard. The guilt of Petitioner was demonstrated by overwhelming evidence at trial, and has been reaffirmed through post-conviction DNA testing. Petitioner has not established by clear and convincing evidence that no juror would have convicted Petitioner if Josh Ryen was subjected to testifying in person before the jury. Accordingly, this Court **DENIES** this claim pursuant to 28 U.S.C. § 2244(b).

### IX. Denial of Access to the Judicial Process

 Petitioner claims that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when the San Diego County Superior Court directed him to file his petition for writ of habeas corpus and related motions directly in the California Supreme Court. (Pet. at 53–54.) Petitioner's claim is properly **DENIED** as failing to present a cognizable federal question for this Court's consideration. Even if the claims were a cognizable federal question, he does not satisfy the requirements of 28 U.S.C. § 2244(b). Even assuming arguendo that Petitioner

met the requirements of 28 U.S.C. § 2244(b), this Court also **DENIES** Petitioner's claim on the merits with deference to the California Supreme Court's denial of Petitioner's claim because that decision is not contrary to clearly established federal law nor based on an unreasonable determination of the facts within the meaning of 28 U.S.C. § 2254(d).

### A. Petitioner Fails to Present a Cognizable Federal Question

Petitioner's complaint involves the application of and interpretation of state law and does not implicate the federal Constitution. In *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), the United States Supreme Court reiterated the well-established rule that federal habeas corpus relief does not lie for errors of state law, and that it is not the policy of the federal courts to re-examine state court determinations of state law questions. In conducting a federal habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States. *Id.* at 68, 112 S.Ct. 475 (citations omitted). Petitioner's claim fails to present a federal question cognizable on federal habeas review and is properly **DENIED**. *See id.* 67–68, 112 S.Ct. 475.

### B. Claim of Denial of Access to the Judicial Process is DENIED on the Merits

This Court also defers to the state court's denial of the claim on the merits. (Sixth State Habeas Pet., (Claim VII) at 88–91; Answer, Ex. 13.) The California Supreme Court's denial of Petitioner's claim is not contrary to clearly established federal law, nor does it rest on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). This Court therefore **DENIES** this claim pursuant to 28 U.S.C. § 2254(d).

### C. Petitioner Does Not Satisfy the Requirements of 28 U.S.C. § 2244(b)

In order to be heard in a successive petition, Petitioner must demonstrate that the claim could not have been previously presented with the exercise of due diligence, and that the facts underlying his claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable juror would have found him guilty of the Ryen/ Hughes murders. *See* 28 U.S.C. § 2244(b)(2). Petitioner does not satisfy the second prong of 28 U.S.C. § 2244(b)(2), because his complaint about being directed to file in the California Supreme Court is of no import to a juror's determination of his guilt.

### X. Petitioner's Claims are Procedurally Barred

■ Even if Petitioner were to satisfy the requirements of 28 U.S.C. § 2244(b), the Court denies his claims from this successive petition as procedurally barred. The California Supreme Court denied Petitioner's claims on February 5, 2004, as untimely and successive citing to *In re Clark*, 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 855 P.2d 729 (1993) and *In re Robbins*, 18 Cal.4th 770, 77 Cal.Rptr.2d 153, 959 P.2d 311 (1998). (Sixth State Habeas Pet. at 37–54 (claim IV); Answer, Ex. 13.) Respondent argues that Petitioner's claims are procedurally barred. In response, Petitioner fails to raise "specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent appli-

cation of the rule." *Bennett,* 322 F.3d at 584, 586. Accordingly, this Court also **DENIES** these claims in the successive petition as procedurally barred.

## XI. Lingering Doubt

■ The Court recognizes that any case involving the death penalty is a serious matter. The capital penalty for this case will continue to be highly debated in society. However, a trial court is bound by the law and cannot be influenced by the positions of either side of the death-penalty issue. As an alternative to the death penalty, Petitioner argues there is sufficient evidence to reduce his sentence to life without parole under the doctrine of lingering doubt. Respondent argues that Petitioner is foreclosed from raising a claim relating to the penalty phase of his trial, as successive habeas petitions are limited to guilt phase issues, and the penalty-phase claim was previously decided by the court against Petitioner, and affirmed by the Ninth Circuit. *See Greenawalt v. Stewart,* 105 F.3d 1268(9th Cir.1997) (ineffective assistance of counsel at sentencing). The Court continues to believe, in light of the totality of the record, that Petitioner received an extraordinarily able defense at trial, and his claims of ineffective assistance of counsel and *Brady* violations are without merit. In addition, Petitioner has not shown any legal authority to reduce his penalty to life without parole in this successive habeas petition. At this time, the Court concludes that it is not appropriate for this Court to alter the valid judgment of the state court that has determined on multiple occasions that Petitioner deserves the death penalty. As an aggravating factor, these brutal murders have forever adversely impacted the lives of the victims. (4/22/05 HRT 124 (Mr. Hughes), 125 (Mrs. Hughes), 128 (Josh Ryen).) Accordingly, the Court **DENIES** Petitioner's claim of lingering doubt.

The Ryen Family and Chris Hughes

## CONCLUSION

In this case, Petitioner has had multiple habeas corpus petitions in state and federal court. In addition to the direct review affirming Petitioner's conviction by the California Supreme Court, he has state petitions in Court, eight petitions for writ of certiorari in the United States Supreme Court, two habeas petitions in the United States District Court, two habeas petitions

in the United States Supreme Court, a habeas petition in the San Diego County Superior Court and two applications for authorization to file a successive petition in the Ninth Circuit Court of Appeal. Post-conviction DNA testing confirms that Petitioner committed the murders of the Ryen/Hughes victims. This Court has conducted mitochondrial DNA testing and EDTA testing, has heard testimony from forty-two witnesses, independently reviewed the evidence, including the trial and evidentiary hearing transcripts and all of the parties' submissions and arguments. Based on this careful review, the Court agrees with the post-conviction DNA results and all of the courts that came before it in this case: Petitioner is the one responsible for these brutal murders. Accordingly, the Court **DENIES** the successive petition for writ of habeas corpus.

**IT IS SO ORDERED.**

McKEOWN, Circuit Judge, concurring:

## I.

I concur in the opinion but am troubled that we cannot, in Kevin Cooper's words, resolve the question of his guilt "once and for all." I do not fault the careful and extensive review by the district court or the multiple levels of appeal carried out under statutory and Supreme Court standards. Rather, the state bears considerable responsibility in making such resolution unavailable. I separately concur to underscore the critical link between confidence in our justice system and integrity of the evidence.

Significant evidence bearing on Cooper's culpability has been lost, destroyed or left unpursued, including, for example, blood-covered coveralls belonging to a potential suspect who was a convicted murderer, and a bloody t-shirt, discovered alongside the road near the crime scene. The managing criminologist in charge of the evidence used to establish Cooper's guilt at trial was, as it turns out, a heroin addict, and was fired for stealing drugs seized by the police. Countless other alleged problems with the handling and disclosure of evidence and the integrity of the forensic testing and investigation undermine confidence in the evidence. As the Supreme Court observed in *Kyles v. Whitley*, "[w]hen, for example, the probative force of evidence depends on the circumstances in which it was obtained and those circumstances raise a possibility of fraud, indications of conscientious police work will enhance probative force and slovenly work will diminish it." 514 U.S. 419, 446 n. 15, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

The legitimacy of our criminal justice system depends on the "special role played by the American prosecutor in the search for truth in criminal trials." *Banks v. Dretke*, 540 U.S. 668, 696, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). The same principle extends to the police and their investigatory work in supporting the prosecution. Of course we don't demand or expect perfection. But we expect full disclosure, competency in the investigation, and confidence in the evidence. To be sure, sometimes the prosecution is hampered by sloppy police work. And sometimes inept investigation and disclosure by the police colors the prosecution. But, the obligation of the prosecutor to disclose evidence favorable to the defense serves to "justify trust in the prosecutor as 'the representative ... of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" *Kyles*, 514 U.S. at

439, 115 S.Ct. 1555(quoting *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)).

Despite the presence of serious questions as to the integrity of the investigation and evidence supporting the conviction, we are constrained by the requirements of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2244(b)(2)(b). The only exception potentially applicable in Cooper's case requires Cooper to present facts that "could not have been discovered previously through the exercise of due diligence," and that, if proven, and "viewed in light of the evidence as a whole, would be sufficient to establish by *clear and convincing evidence* that, but for constitutional error, *no reasonable factfinder* would have found [Cooper] guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(emphases added).

In light of this demanding statutory barrier, I agree that Cooper has failed to qualify for relief. Nonetheless, I write separately to draw attention to the illustrative troubling circumstances involving the alleged state mishandling of evidence. The forensic evidence in this case is critical and yet was compromised.[1] These facts are all the more troubling because Cooper's life is at stake.

## II.

Following are illustrative examples of evidentiary gaps, mishandling of evidence and suspicious circumstances.

### DESTRUCTION OF BLOODY COVERALLS

During the pre-trial investigation, a woman named Diana Roper phoned police to report a pair of bloody coveralls left at her house by her then-boyfriend, Lee Furrow. Roper told police that Furrow may have been involved in the Ryen–Hughes murders. Furrow's hatchet was missing from his tool belt after the murders, and Roper also reported erratic behavior and remarks that aroused her suspicion.

According to Roper and her sister, on the day after the murders, Furrow showed up in a car that matched the description of the Ryens' station wagon. Roper also explained that Furrow bragged about his three rules "to follow anytime you do a crime:" "wear gloves, never wear your own shoes and never leave a witness alive."

In the face of this potential link between Furrow and the murders, and despite being a convicted murderer, Furrow was never pursued as a suspect. *See, e.g., Allen v. Woodford,* 395 F.3d 979, 986 (9th Cir.2005) ("When Furrow and Kitts were finally left alone, Furrow began to strangle Kitts, only to be interrupted by a phone call.... Furrow then strangled Kitts to death ... tie[d] stones to Kitt's wrapped-up body and ... [threw] it into a canal.").

The coveralls were turned over to a detective, but case investigators did not follow up. The homicide division did not return phone calls. Then, before completion of the preliminary hearing, the detective threw the coveralls away in a dumpster. Although the destruction of the coveralls was known at trial and was pursued during Cooper's first federal habeas petition, the destruction of evidence was claimed to be the misguided act of a single officer. Only later, long after the trial, did the defense discover previ-

---

1. Other evidence, such as the eye witness testimony, was wide-ranging and contradictory. For example, following the murders, Josh initially signaled that three men were his attackers. He also signaled that they were not black or dark-skinned. Later, he saw Cooper on television and said that Cooper was not the attacker and that he had never seen Cooper, an observation he also shared with his grandmother. A year and a half later, Josh testified that Cooper had done the killing.

ously undisclosed documentary evidence to the contrary—a police department memorandum confirming destruction of the coveralls, signed by a higher ranking supervisory officer. Destruction of bloody coveralls from a potential suspect is not an inconsequential forensic gaffe.

### THE MISSING SHIRT

Although two suspicious and potentially bloodied t-shirts were apparently turned over to the police and logged in as evidence during the murder investigation, only one of these—a yellow t-shirt—was disclosed to the defense. However, the police logged in a second, possibly blood-covered shirt and recorded it as a *blue* shirt. The blue shirt was not produced to the defense and reference to the shirt was only found when, post-conviction, defense counsel was combing through later-discovered police logs.

In yet another investigative contradiction, the state now claims that the blue t-shirt was actually the yellow t-shirt that was properly disclosed. However, the woman who found the shirt on the side of the road not far from the crime scene and who reported the blue t-shirt remembers it as blue. The written log clearly reflects a blue t-shirt, and separately notes a yellow t-shirt.

The district court concluded that the log reflecting the blue t-shirt was produced to the defense earlier, and hence the blue t-shirt did not constitute new evidence. Cooper claims the page in question is not stamped in the same format as the other police log pages produced in pre-trial discovery. No explanation is provided for this discrepancy. Even had the page been produced, the t-shirt itself was undeniably never produced. Has the t-shirt gone the way of the destroyed coveralls? Is the blue t-shirt really the yellow t-shirt? How could a shirt described as blue become yellow? Once again, bungled records and bungled investigative work obscure the truth.

### BLOOD DROP A–41

Blood drop A–41 is the most controversial and crucial aspect of the state's case, yet it was handled carelessly from the time it was first acquired. To begin, no one actually remembers finding A–41; everyone claims that someone else pointed it out.

When originally tested, Cooper's blood type was identified as Type B, and subsequently A–41 was identified as Type B. Soon after, it came to light that Cooper's blood type was actually RB, and then A–41 was determined to be RB as well. One criminologist changed his testimony regarding the depletion of the sample. The criminologist originally thought he ran low on the blood stored inside a small pill box, but later more "appeared" to him that he claimed not to have seen initially. In 1991, the Supreme Court of California determined that after the final pre-trial tests on A–41, the sample was "completely consumed." *People v. Cooper*, 53 Cal.3d 771, 281 Cal.Rptr. 90, 809 P.2d 865, 878 (1991).

Criminologist Daniel Gregonis, who tested Cooper's blood, saliva and semen, is alleged to have repeatedly mishandled the biological evidence both pre– and post-trial. Evidence points to the fact that Gregonis broke the seal on A–41 in 1999, potentially contaminating it, and conducted testing of unknown source evidence specimens by placing them alongside the samples drawn from Cooper. In state court, Gregonis testified that he did not open the glassine envelope containing A–41 during the time it was in his unsupervised custody. However, photographic evidence reveals that A–41 was opened and resealed with the initials DJG (Daniel John Gregonis) and the date "8/13/99," which was during the period that the sample was checked out to Gregonis. After trial, Gre-

gonis also allegedly checked out and mislaid a sample of Cooper's saliva. On several other occasions, Gregonis altered his laboratory notes and changed his testimony about laboratory testing. The chain of custody of the blood sample is also in question due to mishandling by Gregonis.

To make matters worse, the manager of the San Bernadino Sheriff's Crime Laboratory was a heroin addict during the time period in question and was later dismissed from his employment for allegedly stealing heroin from the police evidence cache. As in *House v. Bell*, "the evidentiary disarray" and the "limited rebuttal of it in the present record, would prevent reasonable jurors from placing significant reliance on the blood evidence." 547 U.S. 518, 126 S.Ct. 2064, 2083, 165 L.Ed.2d 1 (2006). Resting Cooper's conviction on the DNA evidence, which was not before the jury, is particularly problematic because of the extensive evidence documenting the mishandling of the evidence.

THE WIDE AVAILABILITY OF KEDS SHOES

The Keds tennis shoes are perhaps the most damning evidence against Cooper. As the prosecution stated in its opening statement, the shoes "were supplied strictly for prison use within the state of California and unavailable through retail stores in California." However, we now know that the Keds shoes believed at trial to be issued only to prison inmates were actually provided by various government entities, including the Forest Service, Navy, and state hospitals, and were available through retail catalogs.

In district court, Cooper produced a catalog, not before the jury in 1985, that demonstrated that the shoes were available for retail sale. According to Cooper, the widespread availability of the shoes *was known to the prosecution at the time of trial,* as it had been reported by the warden of the minimum security prison from which Cooper escaped. But the

prosecution failed to disclose this evidence. Before trial, the warden reported to a lead investigator that the notion that the shoes were prison-issue only was inaccurate and that the shoes were commercially available to the public through Sears Roebuck and other retail outlets. Cooper's trial attorney confirmed that at the time of trial he was "not aware the Pro Keds Dude tennis shoes were listed for sale in a retail catalogue" and that had he known this information he "would have featured that fact prominently in the defense at trial."

The habeas process does not account for lingering doubt or new evidence that cannot leap the clear and convincing hurdle of AEDPA. Instead, we are left with a situation in which confidence in the blood sample is murky at best, and lost, destroyed or tampered evidence cannot be factored into the final analysis of doubt. The result is wholly discomforting, but one that the law demands.